UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

               Plaintiff,               Criminal No. 25-20560

v.                                  Hon. Terrence G. Berg

D-1 David Taylor and
D-2 Michelle Brannon,

               Defendants.

_____

## <u>UNITED STATES' REPONSE BRIEF TO DEFENDANTS' MOTION TO MODIFY STIPULATED PROTECTIVE ORDER</u>

The United States respectfully submits this response opposing the Motion to Modify Protective Order filed by David Taylor and Michelle Brannon. (ECF No. 90). To protect the statutory rights of the victims and the integrity of the proceedings, the Court should deny the motion.

### PROCEDURAL BACKGROUND

On July 23, 2025, a federal grand jury in the Eastern District of Michigan indicted David Taylor and Michelle Brannon on one count of Conspiracy to Commit Forced Labor in violation of 18 U.S.C. § 1594(b), six counts of Forced Labor in violation of 18 U.S.C. § 1589, and Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h). (ECF No. 1). In the same Indictment, Taylor was charged with two additional counts of Forced Labor. On February 11, 2026, a federal grand jury returned a First Superseding Indictment that charged a third defendant, Kathleen Klein, with

1

Conspiracy to Commit Forced Labor in violation of 18 U.S.C. § 1594(b) (Count One). (ECF. No. 91). Following detention proceedings, the Court ordered Taylor detained pending trial and released Brannon and Klein on bond with conditions. Brannon lives with her son, a former long-time member of KOGGC. Klein lives with several female family members who are long-time members of KOGGC.

Following Taylor and Brannon's arrests, government counsel informed counsel for Taylor and Brannon that a protective order was necessary to protect the victims and witnesses in this case. Defense counsel agreed to the narrowly tailored terms of the Protective Order and, on September 16, 2025, the Court signed the Stipulated Protective Order. (ECF No. 22).

Relying on the Stipulated Protective Order that was drafted and agreed upon to protect the victims and witnesses and maintain the integrity of the case, the government produced voluminous and sensitive discovery, including a key revealing the identities of the named victims, financial documents, sexually explicit materials, and other sensitive information. In total, under the Protective Order, the government has produced, *inter alia*, approximately 82,000 financial records, 14,000 pages of FBI reports and other documents, 41,000 pages of Facebook records, 46 GB of data from Ring Central and Servant Keeper, 776 Body Worn Camera videos, 12,000 photos, extractions of electronic devices, and Taylor's iCloud.

2

Months after production began, on December 2, 2025, counsel for Taylor asked the government to provide "dates of birth, social security numbers and addresses of the named victims, V1-V8 and any other proposed Gov't witnesses." Counsel for Taylor also requested that the parties modify the protective order to allow dissemination of information and materials to people outside the defense team, including to current KOGGC members. The government and defense counsel subsequently engaged in extensive negotiations regarding the defense requests.

On February 11, 2026, Taylor and Brannon filed a Motion to Modify Protective Order. (ECF No. 90). Counsel for Klein engaged in negotiations with the government but has not yet agreed to a protective order or filed a separate motion. The parties continued to negotiate the terms of a new protective order while the motion was pending. However, on March 11, 2026, the government was informed that counsel for Taylor would not agree to the extensively negotiated new stipulation.

In their motion, Taylor and Brannon request that the Court modify the Stipulated Protective Order to:

1. Allow them and their defense team to disclose the names of the victims and witnesses outside the defense team and, particularly, to disclose that information to current KOGGC members;

2. Allow defendants to review and keep discovery materials outside the presence of counsel;

3. Retain a discovery coordinator; and

4. Dictate the ways in which the government manages and discloses its own evidence.

Regarding each of the above requests:

1. The government offered a compromise allowing the defense to disclose names of victims and witnesses starting 90 days before trial, as long as they did not identify any individuals as victims and/or witnesses for the government with certain other restrictions;

2. The government is unable to compromise on the provision that precludes the defendants from retaining discovery materials outside the presence of counsel. The discovery produced to date relied on the current Protective Order, so it includes not only unredacted victim and witness names but also PII and sexually explicit materials. Thus, the government objects to allowing the defendants to keep discovery in their possession;

3. The government has no objection to engagement of a discovery coordinator. The government simply objects to the single coordinator the defense offered based on cases previously handled by the suggested coordinator. The government suggested alternative coordinators with whom the Department of Justice has, to date, successfully worked;

4. The government objects to the defendants' attempts to bind the government as to precisely how the government may handle its own evidence, investigation, and prosecution.

Despite engaging in substantial efforts to negotiate the Stipulated Protective Order, the parties have been unable to reach an agreement, and the government must oppose the defendants' motion. This response first discusses why the defendants have failed to meet the standard for modifying the Stipulated Protective Order and then details why each of the proposed modifications is unwarranted.

**ARGUMENT**

**I.      The Defendants Have Not Met the Standard to Amend the Protective Order**

The Sixth Circuit has held that "[a] challenge to a protective order requires a defendant to demonstrate 'substantial prejudice' to overcome the order." *See United States v. Montgomery*, 592 F. App'x 411, 417 (6th Cir. 2014) (quoting *United States v. Davis*, 809 F.2d 1194, 1210) (6th Cir. 1987)). Although the Sixth Circuit has not set forth an analytical framework for determining "substantial prejudice," other courts have examined factors such as whether good cause for the protective order continues to exist, the parties' reliance on the order, and whether the subject of defendant's complaint was foreseeable at the time of entry of the protective order. *See United States v. Gonte*, No. 20-20380, 2024 WL 3173605 (E.D. Mich. June 25, 2024) (finding defendant failed to establish "substantial prejudice" to modify the stipulated protective order where the subject of defendant's complaint was foreseeable at the time of entry); *United States v. Morales*, 807 F.3d 717, 723 (5th Cir. 2015) (providing a framework to analyze a motion to modify a protective order: "(1) the nature of the protective order[;] (2) the foreseeability, at the time of issuance of the order, of the modification requested[;] (3) the parties' reliance on the order[;] and most significantly (4) whether good cause exists for the modification") (quotation omitted); *United States v. Woods*, No. 5:17-cr-50010, 2017 WL 11380132 (W.D. Ar. Nov. 6, 2017) (rejecting defendants' motion to amend a stipulated protective order, finding "that the good cause originally articulated by the

Government and unobjected to by the Defendants—the need to protect third parties and ongoing investigations—still exists, and that no intervening circumstances have obviated the need for the protective order" and noting in parentheticals "[t]he burden is on the party seeking to modify . . . to demonstrate good cause for why the modification is necessary. This is particularly true when a party seeks . . . modification of a stipulated protective order as opposed to a court-ordered protective order. The party seeking modification must make a showing of intervening circumstances to indicate why the protective order should be lifted or modified.") (quotation omitted). The defendants here fail to meet this standard.

### A. Good Cause for the Stipulated Protective Order Continues to Exist

Federal Rule of Criminal Procedure 16 empowers a district court to issue a protective order, providing that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1). Upon request and proper showing by either party, the Court's broad discretion includes allowing non-disclosure or placing limits on "unwanted disclosure" of materials in the discovery process. *See Alderman v. United States*, 394 U.S. 165, 185 (1969) ("[T]he trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect"). When considering whether to restrict discovery, "among the considerations to be taken into account by the court will be the safety of

witnesses and others," as well as the "particular danger of perjury or witness intimidation." *United States v. Cordova*, 806 F.3d 1085, 1090 (D.C. Cir. 2015) (quoting Fed. R. Crim. P. 16(d) Advisory Committee's Note to 1966 Amendment).

In this case, which involves human trafficking victims, the Crime Victims' Rights Act of 2004 ("CVRA") helps to delineate the contours of what constitutes "good cause" under Rule 16(d)(1). The CVRA provides that all victims have the "right to be treated with fairness and with respect for the victim's dignity and privacy," 18 U.S.C. § 3771(a)(8), and "[t]he right to be reasonably protected from the accused." 18 U.S.C. § 3771(a)(1). The CVRA directs both courts and prosecutors to protect these rights. *See* 18 U.S.C. § 3771(b)(1) ("[t]he court shall ensure that the crime victim is afforded the rights described in subsection (a)"); 18 U.S.C. § 3771(c)(1) ("Officers and employees of the Department of Justice ... shall make their best efforts to see that crime victims are notified of, and accorded, the rights described in subsection (a).").

Courts in similar human trafficking cases have upheld victims' rights under the CVRA by implementing procedures to protect the privacy and safety of victims. *See, e.g., United States v. Majeed*, No. 2:21-cr-20060, ECF No. 64, 66 (D. Kan.) (granting consent motion for protective order with similar restrictions in forced labor case involving defendants and victims who were part of a large, faith-based organization); *United States v. Raniere*, No. 1:18-cr-204, ECF No. 39 (E.D.N.Y.) (stipulation and protective order granting similar restrictions in case involving forced labor and other

charges where defendants and victims were part of a large, belief-based organization); *United States v. Gibbs*, No. 15 & 16, 1:23-cr-35, ECF No. 15 (D. Del.) (stipulated protective order with similar restrictions in case involving forced labor and sex trafficking charges; the court subsequently denied defendant's motion to modify the protective order and imposed additional restrictions on the defendant); *United States v. Bolarinwa*, 1:22-cr-123, ECF No. 23 (D.N.J.) (stipulated protective order in forced labor case restricting defendants' access to and possession of discovery materials).

In this case, as the parties acknowledged in the Stipulated Protective Order, the protective measures are necessary to "protect the safety and privacy of the alleged victims and witnesses" and to "protect against the dissemination of sensitive material containing victims' and witnesses' identities; to provide reasonable protections of the victims' and witnesses' identities; and to [enable the government] to timely produce financial records." (ECF No. 22, PageID. 120). Good cause was established at the time of the entry of the Protective Order and good cause continues to exist: KOGGC has engaged in a public campaign to discredit the government's case; KOGGC members have harassed former members who left the organization; Taylor's teachings included encouraging violence toward law enforcement and individuals who betray him; and the evidence contains extensive sexually explicit materials. The government was, and is even more so now, concerned about victim and witness safety, dignity, and privacy as well as the dangers of obstruction and witness intimidation.

8

KOGGC has engaged in a concerted and public campaign to discredit the government's case and its witnesses. Since December 30, 2025, KOGGC members have posted approximately 17 extensively produced videos on Taylor's public Miracles in America YouTube page specifically discussing this case and claiming that the prosecution is a racist persecution of the defendants. *See* Ex. 1, Trailer for Video, "Truth Behind the FBI Raid Against David E. Taylor." For example, in a panel discussion broadcast on the YouTube channel as part of a series of videos entitled "Truth Behind the FBI Raid Against David E. Taylor," KOGGC members use the image and name of a witness, calling the witness a "liar," a "demon," and "nasty." *See* Ex. 2, Episode 1, "Truth Behind the FBI Raid Against David E. Taylor."  KOGGC members disparaged and tried to discredit other potential witnesses both generally and by name. *Id.* KOGGC members have also held rallies and made public statements that have been carefully crafted, coordinated, and implemented to convince the public to believe that the FBI agents "lied" and are "corrupt," the prosecution is unlawfully motivated by race and greed, and the judge "favors the prosecution." *See* Ex. 3, Trailer for Video "Truth Behind the FBI Raid Against David E. Taylor"; "An Important Message to Oprah Winfrey"; "Weekly Victory Report #1"; and *Modern Day Persecution Against the Church* magazine. In addition, Kearisten Jones, the current Vice President of KOGGC, recently made public comments outside the U.S. Supreme Court, including:

And that's the thing they have tried to silence Apostle. And the more that they silence him, the louder our voices are gonna get. . . . We are asking for help because like you said, pastor Joseph [Busch], they have tried to criminalize a church. Why? So you can take $14 million of liquid finances and assets so you can get away with stealing our money. . . . there's also a part of the FBI that is all politically driven and they're money driven. And that part of the FBI needs to be shut down . . . . The criminalization you have weaponized the entire government to go against American citizens. . . . All of you that are tuned in, we are standing with Apostle Taylor while he is in a jail cell. We are his, his extensions of his heart and his arms.

*See* Ex. 4, "LIVE from Washington, D.C. – U.S. Supreme Court – David E. Taylor,"

starting at 0:57. Even more concerning is the KOGGC's effort to witness tamper, as

demonstrated by Kearisten Jones' text directing a witness to copy-and-paste the

language of an exculpatory statement and send it to Taylor in support of his legal

defense. *See* Ex. 5, Text Message; see also ECF No. 89, PageID. 884; ECF No.122,

PageID.1185.

Furthermore, witnesses have recently reported to the government that current

KOGGC members have been contacting them. Current contact and likely future contact

is supported by evidence indicating that members of KOGGC have learned and written

down the identities of the victims and exchanged messages about victims. For example,

Defendant Kathleen Klein and two current KOGGC members exchanged the following

messages:

KOGGC Member: "would suck if she [a particular victim] randomly died, huh?"

Kathleen Klein: "I had that thought earlier today"

10

KOGGC Member: "Yeah it'd be hilarious"

*See* Ex. 6, Text Messages.

Other members who have left KOGGC also report receiving numerous threatening and harassing messages from current members through text and social media accounts. (ECF No. 47, PageID. 276-77). Victims report that these messages—which include calling the victims traitors, saying they should be afraid, and declaring they will go to Hell—are frightening and terrorize them even after they have managed to leave KOGGC. *Id.* At least one current member of KOGGC interfered with victims and witnesses who sought to accept victim services from victim-witness personnel following the execution of the search warrant in Tampa, Florida, on August 27, 2025.

As discussed in the government's detention memorandum, Taylor set the tone for the fear that should be instilled in those that have left or suggest leaving KOGGC. (ECF No. 47, PageID. 273-77). He threatened and harassed members who indicated they wanted to leave or were able to escape KOGGC, including warning members that they will die or get cancer and go to Hell and their family will be cursed. *Id.*

In addition, Taylor's teachings throughout the charged conspiracies included encouraging self-inflicted violence and violence against others should KOGGC be confronted by law enforcement. *Id.* Taylor has promised to punish and "get rid of" those who do not serve him, which the government interprets to include witnesses against him. *Id.* During a meeting with workers, Taylor stated, "I'm going to be looking

11

at you in Hell and you are going to be having your little FBI jacket on. Who gonna save you then? The American government is not going to save you. They cannot save you . . . . You think they are protecting you, who is going to protect you after you leave here? They are not going to protect you. Not in my realm, not in the realm that I govern. . . . We will watch you burn and the flesh melt off of your bones." *Id.*

During Taylor's pre-arrest meetings and online broadcasts, he often used words like "war" and "battle;" he has claimed he is preparing "soldiers." *Id.* More than once, Taylor referred to himself as a "General" and said he is training the "end time army." *Id.* The KOGGC broadcasts since the arrests of Taylor and Brannon have made clear that the defendants' supporters are amplifying the "war" message, including declaring in a broadcast shortly after the arrests "[w]e're in a war. We're in a war and it is time for you to decide if you're a warrior or you're not." *See* Ex. 7, "KOGGC Sunday Service" and Ex. 8, "Miracles from Jail."

Finally, the discovery includes a significant amount of sexually explicit materials; Taylor's iCloud alone contains thousands of such videos and images. As alleged in the First Superseding Indictment and exposed in discovery materials, Taylor frequently requested and received sexually explicit images and videos from female KOGGC victims; in some instances, victims were fearful of disobeying Taylor and sent Taylor what he demanded. (ECF No. 91). It is not possible for the government to separate sexually explicit materials from text messages given the voluminous number

12

of such explicit materials intertwined with text messages. And, importantly, the government is in the continued process of determining if these materials include sexually explicit videos or images of minors.

Thus, the government's concerns regarding the disclosure of victim identity, which the defense acknowledged in September 2025 in signing the Stipulation for a Protective Order, persist and are even more significant and alarming today.

### B. The Government Relied on the Stipulated Protective Order to Expeditiously Produce Unredacted Discovery and the Defendants Should Be Bound by It

The terms of the current Stipulated Protective Order were mutually agreed upon by all parties before it was filed. The terms are clear, and the defense's need to investigate allegations in the Indictment was foreseeable at the time they entered into the Stipulation. In essence, the parties agreed to certain "narrowly tailored restrictions" on discovery material, including in relevant part that defense counsel would "not provide any person, except for a member of the defense team, with PII of any individual listed in discovery, including . . . any individual's name" and the defense team would not disseminate the identity or PII of victims or witnesses. (ECF No. 22, PageID. 118, 122, 124). In addition, the parties agreed that the defense team would only "allow viewing of the discovery by the defendant that they represent in the presence of undersigned counsel or the defense team," and that no member of the defense team would provide a copy of discovery materials to any defendant. (ECF No. 22, PageID.

123-24). These provisions explicitly prohibit the defendants and defense team from disclosing the names and PII of victims and witnesses. They also explicitly prohibit members of the defense team from leaving copies of discovery materials with the defendants.

The defendants agreed that these protections were "necessary to safeguard the privacy and safety of alleged victims and witnesses." (ECF No. 22, PageID. 118). The parties further agreed that, if the protective measures were not taken, "the victims and witnesses will likely be subject to injury and scrutiny from friends, neighbors, present and future employers, and other members of the community" and that the protective order "does not preclude the defendants or their counsel from reviewing the materials that the United States will provide in discovery; rather, it prevents them from disclosing the information contained therein to third parties in order to reduce the risk of humiliation or harassment of victims and witnesses." (ECF No. 22, PageID. 119-20).

As discussed above, there has been no change in the circumstances that the parties agreed necessitated the protective measures. The defense agreed to the narrowly tailored protective measures in exchange for receiving the significant benefit of expeditious and more fulsome discovery. And, notably, each defendant now has expanded their defense team significantly, which allows for additional resources for investigation and trial preparation. Finally, defendants do not allege that their agreement to these terms was unintelligent, involuntary, coerced, or otherwise invalid.

Since the entry of the Protective Order, the government has reasonably relied upon the stipulated terms to expeditiously produce expansive discovery, as described above. Because of the agreed-to restrictions, the government trusted that it could produce voluminous discovery full of sensitive materials without compromising the safety or privacy of the victims and witnesses or the integrity of the proceedings. The government also relied on the stipulated terms to provide the defense with a list of victim and confidential human source names as part of its initial disclosures. Had the protective measures not been in place, the government would not have disclosed to the defense the identities of victims and witnesses in discovery and would have done the exceptionally time-consuming work of redacting all names and PII from the voluminous discovery materials before disclosure.[1] *See Cipollone v. Liggett Group,*

---

[1] There is no general constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). Indeed, a defendant is not entitled to receive the identities of victims and witnesses until much closer to a trial date—neither the Constitution nor Rule 16 requires the pretrial disclosure of the identity of government witnesses. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) (*Brady* does not require government to "reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one"). Circuit courts, including the Sixth Circuit, have consistently held that defendants do not have a general right to pretrial disclosure of the identity of government witnesses in noncapital criminal cases. *See, e.g., United States v. Davis*, 306 F.3d 398, 420 (6th Cir. 2002) ("'Ordinarily, a defendant is not entitled to a list of the names and addresses of the government's witnesses.'") (quoting *United States v. Perkins*, 994 F.2d 1184, 1190 (6th Cir. 1993)); *United States v. Reis*, 788 F.2d 54, 58 (1st Cir. 1986); *United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990); *United States v. Higgs*, 713 F.2d 39, 44 n.6 (3d Cir. 1983); *United States v. Jordan*, 466 F.2d 99, 101 (4th Cir. 1972); *United States v. Hancock*, 441 F.2d 1285, 1286–87 (5th Cir.

*Inc.*, 785 F.2d 1108, 1123 (3d Cir. 1986 (noting that "[c]ourts use protective orders not only to resolve individual discovery disputes, but also to expedite the flow of discovery in cases involving a large amount of sensitive information") (quotation omitted). The defense should not now be allowed to back out of their agreement, at the expense of the victims and witnesses, after reaping all the benefits. *See United States v. Morales*, 807 F.3d 717, 723 (5th Cir. 2015) (citing the government's reliance on a protective order in affirming denial of motion to modify protective order).

## C. There Is No Constitutional Violation

As the Supreme Court has recognized, "[n]ot every restriction on counsel's time or opportunity to investigate or consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S.

---

1971); *United States v. Edwards*, 47 F.3d 841, 843 (7th Cir. 1995); *United States v. Polk*, 715 F.3d 238, 249 (8th Cir. 2013); *United States v. Grace*, 526 F.3d 499, 508–13 (9th Cir. 2008); *United States v. Lewis*, 594 F.3d 1270, 1280 (10th Cir. 2010); *United States v. Massell*, 823 F.2d 1503, 1509 (11th Cir. 1987); *United States v. White*, 116 F.3d 903, 918 (D.C. Cir. 1997). In 1975, Congress rejected a proposed amendment to Rule 16 that would have required the government and the defendant to exchange witness lists three days before trial. The conference committee concluded that "it is not in the interest of the effective administration of criminal justice to require that the government or the defendant be forced to reveal the names and addresses of its witnesses before trial. Discouragement of witnesses and improper contacts directed at influencing their testimony, were deemed paramount concerns in the formulation of this policy." H.R. CONF. REP. No. 94-414, at 12 (1975). The potential impact that disclosure could have on witnesses is well recognized and underlies many decisions rejecting defendants' requests for disclosure.

1, 11 (1983). Courts have held that protective orders restricting a defendant's access to discovery and restricting dissemination of victim identities do not violate a defendant's Sixth Amendment rights. *See, e.g., United States v. Hausa*, 232 F. Supp. 257, 265 (E.D.N.Y. 2017) (rejecting defendant's claim that the imposed protective order violated his Sixth Amendment rights); *United States v. Torres*, No. 20-cr-418, 2020 WL 4500046 (D.N.J. Aug. 5, 2020) (finding a protective order that included restrictions precluding counsel from even showing certain discovery to defendant did not violate the Sixth Amendment).

In this case, defense counsel's allegations amount to complaints of inconvenience relating mainly to their preferred methods of preparation for cross-examination. No provision in the current stipulations rises to the level of a constitutional violation. That is, defense counsel's "bare assertions" that they are unable to fully investigate the allegations in the Indictment do not satisfy the substantial prejudice standard and are not "sufficient to warrant" modification of the Stipulated Protective Order. *United States v. Campbell*, No. 1:19-cr-25, ECF No. 25 (S.D. Ohio) (granting the government's motion for a protective order over defendant's opposition).

Under the current Stipulated Protective Order, the defendants can spend as much time as they wish reviewing discovery and preparing for trial; defense counsel need only be present. As discussed below in Section 4b, neither Rule 16 nor the Constitution provides the defendants, who have retained multiple attorneys, with a right to unfettered

17

access to discovery. While this restriction may be somewhat inconvenient for counsel,

it does not amount to "substantial prejudice." *Montgomery*, 592 F. App'x at 417.

Likewise, the restriction on revealing the names and PII of victims and witnesses

may require defense counsel to spend more time investigating the case but does not

create "substantial prejudice." The defense team can ask KOGGC members all the

questions they want, simply without using the names of victims and witnesses.

KOGGC members can offer credibility assessments of anyone they have encountered

in KOGGC; the defense is simply restricted from giving a list of victims and witnesses.

Counsel in similar forced labor cases involving victims and defendants who were part

of large-scale, faith or belief-based organizations have fully investigated the allegations

and tried the cases under similar protective order restrictions. *See Majeed*, No. 2:21-cr-

20060, ECF No. 64, 66 (D. Kan.); *Raniere*, No. 1:18-cr-204, ECF No. 39 (E.D.N.Y.).

## II.     Specific Provisions in the Protective Order

### A. Disclosure of Names of Victims and Witnesses

For the reasons discussed above, the government opposes any modification that

would allow anyone on the defense team to disclose the names of victims and

witnesses. However, if the Court decides to allow the defense team to disclose names of

victims and witnesses, the government respectfully requests that the Court include the

following restriction:

- Starting 60 days before a firm trial date, the defense team may discuss former members of JMMI/KOGGC by name outside the defense team, only as

18

necessary to investigate the allegations and prepare for trial. The defense team may not disclose the fact that a particular person is an alleged victim or government witness.

## B. Retention of Discovery Materials by Defendants

For the reasons discussed above, the government opposes any modification of the Stipulated Protective order that would allow the defendants to retain copies of discovery materials outside the presence of counsel. A represented defendant does not have the right under Rule 16 or otherwise to "unfettered access" to discovery materials. *See United States v. Torres*, No. 20-cr-248, 2020 WL 4500046, at *5 (D.N.J. 2020) (explaining that "[p]roviding Defendant unfettered access to and unlimited use of discovery materials containing the personal information of the alleged victims conflicts with the victims' rights under the CVRA"); *United States v. Thompson*, 2013 WL 1809659, at *7 (D. Me. Apr. 29, 2013) (noting no cases hold that "a defendant represented by a lawyer must personally see all the discovery that the government discloses to defense counsel or even the discovery that he asked to see"). While this restriction may be inconvenient for defense counsel, it does not "rise to a level to compromise [the defendants'] substantive rights." *United States v. Barbieto*, No. 2:09-cr-222, 2009 WL 3645063, at *1 (S.D. W.Va. Oct. 30, 2009) (granting a motion for a protective order). Though the defendants may not personally retain the discovery materials—as they have no right to do under Rule 16 or the Constitution—they can fully review them in counsel's presence.

19

Regarding Taylor's review of discovery, the detention facility where Taylor is housed has specific guidelines and restrictions regarding inmate review of discovery. Should Taylor not have sufficient time to review electronic discovery materials in the areas permitted and time allotted by the facility, government counsel advised Taylor's counsel that the facility can arrange for additional time for Taylor to review electronic discovery. The government, however, will not agree to allow Taylor to retain discovery materials in his cell. Taylor engages in frequent communication with KOGGC members while he is detained and continues to direct the activities of KOGGC. KOGGC even posts Taylor speaking from detention on its YouTube channel. *See* Ex. 8.

Brannon also should not be permitted to retain discovery. She has loyally followed Taylor for at least the last twelve years and, at times, has been romantically involved with him. Brannon recently requested modification of her release conditions to allow her to communicate with KOGGC leader Keariston Jones, who has become inextricably involved in the defense of this case, as demonstrated by the text message in Exhibit 5. And, significantly, Brannon lives with a former KOGGC member.

Based on the past behavior and rhetoric of the defendants, Taylor's ongoing and frequent communication with and direction of KOGGC members, and KOGGC's public campaign to discredit the government, the government is rightly concerned that leaving discovery materials—which include not only the names and sensitive PII of

20

victims and witnesses but also sexually explicit images, videos, and messages—with the defendants poses a danger to the safety and privacy of the victims, in violation of the CVRA, and a danger to the integrity of these proceedings.

### C. Discovery Coordinator

The government does not object to the defense retaining a discovery coordinator. Rather, because of the extraordinarily sensitive evidence and discovery material, as well as the manner in which the defense plans to utilize the coordinator in this case, the government has expressed to the defense the importance of selecting a mutually agreed upon coordinator with a strong track record of working with the U.S. Attorney's Office.

### D. Restrictions on the Government

The defense requests that a new order restrict the government's investigation, use, and management of evidence and discovery precisely as it restricts the defense. However, the defendants do not cite and the government has been unable to find any caselaw that supports the defendants' unusual proposal to impose additional binding restrictions on how the government manages its own evidence and, particularly, how it communicates with its witnesses. There is no legal or ethical basis for treating the government and defense as similarly situated regarding the protection of evidence, witnesses, and victims.

In addition, the government is already bound by strict ethical obligations; its obligations under Rule 16, *Brady*, *Giglio*, and their progeny; and its obligations under the CVRA. As always, the government adheres to these obligations with the utmost

21

care and commitment, as evidenced by the current Stipulated Protective Order, its litigation of this Order, and its expedited production of voluminous discovery. Furthermore, any disclosures of evidence to witnesses can be an appropriate subject for cross-examination. But the Court should not allow the defense to bind how the government investigates this case or manages its evidence.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny the Motion to Modify the Stipulated Protective Order.

Respectfully submitted,

Jerome F. Gorgon Jr.
United States Attorney

*s/Sarah Resnick Cohen*
SARAH RESNICK COHEN
Assistant United States Attorney
Eastern District of Michigan
Homeland Security Unit
Human Trafficking Coordinator
211 W. Fort St., Ste. 2001
Detroit, MI  48226
313-226-9100
Sarah.cohen@usdoj.gov

A. TYSEN DUVA
Assistant Attorney General
United States Department of Justice
Criminal Division

22

*s/Lindsey Roberson*
LINDSEY ROBERSON
Trial Attorney
Human Rights and Special Prosecutions Section
U.S. Department of Justice
Lindsey.roberson2@usdoj.gov
202-353-5153

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

 s/Sarah Resnick Cohen
SARAH RESNICK COHEN
Assistant United States Attorney

24