UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

                              Criminal No. 25-20560

          Plaintiff,          Hon. Terrence G. Berg

v.

D-1  David Taylor,
D-2  Michelle Brannon, and
D-3  Kathleen Klein

          Defendants.

_____ /

**DEFENDANT'S MOTION FOR DISCOVERY**

NOW COMES Defendant David Taylor, by and through his counsel, and moves this Honorable Court for the entry of an order for certain discovery, and in support of his motion, he relies on his attached memorandum brief.

Undersigned counsel sought concurrence in the relief requested from counsel for the government. To explain the nature of the relief requested and the bases upon which such relief is predicated, defense counsel provided a draft copy of the instant motion, conducted a meet-and-confer, and subsequently corresponded via email. Concurrence was denied.

1

Respectfully submitted,

/s/ Todd Perkins
Todd R. Perkins (P55623)
Attorney for Def. David Taylor

/s/ Allison L. Kriger
Allison L. Kriger (P76364)
Attorney for Def. David Taylor

/s/ Laurence H. Margolis
Laurence H. Margolis (P69635)
Attorney for Def. David Taylor

DATED: April 28, 2026

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

        Plaintiff,

v.

D-4  David Taylor,
D-5  Michelle Brannon, and
D-6  Kathleen Klein

        Defendants.

Criminal No. 25-20560
Hon. Terrence G. Berg

_____/

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION FOR DISCOVERY

Witness A.G. reported that, during an interview with an FBI special agent, she was pressured not to donate money to Defendant Taylor's legal defense. Specifically, in a sworn declaration, she averred:

2. On February 2, 2026, I received a call from my son, Christopher. He told me that he had been contacted by FBI Agent Erica Kelley. He said that Agent Kelley had told him all about my personal history of financial donations for the Church, and that Agent Kelley would be calling me too.

3. Hearing this, I was livid, and I had to calm down. I had never spoken with or authorized FBI agents to disclose this information to anyone. The government had no right in my view to disclose my personal information to my son, especially as I consider my financial support for my church to be a private, spiritual matter between me and my church.

4. **Agent Kelley did end up calling me on February 2. She wanted to know if by donating to the Church I knew what I was getting into, and if I knew where the money went.** I told her that they didn't tell me where the money specifically went, but that I

understood that it went to the ministry.

5. **Agent Kelley then said what about Pastor Taylor's legal defense? She wanted to know if I knew [my money] was going there too. When she said this, I got the impression that she believed this was not a good use of my money and that I would be taken aback by this information. I told her that if some of the money goes there, that's fine too.** I told her none of my donations were forced—they were gifts.

6. **Agent Kelley told me that she wanted to make sure I knew where my money was going. After she told me the money was going to Pastor Taylor's legal defense, she added something to the effect of, "well you should know that they are charged with money laundering, they are conspirators, forced labor, that the students have to solicit for monetary donations or they are not fed," and that there is an indictment against Pastor Taylor that I can find online**.

7. The conversation was cordial and professional, but **I felt that she was trying to pressure me not to support Pastor Taylor's legal defense, and I feel that others who received a similar call would feel pressured**.

Exh. A, Decl. of A.G., ¶¶ 2-7 (emphases added).[1]

This account differs from the FBI's "302" interview memorandum, which suggests an exchange occurred concerning A.G.'s contribution in part being used for Pastor Taylor's legal defense but casts it in a different light. The 302 states that after A.G. advised the agent that she "would be ok with some of her money going to David

---

[1] There is some irony to the government's unauthorized disclosure of A.G.'s private information to her son, given the protective order dispute currently before the Court. [*See* ECF 90.] While the government has pointed to the Church's responses to *public critics* as "naming" witnesses [ECF 123-3], the agent's actions *here* are the only known actual instance of a party to this case disclosing private information obtained in the course of this case.

Taylor's personal legal defense," the agent "reassured" A.G. that she could "donate whatever she wants to whoever she wants."  This claim of "reassur[ance]" is inconsistent with A.G.'s recollection, as she reports feeling as though the agent believed "this was not a good use of her money" and A.G. should be "taken aback" by it. A.G. felt she was being pressured not to support Pastor Taylor's legal defense.

Pastor Taylor has a Sixth Amendment right to counsel, free from government interference.  Pastor Taylor therefore respectfully requests limited discovery to determine whether and to what degree Pastor Taylor's Sixth Amendment rights were violated during this or other witness interviews, and whether the 302 is accurate.

## FACTUAL BACKGROUND

Witness A.G. is a devoted member of the Kingdom of God Global Church who has donated money to the Church over the years.  Approximately two months ago, she relayed to Pastor Taylor's counsel the specifics of telephone calls she and her son separately received from Special Agent Erica Kelley—the details of which are set forth in her sworn declaration [Exh. A] and excerpted above.

As stated above, the agent pointedly asked whether A.G. was aware that some of her donations were going to Pastor Taylor's *legal defense*.  Curiously, the agent did not ask about any other potential uses of donations, such as the sorts of luxury lifestyle items listed in the First Superseding Indictment—she only asked about donations going to Pastor Taylor's legal defense, which A.G. confirmed was fine with her.

Though the agent was cordial and professional, A.G. felt that she was being pressured not to give money to Pastor Taylor's legal defense. She similarly feels that, were others to receive a similar call, they would feel pressured not to support Pastor Taylor's legal defense.

On March 27, 2026, undersigned counsel received the FBI FD-302 memorandum of the interview with A.G.  The 302 confirms that an exchange took place regarding the use of A.G.'s donations for Pastor Taylor's legal defense.  It reads, in pertinent part, "[A.G.] would be okay with some of her donated money going to David TAYLOR's personal legal defense but not all of it."  Exhibit B.  It then goes on, "FBI SA . . . reassured [A.G.] that she can donate whatever she wants to whoever she wants and only wanted to ensure that she was not coerced into giving."  *Id.*  In light the discrepancy between the 302 and A.G.'s account, undersigned counsel requested the government's permission to review this 302 with A.G. The government denied this request, reasoning that such a disclosure would violate the protective order.[2] Nevertheless, A.G. denies receiving any reassurance from the agent, and says that the agent's response and tone suggested disapproval.

---

[2] Precluding the defense from showing a witness a summary of their own interview highlights the unreasonable restraints imposed by the protective order and the absurd results that follow. As defense counsel stated to the government in an email sent on April 3, to which the government did not respond, it is difficult to identify a legitimate government interest in such a prohibition—particularly where, as here, there is an apparent discrepancy in the witness' memory of the interview and the agent's summary.

## ARGUMENT

"The Sixth Amendment protects an individual's right to choose the lawyer or lawyers he or she desires, and to use one's own funds to mount the defense that one wishes to present." *United States v. Stein*, 541 F.3d 130, 151 (2d Cir. 2008) (citation altered).  Thus, the Sixth Amendment "prohibits the government from interfering with financial donations by others."  *Id.* at 155-56 (citing *United States v. Inman*, 483 F.2d 738, 739-40 (4th Cir. 1973) (per curiam) ("The Sixth Amendment right to counsel includes not only an indigent's right to have the government appoint an attorney to represent him, but also the right of any accused, if he can provide counsel for himself by his own resources or through the aid of his family or friends, to be represented by an attorney of his own choosing.")).

Here, it appears from the 302 that an FBI agent specifically chose to inform A.G. that some of her donated money was going to Pastor Taylor's "personal legal defense," and to ask whether A.G. was aware of this use.  As a threshold matter, it is unclear why the agent believed A.G.'s donation was used for this purpose or how the agent came to learn of this information. More significantly, there was no reason to single out Pastor Taylor's legal defense as a discussion topic in this interview. After all, the government has alleged in this case a host of other uses of donors' money.  *See, e.g.*, First Superseding Indictment ¶ 9, ECF 91 (listing "a series of residences, airline tickets, personal vehicles, and luxury goods").  Why specifically raise Pastor Taylor's legal defense?  The agent's questions and comments made A.G.

feel pressured, as though donating to Pastor Taylor's legal defense was a bad thing. And A.G. believes that others, hearing the same message, would feel the same way.

On top of this, there appears to be a material discrepancy between the 302 and A.G.'s recollection of the interview. If A.G.'s recollection is right, then the 302's "reassured" reference is, at best, misleading. This calls into question the accuracy of other 302s, which are critical to the integrity of the government's investigation and, as the government pointed out during the April 7 status conference, are a critical tool for Defendants' trial preparation.

These circumstances warrant investigation, particularly to determine (1) what took place during the interview of A.G., (2) whether other potential donors have experienced similar pressure, and (3) whether the 302 is inaccurate or misleading. A reasonable next investigative step to address what occurred during the interview of A.G. and the material discrepancy between the 302 and A.G.'s recollection of the interview would be to order production of any raw notes or recordings from the interview of A.G., potentially followed by additional action. *Cf. United States v. Meek*, No. 1:19-cr-00378-JMS-MJD, 2021 LX 49595, at *21 (S.D. Ind. Mar. 19, 2021) (ordering production of raw notes after a discrepancy emerged between the government's 302 and the defense's interview notes).

As for the remaining issue—determining if other donors experienced similar pressure from the government during interviews—the only effective means available is to let Defendant's counsel depose the interviewing agent. *See e.g. United States v.*

*Carrigan*, 804 F.2d 599 (10th Cir. 1986) (refusing to issue writ of mandamus and upholding district court's order allowing the defendant to depose witnesses as a sanction for the government's interference with a defendant's access to potential prosecution witnesses, reasoning, "An order merely to cease such interference, after the fact, might be insufficient because the witnesses' free choice might have been already perverted and the witnesses likely to refuse voluntary interviews."); *see also* Exhibit B, Transcript of Pending Motions Hearing, *United States v. Meek*, No. 1:19-cr-00378-JMS-MJD, ECF No. 268 (S.D. Ind. Jul. 12, 2022) (permitting depositions to determine "whether and to what extent the Government's other 302s concerning witness interviews are accurate, and in turn, whether any prosecutorial misconduct may have taken place[.]"

Respectfully submitted,

/s/ Todd Perkins
Todd R. Perkins (P55623)
Attorney for Def. David Taylor

/s/ Allison L. Kriger
Allison L. Kriger (P76364)
Attorney for Def. David Taylor

/s/ Laurence H. Margolis
Laurence H. Margolis (P69635)
Attorney for Def. David Taylor

DATED: April 28, 2026

9