UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )
vs.                          ) CAUSE NO. 1:19-cr-00378-JMS-MJD
                             ) Indianapolis, Indiana
WILLIAM ERIC MEEK (01) and   ) Tuesday, July 12, 2022
BOBBY LEE PEAVLER (02),       ) 10:00 o'clock a.m.
                             )
          Defendants.        )

Before the
HONORABLE JUDGE JANE MAGNUS-STINSON

TRANSCRIPT OF PENDING MOTIONS HEARING

APPEARANCES:
FOR THE GOVERNMENT:      United States Attorney's Office
                         By:  Kyle M. Sawa
                         10 West Market Street
                         Suite 2100
                         Indianapolis, Indiana 46204

                         U.S. Department of Justice
                         By:  Robert Spencer Ryan
                         1400 New York Avenue, NW
                         Washington, DC 20005

FOR THE DEFENDANT        Paganelli Law Group
WILLIAM ERIC MEEK:       By:  Jonathan A. Bont
                         10401 North Meridian Street
                         Suite 450
                         Indianapolis, Indiana 46290

FOR THE DEFENDANT        Akerman LLP
BOBBY LEE PEAVLER:       By:  Michael P. Kelly and
                         Ildefonso P. Mas
                         750 Ninth Street, N.W.
                         Suite 750
                         Washington, DC 20001

ALSO PRESENT:           William Eric Meek and Bobby Lee Peavler

COURT REPORTER:         Jean A. Knepley, RDR, CRR, CRC, FCRR
                        46 East Ohio Street, Room 301
                        Indianapolis, Indiana 46204


PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

*(In open court.)*

THE COURT: We are on record in Cause No. 1:19-cr-378. This is the case of the United States v. William Eric Meek, who is present in person with counsel, Mr. Bont, and the United States v. Bobby Lee Peavler. Mr. Peavler is present by Mr. Kelly and Mr. Acosta -- no? Who?

MR. MAS: Mr. Ildefonso Mas.

THE COURT: You need to speak into --

MR. MAS: Mr. Ildefonso Mas on behalf of Bobby Peavler.

THE COURT: Okay. I need to make sure you speak into your microphone. To that end, then, don't stand up, or you are not going to be speaking today?

MR. MAS: I am not going to be speaking today. Sorry.

THE COURT: Okay, thank you. All right. I am sorry, your name is written for me here, and I apologize for that. Okay. For the Government we have got Kyle Sawa and Robert Spencer Ryan, and this matter is before the Court for several -- argument on several motions.

The first thing I would like to inquire about, the first motion I am going to address is the proffer statement motion in limine regarding use of Defendant's proffer statements 164, but before we begin, let me advise the parties I have read your submissions, so there is no need to be repetitive.

But I did want to ask the Government, in the Court's order of June 2, 2022, on page 13, the Court said, "For each alleged statement the Government shall list the question that Mr. Peavler was asked during the proffer interview, by whom the question was asked, and then Mr. Peavler's response."

The Government failed to do that, and I wanted to know why.

MR. SAWA:  Understood, Your Honor.  As addressed in the response and the, the appendix, the evidence set forth by the Government, at the Court's request, did not include that information.  The Government didn't feel it was appropriate to go outside the record to include that information.  It used the testimony before the Court and the exhibits submitted to the Court as the basis for the statements that were alleged, said that day.

Throughout Miss Madtson's testimony they were not, there was not testimony of who asked the particular question or what question was asked, so the Government did not feel it was appropriate to add that to the record.

THE COURT:  Perhaps it was on cross, though, or with the submission that the Defendants tendered, but okay.

So without being repetitive, if the parties would like to address -- I think we heard from the Government and a response from Mr. Peavler.  Does the Government have anything further to add concerning the statement that it is seeking,

statements it is seeking to introduce?

MR. SAWA: Yes, Your Honor.

THE COURT: Go ahead.

MR. SAWA: Government is asking for the Court to find that each of the identified statements were said during the August 2019 proffer. From August 2019 through today, the Government has never wavered as to its position regarding the accuracy of the notes in 302 drafted by FBI Special Agent Madtson. Any attempt to claim otherwise simply is not supported by the evidence, and it is not credible.

From the start the Government has stood by the perception, recollection, and testimony of Special Agent Madtson, and it continues to do so here today. Special Agent Madtson accurately took notes during the proffer, summarized those notes in the 302, and testified consistently with both of those documents. The Government has met its burden by a preponderance of evidence, that each of those statements should be permissible if triggered by the proffer agreement.

THE COURT: Thank you. Is that all you wanted to say?

MR. SAWA: No, Your Honor. A few more things.

THE COURT: Sorry, you paused. Go ahead.

MR. SAWA: No matter how litigious this issue has been before the Court, there is certain undisputed facts. It is undisputed that Mr. Peavler agreed to speak with the Government. It is undisputed that he signed a proffer

agreement, and it is undisputed he made many statements that concern this case.

Some of those were self-serving exculpatory statements, which were captured by Special Agent Madtson, and some of those were potentially inculpatory statements, which were also captured by Special Agent Madtson. There is no distinction that day of what she captured, whether it helped or hurt the Government's case. Special Agent Madtson attempted to convey the substance of his statement, and she did so by taking contemporaneous handwritten notes.

It is also not disputed that there are no allegations that this proffer agreement was not legally permissible or that the Defendant or defense attorneys did not understand the ground rules of the proffer that day. It is clear he had counsel, that he had been advised of the terms of the proffer agreement, and he knowingly signed that agreement. This is not in dispute.

So what the Government requests, based on that proffer agreement, that enforceable contract that the parties knowingly entered into on August 2019, they would like to use statements Peavler made that day if he triggers that agreement with the agreement that he knowingly entered into with his present counsel.

Now, this is not a unique fact pattern before the Court in the sense that defendants regularly attempt to proffer

preindictment, and sometimes those proffers do not lead to cooperation.  They lead to someone being charged and eventually those proffer statements being used against that individual in court.  That happens in this courthouse regularly.

But what is in dispute is what Mr. Peavler said that day, and while it is procedurally unique at its core, this type of dispute is also not unique in this courtroom.  Every day witnesses view events, see accidents, observe others, and come into this courtroom and swear under oath as to what they saw that day.

That is what we have heard here from Special Agent Madtson and Attorney Sarah Wang.  Each of them observed the proffer that day, took notes during that proffer, and each of them provided a summary of those notes.

The Court created a procedure in which it must be the fact finder to determine what was said that day.  This fact finding process occurs in courtrooms throughout America every day, and while there are some minor differences between what each recounted of what they observed and heard that day, the Court will find when it reviews the evidence, that these two accounts are remarkably similar.

To be sure, they are not identical, but as the Court is aware, two witnesses can see and hear the same event but have different recollections of that event.  That is no different than what we have here today.

Now, to be clear, the Government is not accusing Ms. Wang of committing perjury, nor is the Government accusing Defense counsel of suborning perjury. Different witnesses can have different recollections of the same event. However, the Government believes that based on the evidence before the Court, where discrepancies do exist, Special Agent Madtson's handwritten contemporaneous notes and consistent testimony are more reliable for what was said that day for reasons cited throughout this briefing and arguments here today.

Turning to the specific statements, the Government is not going to go one by one, addressing counsel's arguments, but it will make some generalized responses to those arguments. The Government set out briefing explaining why it believes its evidence is more reliable and incorporates that into its argument here today.

But before getting to the statements that are disputed, I think it is important to note there are many statements that are not disputed. Defense counsel has, has conceded, at least ten statements, possibly 12 statements, depending on his motion, that he agrees were said that day. In addition to that, there are, there are statements that he also says and concedes that they were said, but his argument for that is that they need additional context. And there is approximately 11 of those statements.

And many of these statements Defendant concedes that

the statements were said by the Defendant. Now, in addition to that, he claims there is comments later than during the proffer or in addition to those statements that are necessary to explain what was said.

At its core, Defendant doesn't like how his own words sound. He is moving the goalposts on what the Court has requested, that the Government meet in this case. Because the Court clearly set forth a standard, the Government must prove by a preponderance of evidence that the Defendant made the statement. And Defendant is agreeing that many of these additional statements were, in fact, said. This should be sufficient for the purposes of this motion.

Now, here Defendant is not debating about the substance of what is said; instead, he is claiming that he wants additional statements to explain it. But there are multiple options the Defendant has in that scenario that do not involve an outright prohibition of that statement being introduced.

That is something that can be addressed on cross-examination of the witness; and in addition, Defendant can take the stand and explain the qualifiers that he claims are associated with that statement. But this argument does not prove that that statement was not said; quite the opposite, it concedes it was. And this is a standard the Court has created for the Government to meet, making the Government have to prove

not only that he made the statement, but also that he didn't say anything consistent with -- inconsistent with that, the rest of the proffer.

That is not the test in place and is inconsistent with what the Court has ordered. The Government has not offered any of these statements to mislead the Court or the jury. It has offered them because the Defendant said them, and Defendant now agrees that these statements are said. The Government has met its burden with those particular statements.

When combining those statements and the statements Defendant has already conceded, it is apparent that many of these statements are already agreed upon. This is direct evidence that many of those statements that Special Agent Madtson testified are consistent with Defendant's own testimony, and any allegations that there is some huge chasm between what Special Agent Madtson testified to and what Attorney Sarah Wang testified to is simply incorrect.

Now, when you look at the, the statements where Defense -- Defendant has alleged their defenses or the Defense claims that they were never said or said differently or said by someone else, the Court will see two things with these statements:

One, these statements are supported by contemporaneous handwritten notes of Special Agent Madtson; and two, when it looks at these discrepancies, alleged discrepancies, it will

see there is not really much daylight between those two recollections of what was said that day. It is splitting hairs, and that should not be sufficient when there is just minimal disagreement to prohibit that statement from coming into evidence.

When you look at some of the categories for the reasons Defendant disputes these statements, one of those is distinction on timing. Defendant claims there are instances in which Defense counsel included timing qualifiers, but the Government did not. The evidence doesn't support this.

When comparing these two accounts, the Government's evidence should be deemed more liable. Special Agent Madtson testified about multiple times when these time qualifiers were included. She was on the lookout for these, and they are present, both in her 302 and her notes. Special Agent Madtson testified that she only included what she heard during the proffer.

She wasn't including information that she learned prior in the investigation. She wasn't including information of what she thought the person meant but he didn't say. In contrast, Ms. Wang testified that she included the word "now" in her summary, when that was not said during the proffer and contradicted by her own notes. And when pressed for an explanation on cross-examination, her basis for including that word, even though it wasn't said during the proffer, was it was

just her understanding of what Bobby was thinking. And that was based on previous conversations, previous conversations that she couldn't identify, so not based on what was said that day based on her representation as Mr. Peavler's Defense counsel.

That testimony alone severely undercuts her reliability that she included information basing statements on what she believed Mr. Peavler was thinking, and that doesn't only undercut her reliability generally, but especially for statements that Defendant now claims they were based on what Mr. Peavler knows now versus then. It casts doubt on whether that distinction is based on what was said that day or what the Defense attorneys believe that Mr. Peavler believed at the time.

And the most brazen example of this is illustrated in the alleged Statement 33, the self-serving now-and-then distinction. Without citing to any evidence in the record, Defendant objects to the statement and states that Mr. Peavler's belief was on the date of the proffer, not a belief he formed in the fall of 2016. What is that based on? Not the notes, not the summary, but what Defense counsel is alleging that he meant when he said that statement. That is not evidence to support that that statement wasn't said. That is Defense counsel giving their own spin of what was said that day.

This further undercuts that it cannot be clear when Defense counsel has included now and then of what was said because it is unclear whether it is doing that based on what it knew, based on conversations with Mr. Peavler, or what was actually said that day.  So for those reasons, Your Honor, any distinction, the time between now and then, simply aren't credible, and the Government has met its burden with regard to those statements.

Defense counsel has also argued that statements have been recharacterized.  Ms. Wang agreed during her testimony that statements can convey the same substance but not use the same words, that different words can memorialize the same statements.  If the same substance is alleged by the Defense counsel and the Government, Defendant's allegation that different words are used shouldn't be sufficient to prevent the Government from using that statement.  That is simply not sufficient.

The next category Defense counsel points out are misattributed statements —— misattributed statements, I apologize.  Many of these are a distinction without any actual difference as to the substance of the statement.  You see throughout the notes from Special Agent Madtson, noting where Peavler acknowledged certain comments made by the questioner, Special Agent Madtson testified that ——

THE COURT:  Help me by being specific about the

statements you are referring to.

MR. SAWA: Yes, Your Honor.

THE COURT: Help me focus. Thank you.

MR. SAWA: So would you like me to refer to the previous ones that I addressed?

THE COURT: No. Go ahead.

MR. SAWA: For misattributed statements, counsel has listed several: 1, 4, 8, 9, 12, 13, 15 –– 13, 14, 15, 25, 30, 31, 32, 36, 38.

THE COURT: Did you get that, Jean?

THE COURT REPORTER: Can you go through that again?

MR. SAWA: I apologize. One, 4, 8, 9, 12, 13, 15, 14, 25, 30, 31, 32, 36, 38.

THE COURT: Let me interrupt you for a minute there, because this brings to mind another point that is on my mind. I would request that –– I feel like there is a lot of back and forth between counsel, like you're communicating this way. The Court is your audience. The court reporter needs to take down your argument, and I would urge counsel to be more helpful to the Court and to the court reporter as you make your presentations today. Go ahead.

MR. SAWA: Thank you, Your Honor.

Special Agent Madtson testified that the statement as said and not acknowledged, that she would not include it in her notes, and that is corroborated by her notes and the phrase

"ACK" is included, just shorthand for acknowledge. And whether Peavler acknowledged or said yes to a question, versus whether he said the statement, isn't an actual distinction for the purposes of this motion. The content of the statement is what matters.

Mr. Peavler adopted that statement of the prosecutor or said that statement. At bottom, it is the same status for the purposes of this motion. He has made the statement. As a result, for these particular objections, the Government believes it has met its burden.

One of the final categories that Defense counsel has addressed is a misstatement, and this is for Statement No. 10. And counsel contends that this statement was not present in Ms. Wang's notes. So because of that, it claims the Government doesn't meet its burden.

That cannot be sufficient to prevent the Government from potentially introducing this statement. The absence of evidence is not sufficient evidence to rebut the Government's evidence, but it has been corroborated multiple times. First, they are contemporaneous notes that support this statement. Second, this statement was, then, included in a 302 that was reviewed by other individuals who were present at that proffer and agree that this statement was said; and third, Special Agent Madtson testified under oath that this statement was said.

The fact that Ms. Wang did not hear or did not include this statement should not be deemed as sufficient to undercut Special Agent Madtson's consistent notes, 302, and testimony. That is sufficient evidence for Government meeting its burden beyond a preponderance of evidence.

And finally, Your Honor, a couple overall -- overarching points. Counsel can't have it. Defendant can't have it both ways with Ms. Wang's work product. If it reflects her mental processes of what was said that day as they have alleged and the Court has found, then it is inherently less reliable than an agent attempting to write down solely what is said.

This Court ruled that large portions of Ms. Wang's notes, summary, and phone call notes should not be disclosed to the Government because of work product privilege. Defense should not, then, be able to rely on that privilege, which essentially says that this material reflects attorney mental processes and then claim that those same notes which it claims, which must be shielded from the Government to hide those attorney mental processes, should at the same time be viewed as an objective, true original source of what was said that day.

The Defendant has to pick a lane on that and has chosen not to disclose those portions because they reflect attorney mental processes. It would be unfair and unjust to now allow the Defendant to do this and then claim that those

same notes only reflect what was said that day. At bottom, Ms. Wang was Defense counsel when she took notes that day. She testified that she was writing down questions to gain insight into what Government was asking.

She later wrote down information summarizing what was said that day based on her conversations she previously had with her client, not what was said during the proffer. She was creating work product with her own mental impressions. That is what she was doing. This was not a mutual note taker. In contrast, you have a witness with over 13 years of experience as a special agent with the FBI, with multiple words and accommodations during that time period, and during that time, Special Agent Madtson testified that she had participated in at least 50 interviews of individuals with their attorneys present like we had before this Court.

By contrast, Ms. Wang had attended three or four proffer sessions involving criminal investigations, although she could not even recall which districts those occurred. Special Agent Madtson spent approximately 17 months on this investigation and participated in approximately 15 interviews before this proffer. By contrast, Ms. Wang had limited knowledge about the case before the proffer. She had not reviewed discovery. She had not interviewed other witnesses, and this is evident when she made the mistake of misnaming one of the key players in this case.

Special Agent Madtson asked for clarifications throughout the proffer, not only did Ms. Wang not ask for clarifications, she didn't ask a single question. These are the two narrators the Court is left with in making its judgment on what was said that day, two witnesses observing and hearing the same event, and when the Court reviews all the evidence, the Government has met its burden for each statement; based on Special Agent Madtson's notes, her 302, and her testimony. The Government respectfully asks the Court to find the Government has proven all statements by a preponderance of evidence. Thank you.

THE COURT: Thank you.

Mr. Kelly.

MR. KELLY: Good morning, Your Honor.

THE COURT: Good morning.

MR. KELLY: Your Honor, as you know from the pleadings, we disagreed with just about everything that Mr. Sawa said. I believe most of the points that Mr. Sawa made were in the pleadings. I will try not to repeat them, but there are a few points I would like to address with the Court today, one of which is Mr. Sawa says the Government has been steadfast since August of 2019 about what they believe Mr. Peavler said in the proffer session. And steadfastness can be a virtue when you are right, but when you are not right, it is a vice and a serious vice.

If you compare Ms. Wang's notes with Agent Madtson's notes, you will notice Ms. Wang's notes have the questions and answers in them.  That is why we could respond to the Court's order and identify what the questions were.  Agent Madtson's notes don't have the questions, and when you look at Agent Madtson's cross-examination, you see that it is a very different story than the one the Government is telling now.

If I went through and read every time we heard "I don't recall," "that is not my recollection," "I don't know what was said," you know, we would be here for, for a lengthy period of time, Your Honor.

THE COURT:  As long as we already were.

MR. KELLY:  Yes, and we appreciate the Court spent so much time on this evidentiary hearing.  So we thank you for that, but what that has given the Court is a substantial evidentiary record to make the decision about who was right and who was not.  It allows the Court not to decide the matter based on, did someone work for the Government for 18 years versus someone didn't.  That is the kind of personal attack that shouldn't be looked at by the Court.

It should look at what makes sense based on the notes that are in place, and I respectfully submit that if you look at the two of them together, one of them tells a full story about what happened at the interview.  The other one, by Agent Madtson's own admission, is sort of paraphrasing what she

thought was important, and there is a difference there, that one is trying to write down everything that everybody says. Now, was she perfect in every instance? Probably not, and any time someone tries to do that and they are not a trained court reporter, you are inevitably going to miss details that will be wrong, but the crux of it is there.

On the other hand, when you are not trying to write everything down, when you say it is too hard to write down a question if it is open-ended, you are going to have, naturally, mistakes. And you know, to, to Mr. Sawa's point about, we are not accusing Ms. Wang of perjury; well, first of all, I would say, that is not an appropriate comment.

You know, when I think what probably truly happened here is Agent Madtson took incomplete notes, and then, when she went back and tried to piece them together, she tried to do what made sense to her. And in the process, she made a lot of mistakes. I think this will bleed a little bit over to the motion to dismiss argument, but we have identified 18 instances where Mr. Peavler provided exculpatory information.

Now, you heard Mr. Sawa say, well, Judge, that was self-serving, but the point is, when someone provides exculpatory information to the Government, the Government has to write that down, whether they believe it or not, whether they like it or not, they have a duty to write that information down. And the failure to do it 18 times, that is not an

accident.

When you look at how you should view this, that is something that the Court should take into consideration is how, despite Agent Madtson's experience, despite the length of time she was on this investigation, how was it that so many mistakes were made during the course of an important interview of someone the Government was seriously considering indicting at that moment in time?

You know, I think again, I don't, I am not here to cast aspersions on Agent Madtson. This is not a comfortable thing to do, but I am duty bound to point out, A, you haven't followed the evidence where it leads and then point out an injustice when we seek it. And the Government says, well, we have a proffer agreement, and you agree that we could use statements in certain circumstances. And that is right as far as it goes, but what he didn't agree to is to have the Government rewrite the statements or attribute statements to him that he didn't say.

That was never agreed to; and frankly, when we -- I wasn't there at the proffer, but when others were, there was an expectation the Government would accurately account what was said and not try to turn a 302 into an advocacy document, which is what seems to have happened.

So you know, I would just point out, Mr. Sawa said they were remarkably similar accounts. I would beg to differ

by the fact that we submitted evidence of 18 statements, 11 of which are entirely undisputed, six of which the Government disputes but they rely only on Agent Madtson's direct testimony and her notes, but they ignore her cross-examination and ignore Ms. Wang's notes.

It, you know, we didn't have 18 missed pieces of information and then of the 41 statements the Government has proffered, we have objections to 29, and the Government says, well, he said something like that. And so, therefore, we have proven that he said it, but that is not what the proffer agreement said, and that is not fair. That would be basically the equivalent of saying we should be allowed to present half-truths. You know, a portion of this statement or a part of the statement we like, but then, we are going to ignore the other part of the statement that we don't like.

In terms of how that can be dealt with at trial, part of the problem is they would present sort of the half part of it but not the other part of it, which would have the effect of misleading the jury. And when I cross-examined Agent Madtson about it, I am confident that the answer I am likely to get is, I don't recall what else was said at that moment, which will, then, force us to put another witness on. And the jury may say, well, Agent Madtson is with the FBI. She must be right, and that is not the purpose of the proffer agreement. It is not fair under the proffer agreement.

Again, I won't respond to the generalized attacks on Ms. Wang's notes.  I am happy to answer any question the Court might have on them, and then, the last point I would --

THE COURT:  There is one point I would like you to address, which is the Defense has taken the position that Ms. Wang's notes conclude her mental impressions, and if they are her mental impressions, then, how can you claim that they are objectively accurate?

MR. KELLY:  My response to that would be, I think the Government is taking one portion of her notes out of context. If you look at her notes, there are several instances where she says, the word "now" is used or knowing what you know today, and she marks that down in her notes not as a mental impression but of what was actually said during the interview.  I think they cited one example where he said, used the present tense, and she interpreted that to mean now.  But that is not a mental impression as an attorney, that is just someone who is watching it and understanding the context of what he is saying.

And in discussing these statements, context is so important because it is so easy to present just half the context and have something taken out of proportion where what you really need to do is to have the full statement in context. And with that, Your Honor, unless there are any questions, I will rest on the papers.

THE COURT:  Thank you.

MR. KELLY:  One thing I would add, too, is the work product issue has been litigated, like, three, four, maybe five times, I haven't gone back to count.  The Court has ruled and has acted appropriately.  We have Rule 26.2(c) —

THE COURT:  Right.

MR. KELLY:  — which allows us to do what we did, so I don't think that should be relitigated for a fifth time.

THE COURT:  Okay.

MR. KELLY:  Thank you.

THE COURT:  Thank you.  I am going to still take this under advisement, bearing in mind your arguments today, and let me just say, that all of this litigation could have been avoided if this statement had been recorded.  And based on questions I asked of Defense counsel, Defense counsel didn't seek to record the statement either.

While I am understanding that this is normal practice, it is not a way to capture accurately somebody's statement, and given the level of detail and the nuances of this statement and the need for me to potentially have to make a decision about whether the proffer agreement is triggered, it is, it is an incredibly burdensome ask, given the paucity of the notes that exist in this case.  But we will shoulder our burden.  So okay, I am taking that one under advisement.

I said there were two other motions that we were going to address, and I think we are only going to address one of

them.

Mr. Bont, on the motion to sever, I have read the parties' papers. Until I make a final decision about the proffer statement, I don't think I am in a position to rule on your motion. There are some circumstances where your client is named. The law allows me to issue a limiting instruction and delete his name, or you know, amend the statement. So I am, once I produce my, what I find to have been proven as to Mr. Peavler's statement, then, I will probably have another hearing with you and the Government on the motion to sever.

MR. BONT: Okay.

THE COURT: I don't think otherwise, and if I can clean that up to my satisfaction, I can hear argument. Maybe it won't be to your satisfaction, and we can talk about that. But I think that is probably the tidiest way to have the finite work. Otherwise, it, it -- but for the proffer statement motion, you would be going to trial jointly.

MR. BONT: It is a hypothetical argument at this point.

THE COURT: Pardon me?

MR. BONT: It is a hypothetical argument at this point.

THE COURT: That's correct. So until I make a decision, A, about what is in the proffer statement; and B, whether consistent with the law that has been cited by the

Government and that our own research has established if references to your client can be satisfactorily removed, in order to permit a joint trial, particularly a four-week-long joint trial, I will attempt that and then hear argument on that.  Is that acceptable?

MR. BONT:  Yes, Your Honor.

THE COURT:  Mr. Sawa, is that acceptable to you?

MR. SAWA:  Yes, Your Honor.

THE COURT:  Okay, thank you.  That is how we will handle that.

So the next issue is the motion to dismiss.  So let me say, that I believe that -- I have read the parties' papers on this.  You just go ahead and make your argument, Mr. Kelly, on the motion to dismiss.

MR. KELLY:  Thank you, Your Honor.

THE COURT:  Uh-huh.  Again, not needing to repeat what is in your papers.

MR. KELLY:  Right.

THE COURT:  Okay.

MR. KELLY:  I, I will do my best.

THE COURT:  Okay.

MR. KELLY:  Your Honor, the Government has acted recklessly for nearly three years and has impeded Mr. Peavler's ability to put on a defense.  You have seen from the pleadings, we believe, that much of the evidence is not in dispute.  And

the Government has presented the testimony of one, evidence of who didn't take verbatim notes, who couldn't recall the questions, what the questions were and who asked them, and had trouble, I think, identifying exculpatory material.

The important thing about this motion is this is systemic. If this was just one issue, you might say, well, we can deal with that after trial, and we can judge what effect that had on the trial. The problem that we have is, when you make so many mistakes and so many serious mistakes about fundamental information in one interview, it removes the ability from counsel to rely on it at all in deciding what witnesses to call, what questions to ask.

It has a sort of a pervasive and debilitating fact on the Defense to put on a defense because *Brady* doesn't require us to make guesses as to what exculpatory information was provided to the Government. It just requires the Government to disclose the information to us, and yes, on this interview, we know what misstatements the Government made in connection with Mr. Peavler's interview. What we don't know is the other 60 interviews.

As you can see, we pointed out examples in the briefs where we think more exculpatory information was provided, and in thinking about this argument on the way over here, you know, it reminds me if you went to a doctor, and you found that a doctor made 18 important mistakes in a procedure, and the

doctor told you that they had a vivid memory of something that you know did not occur, you would walk away with a few firm conclusions. One of them would be, I am never using that doctor again. I wouldn't have any loved one be treated by that doctor, but you would also, when you hear the doctor say, well, don't worry, I have done 60 other of these using the same methodology, using the same processes.

THE COURT: I am sorry, are you saying 16 or 60?

MR. KELLY: Six, zero.

THE COURT: Six, zero.

MR. KELLY: There have been 60, 302s that have been produced in this case, and that is what I am referring to.

THE COURT: Okay.

MR. KELLY: Don't worry, the other 60 are just fine. You don't have to know the details to know that there are problems with those other 60 procedures because it is so persuasive. And this, the nature of this case is —

THE COURT: Let me stop you again. All 60 people, there is no recorded statement?

MR. KELLY: There are — and this is in our briefs. I believe there are 66 total interviews. I think the Government tape recorded six or seven. I may be wrong of the exact numbers. The Government says, well, that is because there was no lawyer present at those interviews. There are six or seven that are tape recorded.

THE COURT: Okay. Go ahead.

MR. KELLY: But there are 60 that are not, but the nature of this case is this was a big company. There were a lot of people that dealt with accounting issues, including evaluations of trucks. And in fact, there was an article -- it is alleged in the indictment in December of 2016, where a short seller of stock pointed to these transactions and said, uh-huh, those are overvalued. And upon receiving that report, the chairman of Celadon's audit committee at the board of directors tasked the accounting firm, the outside accounting firm, look into this and let us know what you think.

And the accounting firm did that, which led up to a phone call on February 9, 2017, at 9:30 a.m., where the accounting firm gave its opinion about the transactions. Now, everybody that would have dealt with Celadon's used trucks would say, and I presume they would say, I didn't believe the trucks were overvalued, and that would be people that worked with the trucks, the board of directors, which approved the filing after hearing from the outside auditor, and the outside auditor didn't say, don't file this Form 10-Q because your trucks are overvalued.

That is a lot of exculpatory information. So the Government has a tall task in identifying and reporting all that, but as Defense counsel, we are entitled to all of it, not just some of it, not just what people remember. And again, one

of the most alarming things I saw in the brief was, well, they just have different recollections, and it is not in our possession if our agent doesn't remember it and your lawyer does.  That would eviscerate *Brady* if that were true, but it is not true.  And in the same way, the Government has an obligation, and it is hard.  I agree it is hard to write down everything everybody says.  It is not an easy thing to do.

THE COURT:  It is not hard to push record.

MR. KELLY:  It is not hard to push record, that is right, but that is their obligation.  That is one of the most important jobs the Government has before trial is making sure it is a fair trial and that you have produced all the exculpatory information.  Now, we have tried, and you see it in the record --

THE COURT REPORTER:  I'm sorry, can you slow down and repeat?  "See it in the record."

MR. KELLY:  Yes.  You will see it in the record, we have tried to alert the Government to these problems.  We tried to work it out with the Government to say, hey, there are mistakes in this memo.  You should fix them, and we have gotten -- there is a lot of denial from the Government for almost three years now, and initially when we brought the *Brady* motion, you will remember from the pleadings in that one we said, we are not suggesting you acted in bad faith because it is not our style of practice of law to just accuse people of

acting in bad faith. But we were surprised when we got the response which they said, it is accurate, and we thought, how could they think that?

We have the notes, we see the notes, but yet, this is one of the problems that faces Defense counsel. Sometimes you just have to move ahead, but then, when the Government tries to use testimony that we know is false about something that was not said, we thought we had no choice but to waive our work product doctrine to put Ms. Wang's notes out there, which we never wanted to do to confront the falsity that the Government was trying to offer. And even then, even after seeing those notes, the Government responded the same way. They doubled down yet again and said, well, you are a defense lawyer. You must be biased.

And that is one of the ways that led us here today. When we looked at the case law on the Court's supervisory powers, this seemed like the perfect case for the exercise of those powers. You know, when you look at *Brady*, its objectives and the Court's supervisory powers are the same. It is to protect the integrity of the Court to prevent the Court from being used as a vehicle to reach a result that is not consistent with the standards of justice.

And if the Court will indulge me, there are a couple of sentences from the *Brady* opinion itself that really stand out. *Brady* said, "Society wins not only when the guilty are

convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."

Later on in the opinion, the Court said, "A prosecution that withholds evidence on demand of an accused which if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in a role of an architect of a proceeding that does not comport with standards of justice, even though, as in the present case, his action is not the result of guile."

And when you have what we think is misconduct, it is reckless. It doesn't have to be intentional. It doesn't mean that Agent Madtson sat there and said, well, I am going to really stick it to Bobby Peavler. Recklessness is enough to have a case dismissed, and when the Government has so many opportunities.

When they have six people there in the room, Mr. Sawa said that some of those people reviewed the memo and approved it. But we haven't had any of those people step forward either to say there were mistakes made in the memo or to take the stand and testify under the penalty of perjury, and that is meaningful, Your Honor. It is meaningful because they have an opportunity, and there is something holding them back from doing it. And I would suggest there are two things holding

back those five lawyers and agents; one of which is, they may say, I don't remember anything about anything of this proffer session. That is possible.

It is also possible that they know that Ms. Wang's memo was right and Agent Madtson's memo was not, and that is why they are not testifying. And we tried, we tried to have Mr. Linder testify as to an authentication issue, and the Government declined our request. They said -- and we offered to work it out because we are trying to avoid conflict. They weren't going to make it easy on us to call those five lawyers and agents to testify.

It was the clear message that we received was, it is not, you know, we are going to make it hard on you. And that is the important principle at stake here. I think the Court's decision on this motion is going to set an important precedent. You know, most cases don't have a substantial evidentiary record that we have in this case, as a result of the judge, the Court so kindly allowing us to develop this record.

It is important that the Government's strategy is to ask the Court to endorse its conduct to say that we can present testimony regardless of whether it is false or not, and we will just let the jury decide. I think Mr. Sawa said earlier that, that this is no different than any other issue, where you put it on the stand and you let the jury decide. But I would say this is different. It is different in a couple of ways; one of

which, is Agent Madtson and the other five lawyers and agents, they saw this with their own eyes. They heard it with their own ears.

This was not trusting Witness A over Witness B. If it were that, I would agree, that should be decided at trial, but the Government has a constitutional obligation not to knowingly use false testimony, and it would violate -- I mean, the trial would be for naught if we go through with it, if Agent Madtson testified as she is asking to do, and we would be in the same position. We would say, Your Honor, you have to vacate the trial because, you know, the Government knowingly used false testimony. So this issue has to be confronted by the Court. It is not just for the jury.

You know, we use the word that the Government fabricated evidence. That is a harsh word. Again, this is not something -- I would prefer not to be here. I would prefer the Government had just disclosed the evidence and we not have to bring this motion. It is unpleasant and uncomfortable, frankly, but we have a duty to raise the issue, now that it has happened.

Anyway, the Court has used its supervisory power. The Seventh Circuit said, and we cited this case in our brief, that the call for the Court's supervisory powers is at its highest and --

THE COURT REPORTER: I'm sorry, can you back up and

repeat?

MR. KELLY: Oh, sorry. I apologize. Of course. The Seventh Circuit said in the *Cortina* case, the call for the use of supervisory powers is at its highest and most defensible when it is designed to protect the integrity of the Court and to prevent the Court's processes from being misused through false testimony by the Government.

And the reason we come back to this, no other remedy, is others have tried and failed to stop this. We have tried and failed. Only the Court can stop this from happening and for making this case as an example of where the guardrails are, what you can't do when you are the Government, and I think this is an opinion that will probably be followed both by the Government and by the defense community.

And because the Government has had so many opportunities to fix this and has declined to do it, we ask that the Court dismiss the case and send a message to the Government that it can't present false testimony. It can't exempt itself from *Brady*, and that it can't act as recklessly as it has in this case. And that is why we ask that this indictment be dismissed.

THE COURT: Thank you.

Who is arguing for the Government, Mr. Sawa?

MR. SAWA: I will, Your Honor.

THE COURT: Go ahead, please.

MR. SAWA:  Your Honor, I will attempt to be brief and not reiterate arguments already made in the prior briefing. The Government would incorporate that by reference.  We will just mention a few notes and a few things to respond to counsel.

Rhetoric is not evidence.  Accusations are not evidence.  There needs to be evidence to support the remedy that counsel seeks, and you don't see that here.  There is speculation that there must have been this interview or these questions were asked, and not only were these questions asked, but exculpatory information was given.  Counsel hasn't interviewed that witness and had her tell counsel that she said that and the Government didn't record it.

There is no other allegation that witnesses have told the Government exculpatory information and the Government hasn't reported it to Defense counsel, because there is none, and you can't just simply accuse the Government of these things without backing it up.

Counsel talks about systemic, how this happened throughout the case.  Based on what?  Shouldn't there be another example?  If there are 60, 60 interviews, shouldn't counsel be able to find one person that provided exculpatory information that he can show to the Court the Government didn't produce?  There is none.

You know, I think of the objection assuming facts not

in the record, and I think that applies to a lot of Defense counsel's argument. I agree, if the things that he claims were done, those are awful. If the Government knowingly put on evidence that was false, if the Government knowingly hid *Brady* information, I agree, that should not be done. It should never be done and should not be acceptable, but where is the evidence supporting that?

There is one interview that he references about these discrepancies where counsel was present. There was not new information learned that wasn't produced to counsel. So instead of relying on evidence, relies on passion, relies on emotion, relies on rhetoric, relies on U.S.A. Gymnastics after the Court already said that is not relevant. This is an extreme remedy.

The Court -- Government set forth the standard to the Court some of the things that the Court has called it, a drastic step, a disfavored remedy, an extraordinary step, an extreme step. Such a step is not supported by the evidence in this case. It is not evidence. It is speculation. It is accusations. It is conspiracy theories that cannot be deemed sufficient to support such an extreme remedy.

The Government has asserted, continually, since August 2019, that what was stated in the proffer is consistent with the 302 and the notes of Special Agent Madtson. As far as Miss Redick's 302, the Government explained in its briefing why

it believed it was not unusual that that topic would not have came up, and the Government won't go into that. But for a defendant to base his motion on speculating what should have been said that day or what should have been asked, and then, speculating again on what should have been answered; and then, speculating again on whether that information should be exculpatory; and then, speculating again as a result that information should be produced to Defense counsel or the Defendant. That can't be sufficient for such an extreme remedy that is sought here.

Counsel points out a couple of things. First, there is this doctor analogy about the 18 things wrong; and then, he talks about he has 60 other patients. Wouldn't one of those 60 patients have a malpractice suit? If all of these bad things are being done to all of these other patients, wouldn't you have just one to point to? Wouldn't you have just one actual evidence of that occurring? But we don't.

And then, counsel, again, points out the additional witnesses from the Government, people at the proffer did not testify, which is confusing. Because additional people for Defendant didn't testify, Mr. Acosta, Defendant, Attorney Paul Will, but it also should not be deemed scandalous by any stretch.

Mr. Linder is now the criminal chief for the Southern District of Indiana, is no longer on this case. Mr. Rush

Atkinson is an assistant to the Deputy Attorney General, is no longer working on this case. These are very busy people that are no longer associated with this case. It should not be inferred that there is some scandalous reason why they did not testify, and that should justify this remedy.

Again, what it goes back to is this entire motion. It is just based on speculation and accusations, and because of that, because the evidence doesn't support this motion, it should be denied. Thank you.

THE COURT: Thank you, Mr. Sawa.

Mr. Kelly, any reply?

MR. KELLY: Your Honor, I would make just two points in response --

THE COURT REPORTER: I'm sorry, your mic.

THE COURT: Your mic, please.

MR. KELLY: Your Honor, I would make just two points in response.

THE COURT: Sure.

MR. KELLY: With respect to nobody has filed a malpractice case for the other 60 interviews, I think doesn't reflect the reality of criminal investigations, which is typically if you are being interviewed as a witness, people aren't providing your 302 for you to review. We don't know if there were lawyers there who were taking transcript-style notes who could compare the two. So I would suggest that the fact

that there hasn't been a complaint about 60 other interviews is kind of meaningless because nobody is looking at that issue. This case, this --

THE COURT: You are.

MR. KELLY: We are, correct.

THE COURT: Yeah.

MR. KELLY: But we also don't have access to a lot of the witnesses. We described with Miss Redick why she is not going to speak with us. The same is true for --

THE COURT: Excuse me, is it your representation to the Court that people have refused to speak with you?

MR. KELLY: We have sent letters to witnesses and said, here is the trial subpoena, and we would like to speak with you before the trial. And many times what we get in response is a response back saying, "Talk to our lawyer." And then, we speak to the lawyers, and the lawyers, many of which are adverse to Mr. Peavler -- it is in their incentive to want to blame Mr. Peavler -- don't take us up on the request to speak with them.

We will be in a position that for many of these people we will be calling them to the stand, and the only thing that we will know of what they have said will appear in the Government's 302. And that is why this is so harmful to us because we don't know what we can rely upon or what we can't. Mr. Sawa said, "Well, this is all based on speculation." Well,

Ms. Wang's contemporaneous notes aren't speculation.  It is something concrete that the Court can base this on.

THE COURT:  He is referring -- well, he disagrees with you about those notes, but he is also referring to the other witnesses that your -- the specter you are raising with the other witness' 302s being unreliable.

MR. KELLY:  Understood, understood.  And so that, I guess, is the crux of the matter before the Court is, are we required to go to trial without having accurate information about what people said, and because our answer is no, we ask the Court to dismiss the trial because in our view, if the two choices are you can have an unfair trial, or you can have no trial, the answer is to have no trial.  That is the more just route as opposed to having an unfair trial.  Thank you, Your Honor.

THE COURT:  Thank you.  Well, on this particular issue, I think the Government makes one valid point, which harkens back to what Mr. -- where did I put that piece of paper -- Mr. Bont said a minute ago, that this is hypothetical.  So I think that the complaints that you are making with respect to the potential for error in the other 302s are hypothetical.

But I think there is, there is an additional path that might elucidate this issue to see if that, if it is a reality or if it is completely speculation or not the reality at all that the other 302s are speculative.  So generally, I am aware

that defendants aren't entitled to take depositions prior to trial, and while Federal Rule of Criminal Procedure 15 would authorize it, the circumstances of that rule are not invoked here.

But as you have noted, the Court does have the inherent authority to regulate its proceedings. The Supreme Court has said as much in a case called *Degen*, D—E—G—E—N *v. U.S.*, 517 U.S. 820, and there the Court said, "Principles of deference counsel restraint in resorting to inherent power and require its use to be a reasonable response to the problems and needs that provoke it."

I am cognizant of this limitation, but I note that courts have previously relied on their inherent authority to authorize the taking of depositions in criminal cases. One of my colleagues in this court, Judge Lawrence, in *United States v. Rogers*, permitted depositions there to determine whether the Government had committed misconduct in the course of the case that was so egregious as to require dismissal.

In a similar case, the Tenth Circuit*, United States v. Carrigan*, 804 F.2d 599, affirmed the District Court's authority to authorize deposition. There it was a sanction for Government misbehavior where the Court had found that the Government had discouraged witnesses from voluntarily communicating with defense prior to trial.

But in the Court's view, the circumstances of this

case are somewhat unique, and the Court does find and it will be reflected when I ultimately decide what the, what has been proven with respect to the proffer statement.  The Court's review of that suggests that the Government's 302 is not entirely accurate.

In some instances it distorts the reality of what was said during the interview, and as a result, additional information is required to determine whether and to what extent the Government's other 302s concerning witness interviews are accurate, and in turn, whether any prosecutorial misconduct may have taken place as asserted in the motion to dismiss.

So pursuant to the Court's inherent authority and following the reason outlined in *Rogers* and *Carrigan*, the Court will authorize the issuance of subpoenas so that Mr. Peavler may depose certain Government witnesses for whom a 302 has been prepared for the purposes of making further presentation and presenting the evidence the Government claims is lacking with respect to its motion to dismiss.

I think 60 seems like a lot, but there are probably five key people that you could identify that you could depose and see, then, from their deposition, present the deposition and the 302 to the Court, and the Court can make a further determination.  So that is -- the motion to dismiss will remain under advisement.  The Court will issue the order basically encompassing what I just said, permitting the taking of five

depositions. You can pick the five, and in that way, we can determine whether there is evidence or not. And that will be helpful, I think, for the determination of the Court's ruling on the motion. So you need to get busy.

MR. BONT: Your Honor, can I be heard on that momentarily?

THE COURT: Yes.

MR. BONT: Thank you, Your Honor. As I indicated in my most recent filing, because Mr. Meek was not present at the proffer interview of Mr. Peavler, Mr. Meek, of course, cannot take a position as to what was said and what was not said as a factual matter. However, given that the Court has now made a finding that the 302 of Mr. Peavler isn't entirely accurate, we would also ask for the same opportunity to choose five individuals who we would like to depose to develop that record, and we may be joining in the motion to dismiss on that basis.

THE COURT: Mr. Sawa.

MR. SAWA: Your Honor, for the record, we object. We don't feel this is necessary. We don't feel that the Defendant has produced evidence requiring this type of procedure. I know you referenced Mr. Rogers. That was a death penalty case with Government misconduct alleged. Government doesn't believe that is similar to this type of case. To the extent the Court is going to allow these depositions to occur, the Government would ask to be able to attend those depositions as well.

THE COURT:  Of course, of course, of course.  All parties can be at the depositions.  That is not the issue, and let me say, I am not making a finding that is consistent with Rogers.  I do think there were inaccuracies in the 302 and some distortions.  I am making those findings.  I am not making a finding of willfulness or anything at this point, but I think the only way to test the accuracy of the other 302s is to permit this remedial step, and maybe there will be nothing to show for it.

But I think it -- I think that will help assuage my concern.  You can probably tell, because I have said it -- you can sit down.  I have probably said it 30 times already.  You-all, well, you should know if you didn't look me up.  I came from a state court where we worked for 12 years, and in the State of Indiana, the Indiana Supreme Court has required the taking of recorded statements just to avoid these issues.

I know it is not the normal practice, but none of this would have to happen if statements were recorded.  It is an observation.  It is not an order, but I will tell you, I recall -- this was a different issue -- telling a detective from the Marion County Sheriff's Department, "If you don't start turning that tape recorder on at the beginning of the interview, I am going to suppress every interview that you take."  And that is because they would talk for a minute and then turn it on.

So I would just urge you to consider the, the

unnecessariness of not hitting record. I just -- I don't understand it. I just tried a case where things were recorded, and I, I just don't understand the distinction, but that is just me. So that is my order on the motion to dismiss. We will reflect it in the minute entry for today. I will issue a ruling on the proffer.

I want to go back and just say this with respect to the proffer. The Seventh Circuit law about when the proffer is triggered is nuanced, and so whether it is triggered is a nuanced decision; and therefore, the accuracy of what was said for me to decide whether the proffer inclusion was triggered is nuanced, and so the accuracy is critical. And so I would just say this, going back to the beginning.

It is the Government that wants to introduce this, and like you said, though, Mr. Sawa, he made a statement. He agreed to make a statement in the contract to make a statement. It says, if you testify or proceed contrarily, this can be triggered. I get that, but I need to know what he said to first of all, make the decision about whether it is triggered.

So that is where we will conclude today, and once I get the ruling out with respect to the statement, why don't you just file a response, Mr. Bont, as to whether you are going to persist in your motion.

MR. BONT: Okay.

THE COURT: And then, if you-all will set a hearing.

That make sense?

MR. BONT: Thank you, Your Honor.

THE COURT: We have got a final pretrial set when, Miss Imel? Sorry.

THE CLERK: August, August 12.

THE COURT: August 12? Okay. So you-all need to get busy. Let me just say another thing. COVID is –– our timing is always terrible, it seems like, but COVID is on fire again. These new variants are not responding to the vaccination. People are also not developing antibodies to the new variants. People are getting reinfected within a week of being negative, they are positive again.

So it will likely be that we will have mandatory masks during the trial because I have got to make sure that I have enough people at the end of it for a jury. But if we get COVID, if one of our jurors gets COVID, chances are a lot more are going to get COVID during the trial. So we will just have to see. Okay? Thank you.

THE CLERK: All rise.

(Concluded at 11:06 a.m.)

– – –

48

CERTIFICATE OF COURT REPORTER

        I, Jean A. Knepley, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.


/S/ Jean A. Knepley                July 13, 2022
JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR   Date
Official Court Reporter
Southern District of Indiana
Indianapolis Division