UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

        Plaintiff,

v.

        Case No. 25-20560

        Hon. Terrence G. Berg

D-1 DAVID TAYLOR,
D-2 MICHELLE BRANNON, and
D-3 KATHLEEN KLEIN,

        Defendants.

_____/

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY (ECF NO. 129)

The United States respectfully submits this response opposing the Motion for

Discovery filed by D-1 David Taylor. (ECF No. 129). The Court should deny the

motion because there has been no Sixth Amendment violation and because the relief

requested is factually and legally inappropriate.

**PROCEDURAL BACKGROUND AND RELEVANT FACTUAL BACKGROUND**

On July 23, 2025, a federal grand jury indicted David Taylor and Michelle

Brannon on one count of Conspiracy to Commit Forced Labor in violation of 18 U.S.C.

§ 1594(b), six counts of Forced Labor in violation of 18 U.S.C. § 1589, and Money

Laundering Conspiracy in violation of 18 U.S.C. § 1956(h). (ECF No. 1). In the same

Indictment, Taylor was charged with two additional counts of Forced Labor. On February 11, 2026, a federal grand jury returned a First Superseding Indictment that charged a third defendant, Kathleen Klein, with Conspiracy to Commit Forced Labor in violation of 18 U.S.C. § 1594(b). (ECF No. 91).

During the investigation of the Kingdom of God Global Church (KOGGC), David Taylor, Michelle Brannon, and Kathleen Klein, the government subpoenaed and reviewed an enormous amount of financial evidence due to KOGGC's constant and voluminous solicitation of funds by their call center workers via a "prayer line." Following the FBI's review of financial data, interviews with dozens of witnesses, and calls from concerned family members, FBI agents acquired evidence that some callers to the "prayer line"—through which callers were encouraged to donate money to the organization and told that the money would go to KOGGC and its charities—were elderly individuals not entirely aware of what, or to whom, they were giving their money.

The evidence included, *inter alia*: (1) the FBI received phone calls from many family members worried about their elderly relatives providing money when asked to do so by the defendants' workers; (2) the FBI received and reviewed financial reporting that indicated potential fraudulent transactions; and (3) the FBI listened to multiple recorded financial "authorizations" saved in call center workers' phones.

FBI agents engaged in conversations with these concerned family members at least as early as 2024 and still continue to do so. For example, in an FBI 302 provided to the

2

defense, FBI agents interviewed a woman (S.G.) who was concerned that her mother, who suffered from dementia, had been donating increasingly large amounts of money to KOGGC from 2023 up through 2025, totaling more than $45,000.  S.G. believed her mother was told by KOGGC that the money her mother was donating was going toward building a school.  Ex. 1 (FBI 302 of S.G.).  In 2024, FBI agents interviewed a married couple after reviewing records that indicated the wife, K.W., had received a settlement and donated $263,400 to KOGGC. Ex. 2 (FBI 302 of K.W. and C.G). During the interview, it was apparent to FBI agents that K.W. was suffering from cognitive impairment and that her husband, C.G., may also have some mental impairment.  C.G. reported that his wife tried to donate additional money to KOGGC at a bank, but a teller refused to complete the transaction.

In addition to the multiple interviews like the ones summarized above, agents also uncovered recordings of conversations with callers, who appear to sound elderly, saved on a KOGGC call center worker's cell phone.[1]  In these audio recordings, the "donors" sound like elderly callers attempting to repeat after a KOGGC member who is prompting them to provide verbal authorization of a financial donation.  During many of these recordings, the level of cognition of the donor is notably concerning.  *See, e.g.*, Ex. 3 (Call and Transcript with A.M.).; Ex. 4 (Call and Transcript with A.H).; Ex. 5 (Call and Transcript with C.W.); and Ex. 6 (Call and Transcript with E.W.).

---

[1] The contents of L.J.'s cell phone have been provided to the defense.

Given these examples, together with the fact that many other witnesses have told agents how they were repeatedly and falsely assured by KOGGC members that their donations would be used for charitable purposes, FBI agents decided to investigate a $14,000 donation by 79-year-old A.G.  The investigation started with a phone call between Special Agent Erica Kelley and A.G.'s son who shared his concerns with Agent Kelley that his mother was aging and could be taken advantage of.  Ex. 7 (FBI 302 of C.G.).

As a result of the investigation into donations by elderly individuals to KOGGC and C.G.'s concerns, Agent Kelly informed A.G. that she wanted to make sure she "knew where [her] money was going" and let A.G. know that Taylor had been indicted on federal charges.  ECF No. 129, PageID. 1314; Ex. 8 (FBI 302 of A.G.).

The FBI 302 memorializing the conversation with A.G. was written by Agent Kelley one day after her conversation with A.G. It gives an even-handed and detailed report of the eight-minute phone call and makes clear that A.G. told law enforcement that she gave her money willingly, believing it to be for the "living expenses of the students and to help with church seminars." The FBI 302 also details that A.G. said she would be "okay with some of her donated money going to David Taylor's personal legal defense but not all of it."  The 302 also recounts that Agent Kelley assured A.G. she could donate her money to whoever she wanted, but Agent Kelley wanted to be sure A.G. was not being coerced into giving to KOGGC.  Ex. 8 (FBI 302 of A.G.)

The declaration submitted by defense was prepared months later and leaves out crucial details of the conversation between A.G. and Agent Kelley.  The declaration states that, while the "conversation was cordial and professional," the "agent's response and tone suggested disapproval." *Id*. at 1314.  Notably, it does not include Agent Kelley's reassurance to A.G. that she was free to give her money to whoever she wanted.  ECF. No. 129 PageID. 1316.

Agent Kelley was conducting an investigation into, and upholding her duty to ensure, the safety of the public and vulnerable victims. Nothing contained in the defense motion for discovery and deposition shows an infringement of Taylor's right to counsel, provides a legal basis for the extraordinary remedy of a pre-trial deposition of the agent, or requires the production of the agent's rough interview notes.

**ARGUMENT**

**I.      Witness Interviews Do Not Violate Taylor's Sixth Amendment Right**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  The Supreme Court has found that "an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citation omitted).  However, the right to counsel of the defendant's choice "is not absolute." *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007).  For example, a criminal defendant does not enjoy a

"constitutional right to use the proceeds of crime to finance an expensive defense."

*Caplin & Drysdale v. United States*, 491 U.S. 617, 630 (1989) (quotation omitted)

(finding that "the Sixth Amendment's protection does not go beyond the individual's

right to spend his own money to obtain the advice and assistance of counsel").  Taylor

alleges that Agent Kelley's contact with A.G. violated his Sixth Amendment right to

counsel.  The two cases Taylor cites in support of this argument are easily

distinguishable from the facts here.  The first is *United States v. Stein*, 541 F.3d 130 (2d

Cir. 2008).  In *Stein*, the Department of Justice promulgated a memorandum in 2003

directing prosecutors to inquire into whether a corporation was protecting culpable

employees by advancing attorney fees when the prosecutor was weighing the extent

and value of a corporation's cooperation.   *Stein*, 541 F.3d at 136.

In 2004, KPMG learned that twenty to thirty of its partners and employees were

subjects of a grand jury investigation and announced to all partners that the subjects

would be represented by competent counsel at the firm's expense. *Id.* at 137.

Thereafter, the federal prosecutors leading the investigation not only followed the

memorandum but also pressured KPMG leaders not to pay attorney fees or face

corporate indictment. *Id.* at 137-40.

KPMG, which generally would have paid employees' legal fees both pre- and

post-indictment without regard to cost, subsequently instituted a new policy capping the

amount of attorney fees it would pay, conditioning payment of fees on the employee's

cooperation with the government, and terminating payment of fees if an employee were indicted. *Id.* at 138.

The Second Circuit affirmed the district court finding that KPMG's decision to cut off all payment of legal fees to anyone who was indicted and to condition payment of fees on cooperation with the government was the direct result of the pressure applied by the DOJ memorandum and the federal prosecutors. *Id.* at 145-46. The conduct in *Stein* involved not only an official DOJ memorandum but also multiple meetings and emails in which federal prosecutors pressured KPMG leaders not to pay attorney fees or face corporate indictment, leading KPMG to change their attorney-fee policy and not pay attorney fees of indicted employees. *Id.* at 137-40.

In stark contrast, Agent Kelley had one conversation with an elderly donor to KOGGC during which she simply informed the donor that some part of her donation may be used to pay Taylor's attorney fees. There was no coercion and no threat of consequences. It was simply a conversation about the accurate facts which included Agent Kelley's reassurance to A.G. that she could donate to whomever in whatever amount she chose. And, as far as the government is aware, A.G. did not change her mind about paying any such fees as a result of her conversation with the agent.

The other case relied on by the defense, *United States v. Inman*, 483 F.2d 738 (4th Cir. 1973), is even further afield. In *Inman*, the issue on appeal was whether the district court abused its discretion and violated the defendant's Sixth Amendment right

to counsel when it denied defendant's motion for a continuance for the purpose of changing counsel from a public defender to retained counsel. *Inman*, 483 F.2d at 740. The Fourth Circuit affirmed the district court's decision, finding no Sixth Amendment violation, even though trial had moved forward and concluded without retained counsel's participation. *Inman*, 483 F.2d at 741. The issue presented in *Inman* is not present in the case at hand, and Taylor continues to enjoy the zealous representation of all of his selected and retained counsel.

Accordingly, Agent Kelley's communication with A.G. was not a violation of Taylor's Sixth Amendment right to counsel.

## II.    The Defendant's Proposed Remedies are Unsupported by Law

### a.  No Extraordinary Circumstances Exist to Justify the Deposition of a FBI Agent

Taylor requests that the Court allow a deposition of Agent Kelly.  However, the only mechanism for a party to take a deposition in a criminal proceeding is Rule 15 of the Criminal Rules of Federal Procedure which does not apply to the circumstances present here.  Fed. R. Crim. P. 15 (providing for deposition of a prospective witness to preserve testimony for trial only where the court finds there are "exceptional circumstances and in the interest of justice").  The Rule 15 standard is met only where the witness's testimony is material to the case, and the witness is unavailable to appear at trial.  *See, e.g., United States v. Cole*, No. 1:20-cr-424, 2022 WL 203055, at *4 (N.D. Ohio Jan. 24, 2022) (citing *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir.

1984)).  Neither circumstance is present here.  Agent Kelley's conversation with A.G. is not material to the charges in this case, and Agent Kelley is available to testify at trial where the defense may cross-examine her regarding her witness interviews if they so choose.

In support of his argument, Taylor cites two cases in which a court allowed the pre-trial deposition of a witness notwithstanding Rule 15 pursuant to the trial court's inherent authority to regulate its own proceedings.  Both cases involved extraordinary and unique circumstances that are not present in this case.[2]

In *United States v. Meek*, one of two indicted defendants participated in a proffer meeting.  An FBI agent took notes and prepared a 302 documenting the proffer. Defense counsel took notes during the proffer. Consistent with the terms of the proffer agreement, the government moved the court to allow the government to use statements made during the proffer to cross-examine the defendant or to rebut defense evidence at trial, or to introduce the defendant's statements if evidence at trial showed the defendant was not completely truthful in the proffer.  *United States v. Meek*, No. 1:19-cr-378, ECF No. 164 (S.D. Ind. filed Dec. 30, 2021).

The defendant opposed the government's motion, noting that defense counsel notified the government of discrepancies between defense counsel's recollection and

---

[2] The government has been unable to locate any case in the Sixth Circuit in which a court relied on its inherent authority to authorize the pre-trial deposition of a witness in a criminal case.

notes of the defendant's statements during the proffer and the FBI agent's 302 documenting the statements. *Meek*, ECF No. 203 (filed Jan. 7, 2022). In particular, the defense argued that the government omitted critical statements and information provided by the defendant. Specifically, the defense alleged the following: (1) the 302 failed to document *Brady* information; (2) the government misattributed statements to the defendant that were made by counsel; and (3) the government attributed a statement to the defendant that he did not say or adopt. *Id.* These statements and omissions went to the very heart of the case. *Id.* The defense further argued that a hearing, outside the presence of the jury, would be necessary should the government wish to introduce any of the defendant's statements at trial or void the proffer agreement. *Meek*, ECF No. 216, 233, 234.

After exhaustive litigation and evidentiary hearings regarding the proffer, the court, in an effort to resolve the issue for the trial, produced a "court constructed proffer transcript" to represent the entirety of the defendant's proffer statements. *Meek*, ECF No. 274.

During the final hearing on the proffer issue and on the defendant's motion to dismiss—cited by Taylor—the defense argued to the court that there were approximately fifty-five other unrecorded witness interviews for which the FBI had produced 302s, and it was concerned about the accuracy of those 302s and its ability to cross-examine witnesses based on those 302s. The court, relying on its inherent

10

authority to regulate its proceedings, ordered that the defense would be allowed to depose five witnesses for whom the FBI had prepared 302s of unrecorded interviews so as to "determine whether the Government had committed misconduct in the course of the case that was so egregious as to require dismissal." *Meek*, ECF No. 268, PageID 3965-69 (filed July 14, 2022). Notably, even under the extraordinary circumstances in *Meek* that had bearing on the guilt or innocence of the defendant, the court did not order the deposition of the FBI agents who drafted 302s, but rather the witnesses who had been interviewed.

Similarly, the other case cited by Taylor, *United States v. Carrigan*, 804 F.2d 599 (10th Cir. 1986)—cited by the *Meek* court in its hearing—also involved extraordinary circumstances not present here. *Id.* at PageID 3965. In *Carrigan*, the defense alleged that federal prosecutors interfered with defense counsel's access to government witnesses and requested that the district court advise certain witnesses that it would be appropriate to submit to defense interviews. *Carrigan*, 804 F.2d at 601.

At a hearing on the issue, the district court heard testimony of the witnesses, the witnesses' counsel, and the defense investigator. The court concluded that the prosecutors discouraged witnesses from communicating with the defense and "substantially chilled the witnesses' previously expressed willingness to discuss the facts with the defense." *Carrigan*, 804 F.2d at 601. The district court then ordered depositions of those witnesses under its "inherent power to enforce fair procedures to

assure a fair trial to reopen the access to these witnesses that existed before the government's actions." *Id.*

On appeal, the Tenth Circuit declined to order the extraordinary remedy of mandamus to vacate the district court's order. The court noted that "courts have long recognized that trial judges must be able to control their own proceedings to ensure the fair administration of justice within the confines of the law." *Id.* at 603. The court further noted that both sides have the right to interview witnesses before trial and that prosecutors have a duty not to discourage or obstruct communication between witnesses and defense counsel. *Id.* The court concluded that "the district court has the power *in extraordinary circumstances* to permit the taking of an opposition witness' deposition," and the government's active interference with defense counsel's access to the witnesses constituted such an extraordinary circumstance. *Id.* at 604 (emphasis added). The court noted that the question was "a close one" and that it "might well have ruled differently than did the district court" but that it would not find that the high standard for a writ of mandamus was met. *Id.*

"Because of their very potency, inherent powers [of the trial court] must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). The extraordinary factual circumstances, present in *Meek* and *Carrigan*, that might justify a court's use of its inherent powers to order a deposition are simply not present in this case. At issue in *Meek* was the substance of the defendant's own proffer

12

statements, which would determine whether those statements could be introduced at evidence at trial, and whether the defendant had breached the proffer agreement. *Meek* also involved significant allegations of *Brady* violations by the government. These issues had enormous implications for the defense at trial and went to the heart of the government's case. Even in light of these material issues, the court in *Meek* did not order the deposition of an FBI agent; rather, it ordered the deposition of fact witnesses to determine the accuracy of the 302s. The district court in *Carrigan* also did not order the deposition of a prosecutor or FBI agent; it permitted depositions of specific fact witnesses where it found that the government had interfered with defense counsel's access to those witnesses.

There is a striking difference between the issues in *Meek* and *Carrigan* and Agent Kelley's statement to an elderly individual who donated to KOGGC. Agent Kelley reached out to investigate A.G.'s donation following a growing concern of elder abuse, fraud, and exploitation by the KOGGC. The agent's statement is not evidence relating to the current charges in the First Superseding Indictment or relevant to the facts of the case. Should defense counsel wish to attack the government's investigation of this case, they may cross-examine the agent on this topic at trial. Such cross-examination is the only appropriate remedy for the defendant's complaint.

### b.  The Defense's Request for an Agent's Rough Notes is Unfounded

Taylor also requests that the Court order the government to produce the agent's rough notes of the interview with A.G.  The Court also should deny this request.  It is well established that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  For most criminal cases, there are three governing rules that "'exhaust the universe of discovery to which [a] defendant is entitled.'"  *United States v. Watson*, 787 F. Supp. 2d 667, 672 (E.D. Mich. 2011) (quoting *United States v. Presser*, 844 F.2d 1275, 1285 n.12 (6th Cir. 1988)).  The first is derived from *Brady v. Maryland*, 373 U.S. 83 (1962), which requires the government to disclose evidence that is favorable to the accused and material to guilt or sentencing.  *Id.* at 672 & n.5.  The second is Federal Rule of Criminal Procedure 16(a), which "requires the government to disclose, upon a defendant's request, any oral or written statements of the defendant, the defendant's prior record, any documents or tangible evidence within the government's possession, custody or control [that are material to the defense, will be used in the government's case-in-chief, or were obtained from the defendant], reports of examinations or tests, and a summary of any expert witness testimony."  *Id.* at 672 (citation and quotation omitted).  The third rule governing discovery in criminal cases is the Jencks Act, 18 U.S.C. § 3500, which "generally requires the government, on motion of a

14

defendant, to produce statements in its possession of witnesses who testify at trial."
*Id.* (quotation omitted).

The government is aware of its discovery obligations under these rules and doctrines, has complied with its obligations, and will continue to comply with its obligations. The government reviewed the agent's rough notes of her brief call with A.G. and represents that there are no inconsistencies or material omissions between the notes and the 302 that has been produced to the defense.

Courts in the Sixth Circuit have declined to order the government to produce agent notes where such notes do not contain *Brady* or Jencks material and are not otherwise discoverable under Rule 16. *See, e.g., United States v. Stephens*, 492 F.2d 1367, 1377 (6th Cir. 1974) ("The Jencks Act applies to a 'substantially verbatim recitation' of an oral statement by a witness and does not apply to an officer's rough notes."); *United States v. Mills*, No. 16-cr-20460, 2019 WL 3423318, at *5 (E.D. Mich. July 30, 2019); *Hassan*, 2014 WL 3526672, at *2.

The agent's notes are not discoverable under *Brady* as they are not exculpatory and material, and the defense has made no showing to the contrary. *See United States v. Hassan*, No. 13-cr-20894, 2014 WL 3526672, at *2 (E.D. Mich. July 16, 2014) ("An agent's rough interview notes may also be discoverable under *Brady* if the defendant shows that the notes are exculpatory and material.") (quotation omitted).

15

The agent's notes are also not Jencks material; they are not a "substantially verbatim" recitation of A.G.'s statement that were made "contemporaneously" to the statement, *Palermo v. United States*, 360 U.S. 343, 351 (1959), and A.G. did not "adopt" the notes. *United States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993).

Finally, the agent's notes do not fall under any of the provisions of Rule 16. *See Presser*, 844 F.2d at 1285 (finding that "discovery afforded by Rule 16 is limited to the evidence referred to in its express provisions").

Accordingly, the defense is not entitled to the discovery of the agent's rough notes, and the Court should not order the government to produce them.

## CONCLUSION

For all of these reasons, the Court should deny this motion that inappropriately alleges constitutional violations and questions the integrity of a law enforcement agent who was properly investigating donations to KOGGC to determine whether there was evidence of additional federal violations or additional vulnerable victims of Taylor, Brannon, and Klein's criminal organization.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney

s/*Sarah Resnick Cohen*
SARAH RESNICK COHEN

16

Assistant U.S. Attorney
211 W. Fort St., Ste. 2001
Detroit, Michigan 48226
Phone: (313) 226-9637
E-mail: sarah.cohen@usdoj.gov
Mich. Bar No.: P51968

A. TYSEN DUVA
Assistant Attorney General
Department of Justice
Criminal Division


*s/ Lindsey Roberson*
LINDSEY ROBERSON
Trial Attorney
Human Rights & Special Prosecutions Section
1301 New York Avenue, NW, Suite 200
Washington DC 20005

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

s/*Sarah Resnick Cohen*
SARAH RESNICK COHEN
Assistant U.S. Attorney