**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

UNITED STATES OF AMERICA,    )
    )
    Plaintiff,    )
    )
v.    )    Case No. 2:25-cr-20560
    )    Hon. Susan K. DeClercq
D-1 DAVID TAYLOR,    )
    )
    Defendants.    )
    )

**DEFENDANT DAVID TAYLOR'S MOTION**
**FOR RETURN OF SEIZED PROPERTY**

Defendant David Taylor, through counsel, seeks release of the funds that the

government has restrained from accounts held in the name of the Kingdom of God

Global Church (the "Church"), together with the precious metals the Church

purchased with donations. The funds and metals should be returned for three

independent reasons:

*First*, the government has not established probable cause that the restrained

assets are subject to forfeiture under 18 U.S.C. § 1594(d) or 18 U.S.C. § 982(a)(1),

and the warrants authorizing seizure of every dollar in the Church's accounts are

facially overbroad. The Church's own records show that the eight alleged victims

raised approximately $150,000, approximately *four percent* of the $4,201,637.65

seized. *Second*, the restraint violates the Fifth Amendment's Due Process Clause.

*Third*, the restraint of the Church funds violates the Religious Freedom Restoration

1

Act, 42 U.S.C. § 2000bb-1. Each of these grounds independently warrants release of the seized assets—at minimum, the approximately $4 million in funds that are unrelated to any alleged forced labor.

The Court should grant this motion and (1) release all $4,201,637.65 of seized funds and the seized precious metals, (2) at minimum, release the approximately $4 million—plus all precious metals—that no theory of forfeiture reaches; (3) alternatively, release $3,000,000 for defense costs under court-approved disbursement procedures.

## INTRODUCTION

This is a case about a church and the donations of tens of thousands of Christians whom the government has never charged with any wrongdoing. Pastor David Taylor founded the Kingdom of God Global Church as a teenager, when he was broke and homeless, and has led it for more than three decades. The Church is a nonprofit corporation governed by a board of directors and bylaws. It operates congregations in multiple states. It broadcasts services through Facebook, Instagram, television, and live video stream to hundreds of thousands of people across the United States and millions across the globe. It engages in charitable work that includes caravans of goods and supplies for communities affected by natural disasters. And it is funded by what churches have always been funded by: the voluntary offerings of believers who give in accordance with their Christian faith.

The government has seized approximately $4,201,637.65 of those tithes from the Church's bank accounts, along with precious metals, such as gold, that the Church purchased with donations. Most of the donors whose offerings fill those accounts have never set foot in a Church building. None of them has ever spoken to one of the handful of individuals the government has identified as victims of forced labor. Most gave in response to broadcasts, mailings, the Church's website, or recurring giving programs they set up years ago. They did not give to fund a criminal enterprise. They gave to support a ministry.

But the government has taken every dollar of those offerings on the theory that because eight of the more than one hundred staff members who worked in the Church's fundraising operation were allegedly subjected to forced labor, *every donation* to the Church is forfeitable proceeds, regardless of who solicited it. In other forced-labor cases, the government has confined itself to what its agents could actually trace to the named victims' labor. *See United States v. Luong*, No. 3:20-CR-00079-KDB-DCK, 2021 WL 10428312, at *1*, *3 (W.D.N.C. Mar. 16, 2021) (government seized only the $50,000 of a $103,171 salon account that the case agent traced to the labor of the single named victim). Here, the government took *every* dollar given to the Church with no victim-specific tracing at all. On its face, that was unlawful.

But that's not all. The defense has now done the arithmetic the government would not. The Church's contemporaneous fundraising records attribute donations to every fundraiser who has served on its staff. Those records show that the eight alleged victims raised approximately $150,000 across their entire recorded tenures. *See* Exs. C & D. In other words, the government took ***twenty-five times*** what its own alleged victims raised.

The Constitution and laws of the United States do not permit any of this. Three independent grounds require release of all of the seized funds.

*First*, the government has not established probable cause that the restrained assets are subject to forfeiture under 18 U.S.C. § 1594(d) or 18 U.S.C. § 982(a)(1). The seizure warrant affidavit nowhere quantifies what the eight named victims raised. It nowhere distinguishes them from the broader Church workforce or the broader community of donors that supported it. It nowhere accounts for the multiple non-call-center channels through which the Church receives donations. And it sweeps in years of deposits that predate the charged conspiracies. And the tracing the government skipped has now been done: by the Church's own records, the eight alleged victims raised approximately $150,000 combined—leaving approximately $4 million of the seized funds beyond the reach of the government's own theory. Exs. C & D. Probable cause cannot rest on a categorical assumption that every dollar in a church's bank account is proceeds of crime. What is more, the government

sought, and the magistrate granted, the seizure of *every* dollar in *every* account—warrants that are facially overbroad. That approximately $4 million should be returned.

*Second*, even setting aside these threshold defects, the restraint violates both the Fifth and Eighth Amendments. The government seized every dollar the Church held *ex parte*, on affidavits filed under seal, without notice or any opportunity to be heard. Nearly a year later, the deprivation continues without adjudication—while Pastor Taylor sits incarcerated, stripped of the funds the Church's board has lawfully committed to his defense. And the penalty the government seeks to extract is grossly disproportionate to the alleged offenses. It took twenty-five times what its own alleged victims raised, sweeping in millions of dollars of donations that no theory of forfeiture can reach. The Due Process Clause and the Excessive Fines Clause forbid both.

*Third*, the seizure of the Church's operating funds violates the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1. Stripping a church of every dollar of its operating funds—including funds that no theory of forfeiture can reach—substantially burdens religious exercise, serves no compelling governmental interest, and is the opposite of the least restrictive means.

5

## FACTUAL BACKGROUND

Pastor Taylor is the founder and lead pastor of the Church, a religious organization. The Church and its predecessor have existed since 2007—long before the April 2013 start date of the conspiracy charged in Count One of the Second Superseding Indictment. *See* Second Superseding Indictment, Dkt. No. 194 ¶ 13 (alleging conspiracy beginning "April 2013"). Over their decades of operation, the Church has received donations from tens of thousands of donors across the country and around the world. Those donations have funded religious services, broadcasts, conferences, charitable activities, and the ordinary operations of a functioning religious organization.

On July 23, 2025, a federal grand jury returned an indictment charging Pastor Taylor with conspiracy to commit forced labor, forced labor, and money laundering conspiracy. Dkt. No. 1. A Superseding Indictment followed on February 11, 2026. Dkt. No. 91. A Second Superseding Indictment followed on July 29, 2026. Dkt. 194. The Second Superseding Indictment alleges that, between April 2013 and July 2025, Pastor Taylor and others compelled the labor of individuals working at the Church call centers and as personal servants. *Id.* 6–7, 10, 13, 16–40. Count Ten charges money laundering conspiracy with respect to a narrower period—"no later than 2018" through July 2025. *Id.* ¶ 44. Counts Two through Nine each charge forced labor as to a single named victim, designated V-1 through V-8. *Id.* ¶¶ 41–42.

6

Although Count One contains broader allegations concerning unnamed laborers, the Second Superseding Indictment charges no substantive forced-labor count involving any person other than V-1 through V-8.

Between August 18 and August 25, 2025, the government obtained *ex parte* seizure warrants from a magistrate authorizing the seizure of five Chase Bank accounts, five vehicles, a Bitcoin wallet, and a boat. The supporting affidavits were filed under seal. *See* Gov't Opp. to KOGGC Pet., Case No. 25-mc-51526, Dkt. No. 3 at 3. The seizures were executed on August 27, 2025—the same day the government filed its First Forfeiture Bill of Particulars. *See* Dkt. No. 5.

The bill of particulars identifies five J.P. Morgan Chase bank accounts held in the name of the Church: accounts ending in 6655, 6671, 7697, 7169, and 2679. Dkt. No. 5 at 8. As the bill of particulars acknowledged, these accounts were not Pastor Taylor's, but those of "The Kingdom of God Global Church." *Id*. The five Chase accounts served different operational purposes—operating account, designated giving, payroll, ministry programs, and reserves. Exhibit A, Declaration of Kearisten Jones at ¶ 11. At the time of seizure, the funds in the five accounts were as follows:

| Account | Balance at the Time of Seizure in September 2025 |
|---|---|
| Chase Checking x2679 | $100.00 |
| Chase Checking x6655 | $214,158.44 |
| Chase Checking x6671 | $19,707.45 |
| Chase Savings x7697 | $3,131,971.86 |
| Chase Savings x7169 | $835,699.90 |
| **Total** | **$4,201,637.65** |

The seizure warrant affidavit describes each of the eight named victims in entirely qualitative terms. Exhibit B, Seizure Aff. ¶¶ 38–45 (hereinafter "Aff."). The Affidavit identifies the years each alleged victim worked at the Church, the locations where each worked, the team or function each served, and the alleged punishments each allegedly endured—including rebukings and threats of spiritual consequences. *Id.* The Affidavit *nowhere quantifies* the donations raised by any of the eight alleged victims. It nowhere states that V-1 raised any specific amount; nor does it state any amount for V-2, V-3, V-4, V-5, V-6, V-7, or V-8. It never provides an aggregate figure for what the eight victims collectively raised. It does not even offer an estimate.

Nor does the Affidavit attempt to disaggregate the eight named victims from the broader staff at the Church. The Affidavit acknowledges that "almost all the laborers" worked at the call center, Aff. ¶ 35, and references the existence of "other laborers" throughout, *see, e.g.*, *id.* ¶¶ 32–34, 36. The Church operated multiple call centers across Michigan, Missouri, Florida, and Texas continuously for more than a decade. *Over 100 staff members* worked in fundraising during the alleged conspiracy period. Exh. A ¶ 16. The Affidavit does not identify how many. It does not identify what proportion of donations any specific staff member—alleged victim or otherwise—raised.

8

What little tracing the Affidavit attempts for each Chase account follows the same problematic pattern. Take Chase 6655 as the principal example. The Affidavit says that between November 2021 and October 2024, Chase 6655 received approximately $24,000,000, of which "approximately $22,000,000 or 94%" came "from payment platforms used in connection with fundraising"—Vanco, PayPal, 5/3 Bankcard, Cash App, Paymentech, and Wise. Aff. ¶¶ 104, 106. The Affidavit then leaps to the conclusion that there is probable cause that the *entire balance* of Chase 6655 "contains proceeds derived from" forced labor. *Id.* ¶ 108. The Affidavit does not connect any specific Vanco deposit, PayPal deposit, or other transaction to the call-center solicitation efforts of one of the alleged victims. Nor does it address what portion of deposits came from other sources altogether—like the Church's website, mailings, broadcast appeals, recurring giving programs, or events. It simply assumes that because the funds came through "payment platforms used in connection with fundraising," all of the funds are proceeds of forced labor. *See* Aff. ¶¶ 94, 106, 111.

What the Affidavit never quantified, the Church's own records do. The Church maintains contemporaneous fundraising records that attribute donations to each member of its fundraising staff—broken out by year and, in many periods, by week and by day. Exhibit C, Katie Frazier Dec. at ¶¶ 2–7. Those records cover every staff member who has solicited donations for the Church, including staff who left years ago, and state an all-years fundraising total for each. *Id.*

9

The Amended Protective Order here, Dkt. No. 133, prohibits disclosure of the alleged victims' identities to third parties—including the Church itself. The Church Records Declaration therefore presents the fundraising totals for the Church's staff without identifying which individuals the government has designated as V-1 through V-8. The records attribute fundraising to seven of the eight and reflect no fundraising at all by the eighth. Exhibit D, Sealed Counsel Affidavit ¶ 8.[1] The results show that across every year the Church's records cover, the eight alleged victims raised only about $150,000. *Id.* ¶ 9. That figure spans the whole of each alleged victim's recorded tenure—including years that predate 2018, when the money laundering conspiracy charged in Count Ten allegedly began. It is approximately four percent of the $4,201,637.65 the government seized.

Pastor Taylor's personal financial circumstances are severely constrained. He has been incarcerated for nearly a year. He has no significant personal accounts. The real property and vehicles in which he holds interests have likewise been seized. *See* Dkt. No. 5 at 2–7. He has no liquid assets sufficient to retain qualified counsel for a case of this magnitude. The Second Superseding Indictment runs 48 pages and charges three defendants with 10 counts; identifies eight individual victims; alleges conduct in Michigan, Missouri, Florida, and Texas; and references hundreds of text

---

[1]     Undersigned counsel, who is permitted to know those identities, has matched each of the eight alleged victims to the Church's cumulative records and totaled their amounts in a separate affidavit filed under seal. Exh. D ¶¶ 4–9.

messages and transaction records spanning more than a decade. The discovery already produced by the government is voluminous and will require significant time to review with Pastor Taylor, especially given his current incarcerated status. Pastor Taylor's defense will require forensic accountants, financial-flow experts, trial counsel familiar with federal forced-labor and money laundering practice, and the full resources necessary to prepare for what will likely be a multi-week jury trial.

On July 29, 2026, the Church's Board of Directors, acting consistent with the Church's bylaws and internal governance, passed a resolution authorizing the indemnification of Pastor Taylor's defense costs in this matter up to $3 million. *See* Exh. A ¶¶ 9–10.The resolution creates a chose in action in Pastor Taylor's favor against the Church for that amount. The government's continued restraint of the Church's liquid assets prevents satisfaction of that obligation and directly impairs Pastor Taylor's ability to retain counsel of his choice.

## ARGUMENT

Rule 41(g) permits "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to move for its return. Fed. R. Crim. P. 41(g). The Rule "is ordinarily used to seek return of property after an indictment is issued." *United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005). If the motion is granted, the court "must return the property to the movant," though it "may impose reasonable conditions to protect access to the property and its use in later

11

proceedings." Fed. R. Crim. P. 41(g). The court "must receive evidence on any factual issue necessary to decide the motion," *id.*, but "need not necessarily conduct an evidentiary hearing on every Rule 41(g) motion," *United States v. Albinson*, 356 F.3d 278, 281 (3d Cir. 2004).

## I. PASTOR TAYLOR HAS STANDING TO SEEK RETURN OF THE RESTRAINED FUNDS.

The government may say that the seized accounts are titled to the Church, not to Pastor Taylor. That objection fails. Rule 41(g) extends to any "person aggrieved by an unlawful search and seizure of property or by the deprivation of property," and to satisfy that standard—and Article III—a movant need only allege "a colorable ownership, possessory, or security interest in at least a portion of the defendant property." *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1204 (10th Cir. 2001). Pastor Taylor holds two such interests. Either suffices.

### A. The Church's Indemnification Obligation Gives Pastor Taylor a Direct Interest in the Restrained Funds.

Pastor Taylor holds a present legal entitlement to the restrained funds. Acting under its bylaws and Missouri law, the Church's Board of Directors has resolved to indemnify Pastor Taylor's defense costs in this matter up to $3 million. Exh. A ¶ 10; *see* Mo. Ann. Stat. §§ 355.471, 355.476(5) (payment may be made "in advance of the final disposition" of a "criminal action" "as authorized by the board of directors").

12

The Church's resolution creates a chose in action, which is a present, enforceable entitlement running to Pastor Taylor against the Church. A chose in action is "an interest in property not immediately reducible to possession" and can "include a financial interest such as a debt, a legal claim for money, or a contractual right." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 275 (2008). And "a chose in action is a constitutionally recognized property interest[.]" *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985); *Hasanaj v. Detroit Pub. Schs. Cmty. Dist.*, 35 F.4th 437, 447 (6th Cir. 2022) ("A property interest can be created by a state statute," as it is here by the statute that authorizes his indemnification.); *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.").

So, Pastor Taylor does not come to this Court as a stranger to the seized accounts asserting "another person's money." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989). He comes as the holder of a lawful claim to those very funds. His claim is one that the government's restraint alone prevents the Church from satisfying.

That interest is more than enough to bring this motion. "[T]he burden of establishing standing in civil forfeiture cases is not rigorous[.]" *United States v. Phillips*, 883 F.3d 399, 403 n. 1 (4th Cir. 2018); *accord Rodriguez-Aguirre*, 264 F.3d at 1204. A present entitlement to be paid from the restrained accounts is a "security

13

interest" in them in every sense that matters, and it is Pastor Taylor's alone, not the Church's. He is aggrieved by the restraint because the restraint is what stands between him and funds the Church is legally bound to pay him.

### B.     Pastor Taylor Holds a Colorable Possessory Interest in the Seized Assets.

Pastor Taylor independently satisfies Rule 41(g)'s "aggrieved person" standard through his own possessory interest in the specific property seized. The Sixth Circuit has recognized that "an officer of a corporation may be a 'person aggrieved' by a corporate search and seizure" where he demonstrates an independent, personal interest in the items seized. *United States v. Mohney*, 949 F.2d 1397, 1403 (6th Cir. 1991). In this context, a "property interest less than ownership may also be sufficient to create standing." *United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 498 (6th Cir. 1998); *see Munoz-Valencia v. United States*, 169 F. App'x 150, 152 (3d Cir. 2006) (a colorable ownership or possessory interest includes a showing that the claimant exercised dominion or control over the property).

Pastor Taylor makes that showing. He founded the Church more than three decades ago, serves as its lead pastor and doctrinal head, and, as a member of its board of directors, has personally directed and overseen the seized funds at issue. *See* Exh. A ¶ 3–4. To be sure, a corporate title alone does not confer standing to reclaim corporate property. But Pastor Taylor does not rest on his title. He rests on

decades of personal dominion over these specific assets and on the Church's binding commitment of those assets to his defense—interests that are at least "colorable," which is all the standing inquiry requires. *Rodriguez-Aguirre*, 264 F.3d at 1204. Standing asks whether the movant has a sufficient stake to invoke the Court's aid, not whether he will prevail. Pastor Taylor has that stake twice over. And the Church, for its part, has separately petitioned for the return of its property. *See* Case No. 25-mc-51526, Dkt. No. 1. Pastor Taylor's standing is independent of, and complementary to, the Church's.

## II.     THE GOVERNMENT FAILED TO ESTABLISH PROBABLE CAUSE THAT THE RESTRAINED ASSETS ARE SUBJECT TO FORFEITURE.

The restrained funds are not subject to forfeiture. The Fourth Amendment demands that any seizure rest on probable cause. *See United States v. Cosme*, 796 F.3d 226, 235 (2d Cir. 2015). To seize assets before trial, the seizure warrant affidavit must demonstrate probable cause that the restrained funds "constitute" or are "derived from" the "proceeds" of forced labor proscribed by 18 U.S.C. § 1589, were "involved in" that offense, or were "involved in" money laundering under 18 U.S.C. § 1956. In this context, the "proceeds" are any money "derived" from the alleged victims of the forced labor conspiracy. *Luong*, 2021 WL 10428312, at *2–3. As for property "used or intended to be used to commit or to facilitate" the

15

crime, there is a nexus if there is a substantial connection between the property to be forfeited and the crime. *United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010).

The government must also show that the seized property had some meaningful connection to the charged crime. "Substantial connection may be established by showing that use of the property made the prohibited conduct less difficult or more or less free from obstruction or hindrance." *Id.* (internal quotation marks omitted). In the case of proceeds, there is a nexus if Defendant would not have received the proceeds "but for" the involvement in the crime. *See United States v. Farkas*, 474 F. App'x 349, 359–60 (4th Cir. 2012). Strict tracing from a particular criminal act to a particular asset is not required if the totality of the circumstances establish that the asset constitutes or is derived from proceeds. *United States v. Smith*, 749 F.3d 465, 488 (6th Cir. 2014).

Here, the government's showing falls short. The Affidavit (1) identifies no dollars raised by the eight alleged victims, (2) conflates those victims with the broader Church staff, (3) sweeps in donations from fundraising channels with no connection to call-center labor at all, and (4) reaches back across years that predate the charged conspiracies. The warrants are also facially overbroad, authorizing the seizure of entire account balances—balances that are, at most, commingled substitute assets beyond the reach of pretrial restraint. Any one of these defects is fatal to probable cause. Pastor Taylor may raise this constitutional challenge before

16

trial under the Due Process Clause. *United States v. Bikundi*, 125 F. Supp. 3d 178, 187 (D.D.C. 2015). He and the Church are entitled to release of the funds.

### A. Only Property Involved in or Constituting the Proceeds of the Charged Offenses Is Forfeitable.

Two separate statutory hooks are at play for the seizures at issue.

For forced labor, under 18 U.S.C. § 1594(d), only two categories of property are forfeitable: (1) "any property, real or personal, that was involved in, used, or intended to be used to commit or to facilitate the commission of" the offense, and any property traceable to such property, 18 U.S.C. § 1594(d)(1); and (2) "any property, real or personal, constituting or derived, from any proceeds that such person obtained, directly or indirectly, as a result of" the offense, and any property traceable to such property, 18 U.S.C. § 1594(d)(2); *see, e.g., Luong*, 2021 WL 10428312, at *3 ("Defendant received significant revenue from the forced labor of K.D. for over a year by requiring her to work long hours at the Salon.").

Separately, under 18 U.S.C. § 982(a)(1), property is forfeitable only if it was "involved in" the money laundering offense or is "traceable to such property." The corpus of a money-laundering conspiracy consists of the funds that the defendant allegedly conspired to launder. *United States v. Huber*, 404 F.3d 1047, 1056 (8th Cir. 2005). Whether specific funds constitute the corpus of a money-laundering conspiracy or the proceeds of a forced-labor offense "rests on whether certain conduct involving funds constitutes" the charged crime, a determination made by

17

examining "the statutory text, winnowed by the allegations of the indictment." *Id.* Here, the funds at issue were restrained pursuant to a post-indictment seizure warrant, so the statutory text must be winnowed by the allegations in the seizure Affidavit. *See United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998); *United States v. Voigt*, 89 F.3d 1050, 1084 (3d Cir. 1996) ("In the money laundering context . . . the forfeiture provision makes clear that the government is entitled only to property 'involved in' or 'traceable to' money laundering activity.").

What matters here is that the offenses charged are specific. The forced labor counts identify the alleged victims—who allegedly generated the "proceeds" that would be subject to forfeiture—and the time period during which it happened. Dkt. 91 at ¶ 57. Section 1594(d)(2) reaches only proceeds obtained "as a result of such violation." The government cannot satisfy probable cause by gesturing at "forced labor in general" or "the KOGGC organization." It must identify the dollars derived, directly or indirectly, from the specific charged violations. *See e.g.*, *Luong*, 2021 WL 10428312, at 3 (calculating the amount forfeitable under 18 U.S.C. § 1594(d) based on the specific "revenue" the identified victim "grossed . . . during the time [she] was forced to work" at the defendant's nail salon)*; cf. United States v. Taquarius Kaream Ford*, 296 F. Supp. 3d 1251, 1261 (D. Or. 2017) (in a sex trafficking case under 18 U.S.C. § 1591, the "proceeds" subject to forfeiture were the money paid to the traffickers for the commercial sex acts performed by the victims).

**B.      The Restrained Funds are Not Proceeds of the Charged Offenses for Four Independent Reasons, and the Warrants Are Facially Overbroad.**

Whether funds constitute proceeds of the charged offenses or the corpus of the charged money-laundering conspiracy "rests on whether certain conduct involving funds constitutes" the charged crime. *Huber*, 404 F.3d at 1056. Here, the conduct alleged in the Affidavit does not reach the restrained funds. The Affidavit fails to establish probable cause on four independent grounds, each of which places the restrained funds outside the reach of §§ 1594(d) and 982(a)(1) and requires their return.

**1.      *The Affidavit Identifies No Dollars Raised by the Eight Named Victims.***

The Affidavit's fundamental defect is that it never even attempts to quantify what the eight named victims raised. The descriptions of V-1 through V-8 in paragraphs 38 through 45 are qualitative. Each paragraph identifies the years an alleged victim worked at the Church, the locations where the victim worked, the team or function the victim served, and the punishments the victim allegedly endured. Aff. ¶¶ 38–45. None states a dollar figure. None even estimates.

Consider the Affidavit's description of V-1. It says that V-1 "was a laborer in JMMI/KOGGC between approximately 2016 and 2022" who "worked at the organization's properties located in Michigan, Missouri, and Florida . . . in the call centers," and "received threats or punishments from [defendants] consisting of

forced additional labor, sleep deprivation . . . [and] rebukings." Aff. ¶ 38. That is the entire description. Nothing about how much V-1 raised. Nothing about which calls V-1 made. Nothing tying any specific dollar in any Chase account to anything V-1 did. The descriptions of V-2 through V-8 follow the same pattern. Aff. ¶¶ 39–45.

This is not a minor omission, but a fatal one. Forfeiture under § 1594(d)(2) requires that the property be "proceeds [ ] obtained, directly or indirectly, as a result of such violation." The "violation" in this case is the alleged forced labor of V-1 through V-8. *See* 18 U.S.C. § 1594(a). Because the Affidavit never identifies what those eight victims raised, the magistrate had no basis to conclude that any specific dollar in any of the Subject Chase Accounts was obtained "as a result of" their forced labor. The probable-cause showing has no anchor. "A bald assertion that [funds are] directly traceable to [the defendant], without a more fulsome description of the transactions involved, cannot create probable cause that these funds are, in fact, traceable to [the defendant]." *United States v. Contents in Acct. No. 059-644190-69*, 253 F. Supp. 2d 789, 797 (D. Vt. 2003).

The Third Circuit's reasoning in *Voigt* confirms why this matters. To establish that property constitutes proceeds for forfeiture purposes, the government must trace a "nexus" between the property and the specific criminal conduct. *Voigt*, 89 F.3d at 1087. The nexus required is causal and cannot be metaphysical or attenuated. The

government cannot satisfy that requirement by alleging that *some* criminal conduct occurred *somewhere* within an organization that had bank accounts. It must show *how* the dollars in those accounts trace, directly or indirectly, to the specific charged violations. The Affidavit makes no such showing for V-1 through V-8.

The omission cannot be papered over by reference to the "$50 million in donations" the Church received since 2014, *see* Aff. ¶¶ 25, or to the bulk fundraising figures the Affidavit cites for each account. Those figures aggregate donations from many sources and across many years. They do not isolate what the eight charged victims raised. Probable cause for a seizure under § 1594(d)(2) is not a matter of general impressions. It requires "some nexus" to the charged conduct, *Voigt*, 89 F.3d at 1087—and "some nexus" requires more than the assertion that the offense and the funds share a building.

Here, again, *Luong* is instructive. The defendant was convicted of forced labor of a single named victim, K.D., who worked at Luxury Nails Salon alongside "three to four" other employees over a period of approximately twenty months. *Id*. at *1, *3 n.3. The government sought to seize funds from the salon's operating account, which held $103,171 at the time of the warrant application. *Id*. at *1. But the government did not seek the full balance. The case agent analyzed bank records, identified approximately $131,000 in merchant-customer credits over a four-month period, and "estimated that approximately half of the $131,000 in merchant-

21

customer credits . . . were generated by the forced labor of K.D." *Id.* at *3. On that basis, the government sought a warrant for $50,000—the portion specifically attributable to the victim's labor—and the court approved the seizure precisely because the government had done the tracing work. *Id*. If the government in *Luong*— where there was only a single victim in a single small business—confined its seizure to the portion the agent could trace, the government cannot evade that obligation here by seizing the *entire* balance of five accounts on the premise that all donations to a multi-decade religious organization are proceeds of forced labor.

### 2. The Affidavit Improperly Conflates the Eight Named Victims with the Broader Church Staff.

The Affidavit's tracing failure is compounded by a second problem. The Affidavit repeatedly describes "laborers" at the Church call centers as a single undifferentiated group, treating their fundraising as collectively forfeitable. *See, e.g.*, Aff. ¶ 35 ("almost all the laborers are required to work at the JMMI/KOGGC call center"); *id.* ¶ 32 (referring to "other JMMI/KOGGC members" working alongside victims); *id.* ¶¶ 33–34 (describing punishments imposed on "other laborers"). The Affidavit's premise appears to be that because *some* staff at the call centers were allegedly subjected to forced labor, *every* staff member's work product—and every donation that resulted from that work—is proceeds of forced labor.

But that premise is wrong. The Second Superseding Indictment's substantive forced-labor counts charge forced labor as to eight specific individuals. It does not

allege that *every* Church laborer was subjected to forced labor. It does not allege that *most* were. It does not specify how many laborers worked at the call centers at all. The Church operated multiple call centers across four states continuously for over a decade. The Affidavit does not identify how many laborers worked across those call centers during the relevant period. It does not say whether the eight named victims represent a substantial majority, a small minority, or anywhere between.

The Church's records answer the question the Affidavit did not ask. The eight alleged victims' combined fundraising—roughly $150,000—amounts to roughly 0.3% of the $50 million in donations the Affidavit says the Church has received since 2014. Aff. ¶¶ 19, 27; Exs. A, C & D. The government's leap from "some laborers were victims" to "all call-center revenue is forfeitable" rests on nothing.

Section 1594(d)(2) does not authorize collective forfeiture of all proceeds generated by all workers at an organization where only some of the workers were alleged victims of forced labor. The statute reaches proceeds of "such violation" (*i.e.*, the specific charged offense). Donations raised by unnamed staff who are *not* alleged to have been subjected to forced labor are not proceeds of "such violation." They are donations raised by church members engaged in core religious activity protected by the First Amendment. The government has not identified probable cause to believe otherwise.

23

The Seventh Circuit's reasoning in *Hodge* is instructive. "When a business has both lawful and unlawful aspects, only the income attributable to the unlawful activities is forfeitable." *United States v. Hodge*, 558 F.3d 630, 635 (7th Cir. 2009). That describes the allegations made by the government here. The Affidavit acknowledges as much when it describes the call centers as the "main source of revenue" for the Church. *See* Gov't Opp. to KOGGC Pet., Case No. 25-mc-51526, Dkt. No. 3 at 2. And even within the call centers, the lawful activity of unnamed laborers is not forfeitable simply because they shared a workplace with the eight named victims. The government bears the burden of identifying "the income attributable to the unlawful activities," *Hodge*, 558 F.3d at 635, and it has not done so. *See United States v. Kousisis*, No. 19-3679, 2023 WL 6294144, at *2 (3d Cir. Sep. 27, 2023) (reversing a forfeiture finding where all of an organization's "gains were not 'ill-gotten' since it always stood to lawfully profit from its own performance obligations" from legitimate business activities unrelated to the charges).

The same defect infects the seized gold.[2] The Affidavit's treatment of the precious metals is thinner still than its treatment of the Chase bank accounts. It never alleges that donations raised by V-1 through V-8 were used to purchase gold. It never

---

[2] The government does not list or otherwise mention the gold in its forfeiture bill of particulars. (Dkt. 5.)

identifies when the gold was purchased, from which account, or with which deposits. What it offers instead is a recorded statement in which Pastor Taylor allegedly said that he wanted to invest in real estate and commodities. Aff. ¶ 53. The Affidavit then recites that criminals purchase commodities to conceal proceeds, and that criminals stash valuables to avoid seizure. *Id*. ¶¶ 54–55. Neither paragraph mentions this case. Neither mentions the eight named victims. Neither identifies a single dollar. Stripped of its generalities, the Affidavit's theory is that a man who said he wanted to buy gold, and who later possessed gold, must have bought it with the proceeds of the forced labor of eight specific people. Probable cause requires more than a syllogism. *See Contents in Acct. No. 059-644190-69*, 253 F. Supp. 2d at 797. The government cannot seize an asset on the strength of an aspiration.

### 3. *The Seized Accounts Received Substantial Untainted Donations Through Channels with No Call-Center Connection.*

The third problem with the government's tracing theory is that the fundraising channels the Affidavit identifies are not, in fact, call-center channels. The Affidavit's analysis of Chase 6655 is illustrative. It identifies deposits from these sources: Vanco ($19,143,361.13), PayPal ($2,264,613), 5/3 Bankcard ($473,706.94), Cash App ($384,487.61), Paymentech ($211,233.42), individual/business direct transfers ($409,247), and Wise ($6,000). Aff. ¶ 104. The Affidavit concludes that 94% of these deposits came "from payment platforms used in connection with fundraising,"

*id.* ¶ 106, and treats that conclusion as sufficient to render the entire balance forfeitable, *id.* ¶ 108.

But that conclusion does not follow. The entire Church's "fundraising" is not the same thing as "call-center solicitation by V-1 through V-8." Vanco, PayPal, 5/3 Bankcard, Cash App, Paymentech, and Wise are payment-platform aggregators that process donations from every source a religious organization uses—website giving, recurring contributions, in-person events, broadcast appeals, mailings, and yes, call-center solicitations. Yet the Affidavit indiscriminately treats *all of these donors as forfeiture targets* because their money flowed through the same platforms that also processed call-center donations. Even attributing to Chase 6655 every dollar the eight alleged victims ever raised, that nearly $150,000 only amounts to 0.6% of the $24 million deposited during the Affidavit's own analysis window. Exs. C & D. The other 99.4 percent of those deposits has no alleged connection to V-1 through V-8 at all.

The Affidavit itself acknowledges this conflation. It cites the Church's use of "several digital platforms to accept donations" and describes solicitations made through Facebook, broadcast appeals, mailings, and the Church website. Aff. ¶¶ 81–85. These channels generate substantial donations independent of any call-center activity. A donor who watches a Church broadcast and clicks the "Donate" button on the screen has had no contact with any laborer at any call center, much less with

26

V-1 through V-8. Her donation is not a "proceed" of forced labor under any reading of § 1594(d)(2). Yet the seizure warrant captures it all the same.

### 4. Substantial Portions of the Seized Funds Predate the Charged Conspiracies.

A fourth defect runs alongside the others. Count One of the Second Superseding Indictment alleges a conspiracy "[f]rom on or about April 2013." Dkt. No. 194 ¶ 13. Count Ten alleges a money laundering conspiracy "[b]eginning no later than 2018." *Id.* ¶ 44. Deposits made before the charged commencement of Count One cannot constitute proceeds generated by that conspiracy. And unless the Government identifies an earlier beginning date for Count Ten, transactions preceding the charged money-laundering conspiracy cannot themselves constitute acts undertaken as part of that conspiracy. The Church has received donations since 2007, many years before the alleged conspiracy period began.

The Affidavit's own factual support reflects this temporal mismatch. The Affidavit traces back through closed accounts at Bank of America, U.S. Bank, and Regions Bank that received deposits dating to 2014 and earlier. Aff. ¶¶ 86–101. BOA 2449, opened in December 2013, received $13 million in deposits between January 2014 and June 2019. *Id.* ¶¶ 87–88. USB 7875 received $11 million across an even longer span. *Id.* ¶¶ 92–93. The Affidavit traces transfers from these closed accounts into the Subject Chase Accounts as part of the foundation for forfeiture. But large portions of the funds in those closed accounts originated *before* the alleged

27

conspiracy period began. The labor of V-8, which the Affidavit acknowledges occurred between 2010 and 2015, *id.* ¶ 45, entirely predates the money laundering conspiracy charged in Count Ten, and the labor of V-7 (2009 to 2018, *id.* ¶ 44) almost entirely does. Dkt. 91 at ¶¶ 57–58.

Under the "lowest intermediate balance" doctrine, where tainted and untainted funds are commingled in an account, the untainted funds retain their character as long as they exceed the highest balance to which the account fell after the alleged taint entered. *See United States v. Banco Cafetero Pan.*, 797 F.2d 1154, 1159–60 (2d Cir. 1986); *United States v. Erker*, 129 F.4th 966, 977 (6th Cir. 2025) (applying both a "proceeds-first or lowest-intermediate-balance rule" but declining to formally adopt either). Even taking the government at its word, there is no question that it has seized pre-conspiracy deposits and their lawful accretions. Those funds cannot, as a matter of law and arithmetic, be proceeds of the charged conspiracy.

### 5.    *The Seizure Warrants Are Overly Broad.*

Finally, the government overreached by restraining entire account balances rather than tracing specific funds. It seized every dollar in all five Chase accounts $4,201,637.65—without connecting a single deposit to the labor of a single named victim. The government is entitled only to funds derived from the charged offenses, not to whatever balance happened to sit in the accounts through which donations once passed.

The Seventh Circuit addressed this exact problem in *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992): "Bank accounts do not commit crimes; people do. It makes no sense to confiscate whatever balance happens to be in an account bearing a particular number, just because proceeds of crime once passed through that account." The Third Circuit has applied the same principle. *Voigt*, 89 F.3d at 1084. The principle controls here. The government may believe that *some* donations to Chase 6655 derive from call-center solicitations by V-1 through V-8. But that belief, even if correct, does not authorize the seizure of the *entire* account balance, much less the entire balance of five accounts, all without any tracing analysis.

The defect is not curable by post-hoc speculation. Probable cause must rest on the showing the government made to the magistrate judge. *See United States v. Lucas*, 986 F.3d 224, 229 (3d Cir. 2021) ("The Government must turn square corners when it exercises its power to confiscate private property."). The government made no showing here. The Affidavit's leap from "fundraising platforms" to "forced-labor proceeds" is exactly the kind of categorical assumption that case law prohibits.

## C.    The Restrained Funds Are Substitute Assets.

The restrained assets are, at most, commingled substitute assets that derive from years of legitimate religious activity. So, they are not "associated with the

29

crime," *see United States v. Pantelidis*, 335 F.3d 226, 234 (3d Cir. 2003), and cannot be restrained at this stage of the proceedings.

The record establishes that the seized accounts hold overwhelmingly lawful funds. The tracing analysis the government skipped, once performed, destroys the basis for the continued restraint. The Church's contemporaneous records attribute donations to every member of its fundraising staff, year by year. Exh. C ¶¶ 2–7. And the combined total for V-1 through V-8 is approximately $150,000. Exh. D ¶¶ 9–10.

And the roughly $150,000 is a *ceiling*, not a floor. Pastor Taylor does not concede that any of the eight was subjected to forced labor, or that a single dollar any of them raised is forfeitable—those allegations are contested and will be tried. But indulge the government's theory at full strength. Treat every dollar the eight alleged victims ever raised as a "proceed" of forced labor under § 1594(d)(2). Assume every one of those dollars was deposited into the Subject Chase Accounts. Assume not one was spent in the years since. Even then, the theory reaches $150,000—and not a dollar more. The remaining amount of approximately $4 million is untainted on the government's own premises.

Had the government done the tracing work *Luong* illustrates, the warrant application could have supported—at its absolute outer limit—a seizure of roughly $150,000. It instead took all $4,201,637.65. That difference is dispositive. Once a defendant contends, "with some evidentiary support, that at least some of the value

in a given asset came from lawful, nonforfeitable sources," the government "must demonstrate how much is forfeitable." *United States v. Genova*, 333 F.3d 750, 763 (7th Cir. 2003). Pastor Taylor has made that showing from the Church's own contemporaneous records. On this record, the government cannot carry its burden as to at least $4 million of the seized funds. Lawful activity does not merely comprise a substantial fraction of the donations here, *see Hodge*, 558 F.3d at 635; on the government's own numbers, it comprises nearly all of them.

Nor can the government trace its way out. The Church accounts were not static: they processed thousands of incoming and outgoing transactions over more than a decade, and those intervening deposits and withdrawals obliterate any traceable nexus between specific deposits and the restrained funds. *See United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 158 (3d Cir. 2003). This is the scenario the Third Circuit confronted in *Voigt*: where the property involved in an alleged money-laundering transaction is commingled with untainted property after "numerous intervening deposits and withdrawals," the government's tracing burden becomes "difficult, if not impossible, to satisfy," and the government is relegated to "satisfy[ing] its forfeiture judgment through the substitute asset provision." 89 F.3d at 1082, 1087–88.

This is fatal to pretrial restraint. As the Third Circuit explained in *Pantelidis*, the substitute-asset provisions become operative only once a defendant has been

31

convicted and the proceeds of the crime of conviction are not otherwise recoverable. "[I]n a very real sense, substitute assets are assets not associated with the crime." 335 F.3d at 233–34 (cleaned up). Because the government cannot trace the restrained funds to specific criminal conduct, these assets fall within the substitute-asset provisions. And substitute assets cannot be restrained pretrial. *See id.* at 234 ("The government concedes, as it must, that substitute assets are not subject to pretrial restraint."); *accord United States v. Ripinsky*, 20 F.3d 359, 365 (9th Cir. 1994). The Court should therefore release the funds.

## III. THE PRETRIAL RESTRAINT ALSO VIOLATES THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE.

The Fifth Amendment guarantees that no person shall "be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. At its core, this requires notice and an opportunity to be heard. *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48–49 (1993) ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property."). The government has not satisfied that standard here.

The government obtained its seizure warrants *ex parte*, on affidavits filed under seal, and executed them on August 27, 2025—sweeping every dollar out of the Church's accounts in a single stroke. Neither KOGGC nor Pastor Taylor received any notice or hearing before the deprivation. He has received none since. Nearly a

32

year has passed, and the government has never been required to defend its probable-cause showing in an adversarial proceeding—which (as detailed above) it cannot do. "It is well recognized that criminal proceedings do not suspend a property owner's right to a prompt post-seizure hearing." *United States v. $19,440.00 in U.S. Currency*, 829 F. Supp. 303, 305 (D. Alaska 1993); *see also United States v. Lazarenko*, 476 F.3d 642, 651 (9th Cir. 2007) (warning that "an inordinate delay . . . could deprive constitutional rights to prompt due process notice and hearing"). The forfeiture remains unadjudicated, and on the government's view Pastor Taylor must simply wait—without the property and without a hearing—until trial. Due process does not permit that. *See United States v. Paris Lopez*, 111 F. Supp. 2d 100, 103 (D.P.R. 2000) (length of un-adjudicated seizure "too great to remain within the bounds of due process").

The deprivation is not abstract, and its consequences fall hardest where the Constitution is most protective: Pastor Taylor's ability to defend himself. He has been incarcerated for nearly a year. The Church's real property has been seized. *See* Dkt. No. 5 at 2–7 (identifying nine parcels, including his residences). The government has taken currency, precious metals, jewelry, and other property from the homes where Pastor Taylor lived. *See* KOGGC Pet. for Return of Property, Case No. 25-mc-51526, Dkt. No. 1 at 5. What remains is not sufficient to defend a ten-

33

count indictment that spans four states, eight alleged victims, more than a decade of conduct, and voluminous financial discovery. *See supra* at 10–11.

And the restrained funds include money to which Pastor Taylor holds a legitimate claim of entitlement: the $3 million in defense costs the Church's Board of Directors has lawfully committed to him under its bylaws and Missouri nonprofit law. *See supra* Part I.A. By restraining every liquid asset the Church holds, the government has ensured that this lawful obligation cannot be satisfied—and that Pastor Taylor will face the most serious charges of his life stripped of the resources committed to his defense. That deprivation does not satisfy due process.

The remedy is release of the funds. At minimum, due process requires a prompt adversarial hearing at which the government must establish probable cause to believe the restrained assets are traceable to the charged offenses. *See United States v. Jamieson*, 427 F.3d 394, 406–07 (6th Cir. 2005). The government has never been put to that test. On this record, it cannot pass it. *See supra* Part II.

**IV.  THE SEIZURE OF THE FUNDS INDEPENDENTLY VIOLATES PASTOR TAYLOR'S RIGHTS UNDER THE RELIGIOUS FREEDOM RESTORATION ACT.**

The pretrial seizure also violates the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, on grounds independent of the Fourth and Fifth Amendment defects discussed above. RFRA applies to federal criminal prosecutions and to the government actions taken in connection with them, and a person whose religious exercise is substantially burdened may assert that violation as a defense and obtain "appropriate relief." 42 U.S.C. § 2000bb-1(c). Release of the seized funds is appropriate relief here. Pastor Taylor also incorporates by reference the Church's contemporaneously filed motion seeking return of property under RFRA.

**A.  The RFRA Framework.**

RFRA forbids the federal government from substantially burdening a person's religious exercise—including a pastor's exercise of his ministry—unless the government proves that the burden (1) furthers a compelling governmental interest and (2) is the least restrictive means of furthering that interest. 42 U.S.C. § 2000bb-1(a)–(b). The defendant must first make a *prima facie* showing of substantial burden on sincerely held religious belief; the burden then shifts entirely to the government on both production and persuasion. 42 U.S.C. § 2000bb-2(3); *Autocam Corp. v. Sebelius*, 730 F.3d 618, 625 (6th Cir. 2013).

The Sixth Circuit recognizes that a substantial burden arises where the government coerces religious adherents to act contrary to their beliefs or imposes serious consequences for religious exercise. *Id*. at 625–26. Strict scrutiny under RFRA is exacting and individualized; broadly formulated interests do not satisfy it. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006). The government must show that it "lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." *Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, 818 F.3d 1122, 1158 (11th Cir. 2016). The full doctrinal framework is developed in Pastor Taylor's pending Motion to Dismiss, Dkt. No. 178, and is incorporated by reference.

Pastor Taylor, as the doctrinal head and business leader of the Church, can claim religious-liberty protections over the seized funds because "[b]usiness practices [may be] compelled or limited by the tenets of a religious doctrine." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 684 (2014). Evidence that Pastor Taylor's Church received large donations from its religious activities does not make its free-exercise claims disingenuous. Religious protections are not only for the destitute. *See* Lukas Hund, *The Finances Behind Vatican City*, Mich. J. Econ. (May 24, 2022), https://sites.lsa.umich.edu/mje/2022/05/24/the-finances-behind-vatican-city (describing the Roman Catholic Church as one of the world's largest and

36

wealthiest organizations); Peggy Fletcher Stack, *Does Tithing Requirement for Entry into LDS Temples Amount to Mormons Buying Their Way into Heaven?*, Salt Lake Trib. (Mar. 26, 2018) (describing the tithing obligation for temple access). The fact that Pastor Taylor's motion seeks to use Church money for approved purposes, rather than prayer, fasting, or some other religious discipline, does not eliminate RFRA protections.

**B.    The Seizure Substantially Burdens Pastor Taylor's Religious Exercise and Fails Strict Scrutiny.**

The seizure imposes a substantial burden on Pastor Taylor's religious exercise. For more than two decades, Pastor Taylor has led his Church as its apostle and chief minister. His religious vocation is not a side activity or an avocation; it is his life's work and the expression of his sincerely held faith. The exercise of his vocation requires the institutional infrastructure of a functioning church: broadcasts to reach his congregation, places of worship to gather his flock, support for the clergy who serve alongside him, and the resources to carry out the charitable and pastoral mission to which he believes God has called him. By seizing the Church's operating funds, the government has not merely taken cash. It has stripped Pastor Taylor of the means by which he carries out the religious exercise at the center of his faith. What matters is whether the government has burdened Pastor Taylor's religious exercise as he understands and practices it, not whether he could practice a legally safer version of his faith. *Holt v. Hobbs*, 574 U.S. 352, 361–62 (2015).

37

The government cannot satisfy strict scrutiny. Its asserted interest must be a compelling interest in *this* seizure, of *these* funds, in *this* case—not a generalized interest in enforcing forfeiture statutes. *O Centro*, 546 U.S. at 430–31. Whatever interest the government has in preserving forfeitable property is sharply limited by the fact that the seizure swept in millions of dollars that are not even proceeds of the charged offenses. *See supra* Part II. The government has no compelling interest in restraining funds it has no plausible basis to forfeit—on this record, at least $4 million of the $4,201,637.65 seized, *see supra* Part II.C—and certainly no compelling interest in restraining them at the cost of Pastor Taylor's ability to lead his church.

The seizure also fails the least-restrictive-means requirement. Multiple narrower alternatives were available and obvious. The government could have sought to restrain only the portion of the accounts traceable to the labor of V-1 through V-8—a figure the Church's own records cap at no more than $150,000. *See e.g.*, *Luong*, 2021 WL 10428312, at *3. It could have sought a bond or substitute security sufficient to satisfy any potential forfeiture money judgment. It could have released only the funds necessary for Pastor Taylor's defense subject to court-approved disbursement procedures. It chose none of these. Instead, it took everything. That is not the least restrictive means. *Eternal Word Television*, 818 F.3d at 1158. RFRA independently requires release of the funds.

38

**CONCLUSION**

The government's restraint of the Church's funds is unlawful on multiple grounds. The Court should grant this motion and (1) release all $4,201,637.65 of seized funds and the seized precious metals, (2) at minimum, release the approximately $4 million—plus all precious metals—that no theory of forfeiture reaches; (3) alternatively, release $3,000,000 for defense costs under court-approved disbursement procedures.

Respectfully submitted,

*/s/ Zachary C. Lawson*
**J. Alex Little**
**Brent Adams Hannafan**
**Zachary C. Lawson**
Litson PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
615-985-8205
alex@litson.co
brent@litson.co
zack@litson.co

<table>
<tr>
<td>

**Allison L. Kriger**
LaRene & Kriger, P.L.C.
500 Griswold St.
Suite 2400
Detroit, MI 48226
313-967-0100
allison.kriger@gmail.com

</td>
<td>

**Andrew T. George**
Bourelly, George, and Brodey PLLC
1050 30th St. NW
Washington, DC 20007
202-753-5012
andrew.george@bgblawyers.com

</td>
</tr>
</table>

**Laurence H. Margolis**
Margolis Law Firm
214 South Main Street, Suite 202
Ann Arbor, MI 48104
734-994-9590
larry@lawinannarbor.com

**Todd Russell Perkins**
615 Griswold, Suite 400
Detroit, MI 48226
313-964-1702
tperkins@perkinslawgroup.net

*Counsel for Defendant David Taylor*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of August, 2026, a true and correct copy of the foregoing has been served via the Court's CM/ECF system upon all counsel of record.

/s/ Zachary C. Lawson