**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

UNITED STATES OF AMERICA,

Plaintiff,

v.

D-1 DAVID TAYLOR

Defendant.
_______________________________/

Case No. 2:25-cr-20560
Hon. Susan K. Declercq

**RENEWED MOTION TO REOPEN THE DETENTION HEARING OR FOR BOND REDETERMINATION HEARING AND FOR EXPEDITED HEARING**

Pastor David Taylor, through counsel, renews his request to reopen his detention hearing or for a bond redetermination hearing,[1] and after either hearing release Pastor Taylor with conditions the Court deems appropriate. Newly available evidence materially undermines the government's allegations, reveals that the government misled the Court in arguing for pretrial detention, and establishes that

[1] This renewed motion follows the Sixth Circuit Court of Appeals' Opinion and Order affirming the detention order. On August 13, 2026, this Court entered an Order [ECF No. 214] denying without prejudice Pastor Taylor's Motion to Reopen the Detention Hearing or for a Bond Redetermination Hearing and for Expedited Hearing [ECF Nos. 206 and 207] for lack of jurisdiction while his bond appeal remained pending. On August 25, 2026, the Sixth Circuit affirmed the Detention Order. Its rationale was rooted in the record made during the detention proceedings, as proffered by the government. *See e.g. United States v. Taylor*, No. 26-1222, slip op. at 6 (6th Cir. Aug. 25, 2026) (noting, the government "proffered specific facts about the violence at the detention hearing and in a written submission," including against "at least one minor," and "[t]he record shows … that Taylor routinely used others to coerce, threaten, and punish his victims."). As discussed at length in Pastor Taylor's supporting memorandum, that record is unsupported by the evidence.

conditions exist to reasonably assure Pastor Taylor's appearance and community safety. Reopening is authorized under 18 U.S.C. § 3142(f) because this evidence was not known to the defense at the time of the hearing and bears materially on the propriety of pretrial detention.

The government's material misrepresentations during the bond proceedings provide an additional independent basis for redetermining his detention. The government's misrepresentations rendered the proceedings fundamentally unfair in violation of the Due Process Clause. The government's seven-month delay in producing the material negating the government's claims further compounded the error, and he asks this Court to give expedited consideration to this Motion. In support of his requests, Pastor Taylor relies on his attached memorandum.

Undersigned counsel sought concurrence in the relief requested from counsel for the government. Concurrence was denied.

Respectfully submitted,

**Allison L. Kriger**
LaRene & Kriger, P.L.C.
500 Griswold St., Suite 2400
Detroit, MI 48226
313-967-0100
akriger@larenekriger.com

**Todd Russell Perkins**
615 Griswold
Suite 400
Detroit, MI 48226
313-964-1702
tperkins@perkinslawgroup.net

**Laurence H. Margolis**
Margolis Law Firm
214 South Main Street, Suite 202
Ann Arbor, MI 48104
734-994-9590
larry@lawinannarbor.com

**Andrew T. George**
Bourelly, George, and Brodey PLLC
1050 30th St. NW
Washington, DC 20007
202-753-5012
andrew.george@bgblawyers.com

**J. Alex Little**
**Brent Adams Hannafan**
**Zachary C. Lawson**
Litson PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
615-985-8205
alex@litson.co
brent@litson.co
zack@litson.co

*Counsel for Defendant Taylor*

DATED: August 25, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 2:25-cr-20560
Hon. Susan Declercq

D-1 DAVID TAYLOR

Defendant.
_______________________________/

**MEMORANDUM IN SUPPORT OF RENEWED MOTION TO REOPEN THE DETENTION HEARING OR FOR BOND REDETERMINATION HEARING AND FOR EXPEDITED HEARING**

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION ..................................................................................1

ARGUMENT .........................................................................................6

I. The intimidation, coercion, and control narrative is false. ..............................6

a. KOGGC did not recruit congregants. ........................................................7

b. The ministers retain their autonomy and property. ..................................10

c. Ministers had unrestricted access to medical care, food, movement, and other benefits.........................................................................................13

d. Full-time ministry came with obligations, and ministers who wouldn't meet them were free to leave. That is not forced labor. ............................................20

II. The government grossly overstated and, in key respects, misrepresented the evidence of violence, minor mistreatment, and harassment. ...............................23

a. The allegations of mistreatment of minors and physical violence were deceptive. ...........................................................................................24

b. The claims of threats, harassment, and stalking are old and vague. ..........29

III. Discovery also disproves Pastor Taylor disseminated sexually explicit images. ..............................................................................................31

# TABLE OF AUTHORITIES

## CASES

*Martinez v. Mattos*,
2026 WL 674497 (D. Nev. Mar. 9, 2026) ....................6

*Salem v. Michigan State Univ.*,
2021 WL 1381149 (W.D. Mich. Apr. 13, 2021) .................... 22, 23

*United States v. Ballard*,
322 U.S. 78 (1944). ....................23

*United States v. Watson*,
475 F. App'x 598 (6th Cir. 2012) ....................5

*Zheng v. Rokosky*,
826 F. Supp. 3d 545 (D.N.J. 2026) ....................6

## FEDERAL STATUTES

18 U.S.C. § 3142 ....................5

## INTRODUCTION

The government's original case for detaining Pastor Taylor rested on claims it knew were deeply misleading and, in many instances, false. The government told the Court that he was a "false prophet" (blatantly violating the Establishment Clause) who lured congregants into his ministry and coerced them into unpaid labor to fund a lavish lifestyle — isolating them; depriving them of food, sleep, housing, and medical care; threatening them, including minors, with violence; and threatening to release sexually explicit images of them. Discovery the government had but produced only after the Court ordered Pastor Taylor detained shows the government had little to no evidence for much of this. For the rest, the evidence sitting in its own files said the opposite of what it told the Court.

The government told this Court that Pastor Taylor "first lured in workers with promises of filling their spiritual hunger." Gov't Mem., ECF No. 47, PageID.238. Two months earlier, those "workers"—the live-in ministers—told the government the opposite: they sought out the ministry themselves.[2]

The government told this Court that Pastor Taylor's "consequences, punishments and daily rules included ... often medical deprivation, and *always* food deprivation." Mot. Hr'g, ECF No. 62, PageID.403 (emphasis added). *Always*. But the ministers had already told agents that the Church paid their medical expenses

[2] *See, e.g.*, Ex. M, FD-302, Interview of A.G. (8/27/25); Ex. Q, FD-302, Interview of S.F. (8/28/25); Ex. R, FD-302, Interview of D.P. (8/27/25); Ex. S, FD-302, Interview of X.M. (8/27/25).

and that Pastor Taylor provided breakfast, lunch, dinner, and snacks every day, at no cost. Even a former member told agents the ministers were "free to go out for food or use DoorDash." Ex. KK., FD-302, Interview of K.H. (8/27/25). The ministers' own cell phone data corroborated both accounts. In exchange for these benefits, ministers were expected to contribute to the Church. They were also free to walk out the door at any time if they didn't want to. That is not forced labor.

The government told this Court that minors were "forensically interviewed and … significantly and disturbingly, suffered their own physical abuse [and] emotional, psychological and traumatic experiences." ECF No. 62, PageID.407. The government had the recordings of those interviews when it said so. The children described regular meals and snacks, structured schooling, phone contact with friends and family outside the ministry, and a community they likened to family. None worked the call center. None reported abuse.[3] The Court heard none of it.

The government told this Court that Pastor Taylor "evangeliz[ed] violence and obstruction in defiance of law enforcement." ECF No. 67, PageID.530. Years before the indictment, agents asked the government's own witness whether Pastor Taylor would direct an armed guard to "act with their weapon" if the FBI came. The

---

[3] *See*, *generally*, recording of CAFI Interview of N.S.; CAFI Interview of A.S.; CAFI Interview of D.D.; CAFI Interview of B.W. It is important to note that the recorded CAFI interviews are not included as exhibits, as they are only available for review at the United States Attorney's Office. They were not produced to the defense. Additionally, the summaries of those recorded interviews are not included as exhibits as there are discrepancies between the recorded interviews and the summaries.

witness said no.[4] When asked whether Pastor Taylor would direct anyone to fight if law enforcement took physical action, the witness said she did not think he would.[5]

The government told this Court that "[w]omen are fearful" Pastor Taylor would release their sexually explicit images if he were released. The woman it quoted had reported no such fear. She was answering a hypothetical posed by the agents: how she would feel "if the photos [she] sent to TAYLOR were made public." Ex. RR, FD-302 Interview of S.J., p. 9 (10/20/25). The fear was the interviewer's invention. The government repeated it to this Court as the witness's own.

The government told this Court that Pastor Taylor cut the ministers off from the outside world: "Their phones were taken away. They were not permitted to have any contact with family and friends." Mot. Hr'g, ECF No. 62, PageID.462. No minister said any such thing. In interviews conducted long *before* the bond proceedings, the ministers described frequent contact with family and told agents that no one from the Church had taken their possessions—not their phones, computers, credit cards, or passports.[6] None of this reached the defense before the hearing. Instead, the government told this Court things its own files refuted, and did not produce those files until after detention was ordered.

The government also knew who had taken the ministers' phones, computers,

---

4 Audio Recording of Interview with V-2, at 1:29:46.

5 *Id*. at 1:31:00.

6 See, e.g., Ex. JJ, FD-302, Interview of D.F. (8/27/25); Ex. U, FD-302, Interview of C.B.W. (8/28/25); Ex. FF, FD-302, Interview of A.C. (8/27/25); Ex. S; CAFI Interview of B.W. (11:49:05); CAFI Interview of N.S. (15:18:45).

and passports. Its own agents had. Body-worn camera footage produced in discovery shows what happened. In the early morning hours of August 27, 2025, agents in combat gear, driving armored vehicles and carrying rifles, forced their way into the ministers' bedrooms across five states. They woke the sleeping ministers at gunpoint—the same ministers the government told this Court were never permitted to sleep. They pulled them from their beds, some of them naked, zip-tied them, took their belongings, loaded them into vans, and drove them away.

The government then separated the ministers from one another and from their families, and pressed them to declare themselves victims and accept government victim services. It did not work. One by one, alone with federal agents—without the influence of Pastor Taylor—they declined the services, told agents they were not victims, and said they had no safety concerns. Each described how he or she had come to Pastor Taylor and KOGGC, and what life in the ministry was actually like.[7]

As the early morning raids show, the government's representation to this Court that has aged worst is that "[n]o one is allowed to leave the organization"—and that the ministers were free only "today because the government … released all of the people in the organization." Hr'g Audio, ECF No. 33 (15:12-19). One year after that so-called "rescue," nearly every one of those people has returned to the

[7] *See, e.g.*, Ex. A-D, O, Z, FD 302 Interviews of Q.D.; C.E.; J.J.; N.P; C.W.; R.M. (8/27/25) (declining victim services); Ex. E-K, N, O, C, D, TT, FD 302 Interviews of J.A.; A.J.; T.A.; V.L.; J.D.; J.C.; G.N.; J.B.; B.R.; C.W.; J.J.; N.P.; M.G. (8/27/25) (no victimhood, no safety concerns).

Ministry. They live and work there now, following their faith as the First Amendment permits them to do. They did not ask for the government's protection. They do not want it. **They want their pastor back**.



Ministers and congregants march in Washington D.C. to protest the prosecution of Pastor Taylor.

## LEGAL STANDARD

This Court should reopen the detention hearing under 18 U.S.C. § 3142(f). The recently produced discovery presented here is "new information . . . that was unknown to [Pastor Taylor] at the time of the hearing." And it "show[s] that the defendant is less likely to pose a danger to the community." *United States v. Watson*, 475 F. App'x 598, 600 (6th Cir. 2012). Pastor Taylor did not have this information in October and December—he did not even know it existed. The government withheld it—in some cases for months.

Even if this Court were to find that some of the information was known to Pastor Taylor in October and December, he is entitled to a bond redetermination hearing. The Due Process Clause bars the government from using false or misleading

information to secure pretrial detention. *See, e.g.*, *Montero-Martinez v. Mattos*, No. 2:25-CV-02391-CDS-DJA, 2026 WL 674497, at *1 (D. Nev. Mar. 9, 2026) (in the immigration context, ordering bond redetermination after the government misrepresented the respondent's criminal history); *Zheng v. Rokosky*, 826 F. Supp. 3d 545, 559 (D.N.J. 2026) (in the immigration context ordering immediate release after the government materially misrepresented the respondent's reporting history in support of detention). That is precisely what the government did here. A bond redetermination hearing is, therefore, warranted.

**ARGUMENT**

To prove Pastor Taylor's supposed dangerousness the government asserted—and the Court credited—three claims:

1. Pastor Taylor isolated and deprived live-in ministers of "the basics of living," such as food, sleep, and shelter to "coerce people to raise funds at all hours";[8]

2. Physical violence was prevalent within the ministry—against adults and multiple children;[9] and

3. Pastor Taylor sincerely threatened to disclose women's sexually explicit images if they defied him.[10]

The government sat on evidence contradicting these allegations, misleading the Court and violating Pastor Taylor's due process rights.

## I. The intimidation, coercion, and control narrative is false.

---

[8] ECF No. 62, PageID.474-75.
[9] *Id*. at PageID.475.
[10] *Id*. at PageID.477, 480-81.

Through proffer and context-free text messages, the government alleged a pattern of intimidation, coercion, and control. It claimed members were recruited and forcibly isolated from friends and family. Phones were confiscated. They were deprived of food, sleep, medical care, transportation, and the freedom to leave.

Recently produced discovery shows the opposite: KOGGC members are adults who understood the commitments of being full-time ministers, joined voluntarily, and were (and still are) always free to leave.

**a. Pastor Taylor did not recruit congregants.**

The government alleged that "TAYLOR first lured in workers with promises of filling their spiritual hunger." Gov't Mem., ECF No. 47, PageID.238. Putting aside that promising to fill spiritual hunger is core protected conduct under the First Amendment, recently produced discovery establishes that live-in ministers sought out Pastor Taylor and KOGGC, not the other way around.

In interview after interview, the ministers told their so-called "rescuers" that they first encountered KOGGC through public ministry events, online sermons, or recommendations from friends within their faith communities. These competent adults described being spiritually moved by Pastor Taylor's teachings and choosing, *of their own free will*, to pursue deeper involvement. And eleven months after the government's so-called "rescue" mission, nearly all still live with the Church.

In 2013, for example, Poland native A.G. attended one of Pastor Taylor's crusades after reading one of his books and felt "called to join the ministry." Ex. M.

S.F., a college basketball player at Northeastern University, was given one of Pastor Taylor's books by a teammate. After attending a crusade where he "witness[ed] healings" and "experience[d] a personal encounter with God," he returned to college. Ex. Q. He felt "called to ministry," however, and joined KOGGC full time. *Id.* Although he briefly left after the August raids, he returned *on his own* and remains a full-time minister.

D.P., a Louisiana high school teacher, first learned of Pastor Taylor through a friend from Africa in 2020 and began having dreams about joining the ministry. Ex. R. In 2021, he left his teaching position, moved to Houston "to be closer to the ministry," and "joined the school when it opened." "[J]oining the ministry was the best decision he has ever made." *Id.*

X.M., who was not born Christian, read one of Pastor Taylor's books and soon after had a dream in which Jesus appeared to him and introduced him to Pastor Taylor. Ex. S. He joined the ministry after attending a KOGGC event in 2015. *Id.* Although he remains a KOGGC minister, he works a full-time job outside of the ministry in Canada. *Id.*

F.M., an Iraqi Christian who survived torture under Saddam Hussein's intelligence service and witnessed miraculous interventions, was approached in 2016 to translate one of Pastor Taylor's books into Arabic. Ex. DD. After reading it, he joined immediately. He became the ministry's driver and truck manager, maintaining the semi-trucks used for disaster relief. *Id.*

C.B.W., who "worked for the courts for 25–30 years," was introduced to the Church in 2018 by a friend. After retiring, she joined full time "to save as many people as possible from hell." Ex. U.

K.C. was raised Muslim. She had a dream in which Jesus appeared to her and told her to give her life to Him. She credits "the Lord [with] … find[ing KOGGC on Facebook]." Ex. V, FD-302 Interview of K.C. (8/27/25). She moved from California to Michigan, then to Houston, where she lived at the Campus of Harvest. *Id.*

C.W. (a different congregant) found JMMI in 2013 while browsing online. She was suffering from health ailments and called the ministry. Congregants cared for her initially in Phoenix and later in St. Louis and drove her to medical appointments after surgery. She told agents she "would have died without their care." Ex. O.

M.B. saw Pastor Taylor on television and traveled to Taylor, Michigan with his mother, who had breast cancer, to attend one of Pastor Taylor's crusades and she was healed of cancer. Ex. W, FD-302 Interview of M.B. (8/27/25). He joined full time after "Jesus instructed him to go there." *Id.*

M.G., who has been a KOGGC minister for approximately ten years, was taken to the emergency room after the raids for extremely elevated blood pressure—which, as the agent explicitly documented, "isolated him from church members attempting to interfere with interviews." Ex. TT, FD-302 of M.G. (8/27/25). He explained that he joined after reading one of Pastor Taylor's books, which led him

to "hav[e] face to face appearances with Jesus." *Id.* The agent, then, interjected unsolicited (and unconstitutional) spiritual commentary, telling M.G. that "the appearances and [his] relationship with Jesus was his own" and that he "did not need TAYLOR to have that relationship." *Id.* And, when M.G. stated that he "felt safe at the house and wanted to go back," the agent, again, attempted to redirect him, "present[ing] [M.G.] with another path to take" and offering "a plane ticket" to St. Louis. *Id.* M.G. declined. *Id.*

In 2017, R.R. was attending a different church in Houston when he had what he described as a face-to-face encounter with God, who told him he was "meant for more." Ex. X, FD-302, Interview of R.R. (8/27/25). A stranger introduced him to KOGGC, and, in 2022, R.R. joined full time. *Id.*

J.D., formerly a lead teacher at a daycare facility, described KOGGC, in pertinent part, as "a university where members receive education about their mission." Ex. I. She joined and attends the school "voluntarily" and "she is not a victim." *Id*.

J.A. similarly described KOGGC as "a spiritual school" where she was trained to "evangelize and get more Christians." Ex. E. Like J.D., she rejected agents' suggestion that she was a victim. *Id*.

**b. The ministers retain their autonomy and property.**

During the detention proceedings, the government claimed Pastor Taylor and Michelle Brannon "isolated [ministers] from the outside world[.]" ECF No. 47,

PageID.240; Mot. Hr'g, ECF No. 62, PageID.462 ("workers were forcibly isolated from family and friends. Their phones were taken away. They were not permitted to have any contact with family and friends. This assured that they remained loyal to David Taylor. This even caused the break-up of marriages and other relationships. And David Taylor and Michelle Brannon forced them to block family members or anyone that questioned David Taylor."); Mot. Hr'g, ECF No. 59, PageID.347 ("The victims and workers of the organization join. Their phones are taken away. They are completely cut off from their family, their friends and the outside world. They remain in the organization with no contact to the outside world.").

Discovery says otherwise. *Not one* minister reported being involuntarily isolated from their family or friends. In their interviews immediately following the raids, none of the ministers reported that the ministry confiscated their identification documents, travel documents, bank/credit cards, or electronic devices (only the government took those things when it "rescued" them). To the contrary, although some 302s were silent on the issue, most reported having at least one electronic device, travel documents, bank/credit cards, and/or identification documents:

**Phones, computers, and other communication tools:** E.C., R.M., T.A., F.M., D.G., X.M., A.W., G.T., B.W. reported access to phones, computers, and tablets.[11]

**Identification, travel documents, and financial cards:** A.J., J.W., Q.D., A.C., B.H., N.P., C.W., C.E., and J.J. reported access to identification, passports, birth certificates, debit cards, wallets, purses, or similar property.[12]

---

[11] Exs. Y, Z, G, AA, S, DD, BB, CC, *FD-302 Interviews of E.C., R.M., T.A., D.G., X.M., A.W., G.T.* (8/27/25); *F.M.* (8/27/26 and 8/28/26)*; CAFI Interview of B.W.*, 12:04:00.

[12] Exs. F, T, A, FF, GG, D, O, B, C, *FD-302 Interviews of A.J., J.W., Q.D., A.C., B.H.,*

**Personal contact information and ordinary access:** S.W., J.C., J.Y., D.F., N.P., and Q.D. provided agents with telephone numbers or email addresses; B.W. stated that others in the house had phones, tablets, or computers.[13]

The government must have known this when it told the Court the opposite, because it seized these possessions when it supposedly "rescued" the ministers. Agents took *hundreds* of these so-called "victims'" cell phones, computers, and other personal property away from them, for some reason. It only began to return these items a few weeks ago, and it is still holding many of their passports.

And, contrary to the government's allegations, ministers not only possessed phones and computers, they used them too. D.F., for example, reported to agents that he remains "very close with his father" and "will text with his sister often," even though neither is part of the ministry. Ex. JJ. 16-year-old D.D., whose mother is a full-time minister, similarly stated, "I communicate with other kids or friends by phone." CAFI Int. of D.D. (14:09:10).

Ministers traveled to visit their family and "people can visit" the ministry too. CAFI Interview of B.W. (11:49:04). Just before the raid, for example, C.W. returned from a month-long trip to see family in Phoenix. Ex. P. A.C., a retired therapist and full-time minister, visits her mother in Georgia. Ex. FF. During her interview, 14-year-old N.S. explained that she lived primarily with her mother, a full-time minister,

---

*N.P., C.W., C.E., J.J.* (8/27/25).

13 Ex. HH, J, II, JJ, D, A, *FD-302 Interviews of S.W., J.C., J.Y., D.F., N.P., Q.D.; CAFI Interview of B.W.* (12:04:00).

but also spent extended periods living with her father—who is not a ministry member. CAFI Interview of N.S. (15:18:45). D.G.'s mother is a full-time pastor in Virginia; he has traveled to visit her—including with Pastor Taylor when the ministry holds services there. Ex. AA. Another full-time minister, X.M., "primarily work[s] remotely" from Canada. Ex. S.

### c. Ministers had unrestricted access to medical care, food, movement, and other benefits.

In support of detention, the government claimed the defendants denied live-in ministers food, medical care, and the freedom to leave:

- "[F]or 11 years, in four states, over a decade [Taylor] terrorized and traumatized workers with ... **medical deprivation and food deprivation**." ECF No. 62, PageID 400.
- "**Behind the locked doors of call centers** in Michigan, Missouri, Florida, and Texas, Michelle Brannon was the enforcer of every order, and every punishment, forced unpaid labor, **denial of sleep, denial of food, denial of medical care**." Brannon Det. Hr'g, 4:04-4:20 (emphasis added).
- "Victims and witnesses will also testify that they were **deprived of food ... and medical care**." ECF 67, PageID.523.
- "The consequences, punishments and daily rules included ... often **medical deprivation**, and **always food deprivation**." ECF No. 62, PageID.403.

Text messages offered by the government *appeared* to substantiate these claims. Recently produced discovery shows the truth. The text messages were a spiritual rallying cry—motivational, not punitive. And ministers had actual ordinary access to medical care, food, basic necessities, transportation, and movement.

**Medical care.** C.W. credited the ministry with saving her life, explaining that "someone from the ministry is always available to take care of her and get her to

medical appointments," and that during the years she lived there, members provided healthcare services without which "she would have died." Ex. O. Other interviews likewise reference ministers' prescription medications. *See* Exs. M, P, GG, G, C.

D.F. similarly explained that if he needs medical care, he can submit an invoice or request funds in advance. Ex. JJ. Former full-time minister K.H. also rejected the claim that ministers were denied medical care, reporting that he "went to the doctor a few times" while living at the Houston campus and that ministry vehicles were available when needed. Ex. KK.

**Food and basic needs.** C.W. stated, she is "free to eat whenever she feels like it," there is "no set schedule at the living quarters," and "no set rules about when and where she goes." Ex. O. D.F. said, "the church provides him with food, water, and clothing," and the ministry is "flexible when it comes to asking for money." Ex. JJ.

The minors' interviews are consistent. D.D. explained that Pastor Taylor "provides groceries" and that residents make lists for food, toiletries, and other items. CAFI Interview of D.D. (14:06:00). A.S. described ordinary meals—breakfast, lunch, and dinner—and stated that if residents want a snack, "we can just get one." CAFI Interview of A.S. (13:40:53).

Former full-time minister K.H. corroborated these accounts. He denied allegations of food deprivation, explaining that full-time ministers "were provided breakfast, lunch, dinner, and free snacks each day" and were "free to go out for food or use DoorDash." Ex. KK.

**Freedom of movement.** C.W. stated there were no set rules about when and where she went. Ex. O. D.F. stated that he "is able to come and go whenever he wants and does not have to let anyone know beforehand." Ex. JJ. K.H. reported that ministry vehicles were available when needed and he *voluntarily* left the church "in May of 2025 to spend time with family." Ex. KK. F.M. likewise said, "the vehicles that the staff uses are available to everyone[.]" Ex. DD. S.W. said she "could leave the campus anytime she wanted." Ex. HH.

Data extracted from a single iPhone—seized during the raids, produced six months later—corroborates the ministers' accounts. It shows live-in ministers make grocery runs and pick up food:




They plan meals:



Wednesday

Breakfast - [redacted]
Yogurt
Granola
Fruit
Protein bars

Lunch - [redacted]
Chicken Caesar salad

Dinner - [redacted]
Beef Stroganoff
Bland Veggies (Consequences)

$150

——

Thursday

Breakfast - [redacted]
Cereal
English Muffins
Milk
Bananas
Apples

Lunch - [redacted]
Southwest Salad
Soup

Dinner - [redacted]
Sandwiches
PB & J (Consequences)

$150

——

Friday

Breakfast - [redacted]
Oatmeal
Sausage
Toast

Lunch - [redacted]
Meatball Subs

Dinner - [redacted]
Sandwiches
PB & J (Consequences)

$150

——

Saturday

Breakfast - [redacted]
Cereal
Grits
Eggs
fruit

Lunch - [redacted]
Lasagna Soup
Croissants
Crackers

Dinner
TBD

$175

——

Sunday

Breakfast - [redacted]
Eggs
Oatmeal
Fruit
Cereal

Lunch - [redacted]
Grilled Chicken
Cucumber dressing
Pita

Dinner - [redacted]
Fried Chicken
Fries

Meals generally include breakfast, lunch, *and* dinner, *see id.* at pp. 3, 4, 7, 22, 40, 47, 52, 57, 60, 80-82, 93, 94, 112, 118, 133, 137, 141, 151, 152, 181. *Sometimes* dinner is PB&Js, cheese sandwiches, or bland veggies—*but only dinner* and certainly not daily as the government claimed. *Id*. at pp. 3, 4, 93, 94. Still, ministers are free to order food:

From: +1[redacted]
To: +177[redacted]
[redacted]! We won't be cooking tonight is there anything you would like us to order for your dinner ?

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +1[redacted] | 6/18/2025 5:24:20 PM(UTC-5) | | |

Status: Sent

6/18/2025 5:24:15 PM(UTC-5)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x85D19F49 (Table: message, handle; Size: 3002195968 bytes)

From: +[redacted]
To: +13[redacted]
Yeah!, Can I get Wendy's then?

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +13[redacted] | | 6/18/2025 5:37:10 PM(UTC-5) | |

Status: Read

6/18/2025 5:26:48 PM(UTC-5)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x85D1A215 (Table: message, handle; Size: 3002195968 bytes)

*See also id.* at pp. 14, 46, 47, 56, 65, 74, 79, 80, 91, 92, 95, 113.

They can even pick it up:

From: +13[redacted]
Shoot since you're going can you pick up My Shake from Whataburger on your way back?
Status: Sent

8/24/2025 5:38:55 PM(UTC-5)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x9CCFECB3 (Table: message; Size: 3002195968 bytes)

*See also id. at* pp. 92, 93, 95, 112, 118, 119, 122.

They see doctors (with the defendants' knowledge):

From: +[redacted]
To: +17[redacted]

Hi Kathleen

The Doctor wants me to come in 3x/ week for treatment. He also wants me get an MRI done as well to see the actual damage to the muscles and tissues.

I didn't realize how much pain I was in until he started pressing and pulling my shoulder and back

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +1[redacted] | 7/17/2024 1:32:56 PM(UTC-5) | | |

Status: Sent

7/17/2024 1:32:54 PM(UTC-5)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x30ECEF49 (Table: message, handle; Size: 3002195968 bytes)

From: +17[redacted] Kathleen Klein
To: +1[redacted]

Omg! Yes!! It's probably deep

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +1[redacted] | | 7/17/2024 1:53:23 PM(UTC-5) | |

Status: Read

7/17/2024 1:37:28 PM(UTC-5)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x30ECEA63 (Table: message, handle; Size: 3002195968 bytes)

*See also* Ex. WW, L.J. Cellebrite Report (Medical), pp. 1, 19, 31, 35, 39, 41, 43, 44.

They go to hospitals (with the defendants' knowledge):

**Reply**

From: [redacted]
To: +1[redacted]

From: +[redacted]
To: +13[redacted]

Tichiana said she's at the hospital

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +1[redacted] | | 2/12/2025 3:45:07 PM(UTC-6) | |

**Status:** Read

2/12/2025 3:26:22 PM(UTC-6)

From [redacted]

Yes ma'am I was there because there was an incident and I know can't bend my knee and was in a lot of pain. I just left and getting prescription filled now.

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +[redacted] | | 2/12/2025 3:45:07 PM(UTC-6) | |

**Status:** Read
**Label:** Reply

2/12/2025 3:31:06 PM(UTC-6)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x5A974476 (Table: message, handle; Size: 3002195968 bytes)

From: +[redacted] Michelle Lynn
To: +13[redacted]

No she fell and heard knee pop

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +13149170796 Lanessia | | 2/12/2025 4:48:50 PM(UTC-6) | |

**Status:** Read

2/12/2025 3:51:31 PM(UTC-6)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x5A98642F (Table: message, handle; Size: 3002195968 bytes)

*See also id*., at pp. 21, 30, 28.

And they take prescription medication that they get from real doctors and pick up those prescriptions from a pharmacy:


From: +[redacted]
To: +1[redacted]

Walgreens
107 W Rankin Rd
Houston TX

2 meds for:
[redacted]
April 18, 1987

They need to be paid for. Send the following request for money to Jessica and Bashira in a group text:

$ (fill in the amount)
Walgreens
[redacted]rescription
[redacted]Zelle

| Participant | Delivered | Read | Opened |
|---|---|---|---|
| +1[redacted] | | 8/23/2024 3:31:33 PM(UTC-5) | |

Status: Read

8/23/2024 3:00:39 PM(UTC-5)

Source Info:
iPhone/mobile/Library/SMS/sms.db : 0x3742DF29 (Table: message, handle; Size: 3002106086 bytes)

*See also id*. at pp. 2, 5, 7, 9-11, 13-15, 18, 22, 26, 29-33, 36, 38, 39, 42, 44.

Body worn camera footage and photographs taken by agents during the raid at the Houston property (produced in discovery) further substantiate the ministers' representations.[14]




[14] **Left**: A white board for requesting food and supplies. The writing in the top left of the board reads, "Add things here that we need … food, supplies, etc."; **Middle**: A microwave, a mini refrigerator, and food products (all rooms have both a microwave and refrigerator); **Top right**: federal agents standing in a live-in minister's room seen with a microwave and snacks; **Bottom right:** One of the refrigerators in the industrial kitchen stocked with food.

**d. Full-time ministry came with obligations, and ministers who wouldn't meet them were free to leave. That is not forced labor.**

Live-in ministers understand they are expected to contribute. Recently produced interview summaries and audio recordings of internal meetings confirm what the ministers themselves say: full-time participation carries significant benefits—free housing, clothing, food, toiletries, medical care, transportation, other basic needs, and spiritual fulfillment—and, in exchange, defined expectations. Individuals who did not meet those expectations could be told to leave—or simply leave on their own. In recently produced recordings, Pastor Taylor said so:

> I'm telling you, I keep warning you. There's coming a time, that there's some of you who've been here for a long time and you're not doing your work. I am telling you that's coming a time where I'm going to ask you to leave because I can't take care of you no more. I won't be able to do it. (Audio 15, p. 2:18–3:8).
>
> I don't know what some of you are here for. I don't understand what you think you're here for. You came here for ministry. If ministry is not your focus, get out. Ministry is about serving and helping people. (Audio 11, p. 7:12–19).
>
> I got 78 freaking adults in this place that won't learn how to close and connect with people so that we can raise the finances. This stuff is not free. I made it free for you and other people, but it is not free. We have to work. (Audio 5, p. 4:4–11).
>
> We came here to receive from you and to help you get to … to be trained and … help raise finances and … connect with relationships and save souls. It's about the harvest. (Audio 11, p. 47:11–17).

Put another way, if adult ministers are not "doing your full part and you're not actually caring, then you can leave. And people are literally free to leave. Sometimes Apostle has to tell them to leave … but sometimes people just leave on their own."

CAFI Interview of N.S. (14:47:20).

Contrary to the government's claims, individuals do not have a fundamental right to freeload off their ministry—not V-1 through V-8 or anyone else. Pastor Taylor and KOGGC are *not required* to provide *free* housing, clothing, food, toiletries, medical care, transportation, and other basic needs to anyone and everyone regardless of whether they uphold their end of the bargain. At bottom, the government has ignored that Pastor Taylor provides these benefits to all who choose to participate—even going over and above the benefits provided by the ministry. The forced labor statute does not exist to compel people or religious institutions to financially support individuals who *want to be there* but do not want to contribute.[15]

This is true even assuming *arguendo* that the environment was demanding, that some full-time ministers felt social or spiritual pressure to stay, or that Pastor Taylor's leadership style could be viewed as harsh. A demanding ministry is not forced labor, and none of this justifies pretrial detention.

---

[15] It additionally bears mentioning that the recently produced discovery undermines the government's claims that Pastor Taylor uses church proceeds to fund a lavish lifestyle for himself. *See, e.g.,* Ex. II, FD-302 of J.Y. (Aug. 27, 2025) ("Kingdom of God Global Church generates a lot of money, but the money is used to help reach more people. David Taylor lives "meagerly." The money collected by Kingdom of God Global Church is used to reach more souls. David Taylor lives in a small apartment."); *see also* Ex. DD, FD-302 Interview of F.M. (Aug. 27, 2025) ("Taylor is currently doing a "shut away" at the request of God and does not visit or stay at any of the church properties."). And, while not new information, the money transactions enumerated in the money laundering count in the Second Superseding Indictment (SSI) (¶ 45e) total approximately $618,723.00, which is a piddly 1.2% of the total donations to KOGGC since 2014. Second Superseding Indictment (¶ 9).

*Salem v. Michigan State Univ.*, No. 1:19-CV-220, 2021 WL 1381149 (W.D. Mich. Apr. 13, 2021), is directly on point. Two Ph.D. students at Michigan State University brought a forced-labor claim against their academic supervisor, Dr. Parviz Soroushian. He required both plaintiffs to perform grueling, virtually uncompensated physical labor—lifting heavy equipment, mixing and casting concrete—entirely unrelated to their research. He also verbally degraded them, telling one student she "did not deserve a Ph.D." and screaming at her while slamming his fist on a desk beside her. He told the other student, "You have no brain," "You are a walking wall," "I should smash you," "I should hang you," and "[You] should go back to Jordan." He threatened both with negative academic consequences if they refused to work, isolated them from the university campus, and, when one was sexually harassed by a colleague, did nothing. An investigation found he had "specifically targeted" foreign advisees, exploiting their unfamiliarity with U.S. law and their "lack of ability to advocate for themselves." *Id.* at *3.

The court nonetheless rejected the forced-labor claim:

> The key difference between this situation and forced labor is that **a victim of forced labor *remains in servitude* to avoid negative consequences** (i.e., "serious harm") ***inflicted* or threatened by their employer**. In other words, the consequences compel the labor; without them, the victim would not remain under the employer's power. A graduate student, on the other hand, accepts the risk of negative consequences in order to obtain substantial benefits. The benefits are what motivate the labor, not the consequences; without them, the students would not enter or continue in the program. (Emphasis added).

*Id.*

The same reasoning controls here. At worst, the evidence suggests that KOGGC members contributed labor to *remain part of a voluntary religious community* and to receive its benefits—free housing and necessities, the opportunity to minister, and the spiritual fulfillment of pursuing their faith.[16] There is no evidence they were compelled to remain in servitude for fear of "serious harm inflicted by [*Pastor Taylor*]." Where individuals labor to remain part of a religious community they have chosen to join, even a strict one, the forced labor statute is not violated, and Pastor Taylor should not be detained pending trial on such a premise.

## II. The government grossly overstated and, in key respects, misrepresented the evidence of violence, minor mistreatment, and harassment.

The government repeatedly claimed that Pastor Taylor and his co-defendants used physical violence and threats of violence, including against minors, as well as threats to disseminate sexually explicit images, as tools of coercion:

- "As TAYLOR and Brannon … used a combination of means to create a climate of fear through … **physical violence that caused the workers to fear serious harm** if they made a mistake." ECF No. 47, PageID.240.
- "TAYLOR's **years of victimizing and manipulating individuals, through violence** … show that he is a danger to the community." ECF No. 47, PageID.265.
- Taylor "**terrorized and traumatized his workers** for over a decade with

[16] The government may find the live-in ministers' pursuit of this benefit "incomprehensible." But the First Amendment protects their pursuit of it whether the Government likes it or not: The First Amendment "embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faith … Men may believe what they cannot prove." *United States v. Ballard*, 322 U.S. 78, 86 (1944). As one minister put is when agents asked about Pastor Taylor's text messages to ministers and at times women, "a couple years of bad behavior is nothing when compared to a lifetime of saving souls." Ex. II (8/28/25).

**actual violence, with threats of violence**." ECF No. 62, PageID.400;

- The government "highlight[ed] for the Court and stress[ed] to the Court **the breadth and the depth of the physical violence** that occurs within this organization." *Id*. at 401.
- "**Minors** have been forensically interviewed and … significantly and disturbingly, **suffered their own physical abuse**, their own **emotional, psychological and traumatic experiences** because of their presence within the organization." *Id*. at 407.
- "**[M]inors** [*plural*] **used the term "whooped**," Your Honor. That is the term that *they* use **for the physical violence that was inflicted upon them** when they were viewed as being disobedient by the organization." *Id*. at 402.
- "**[M]inors** have come forward to the FBI. They have been recently interviewed. They've **corroborated the forced labor scheme including physical assaults**." ECF No. 67, PageID.526.

Recently produced evidence demonstrates these claims were at best misleading.

**a. The claims of mistreatment of minors and violence were deceptive.**

Minors were forensically interviewed. They didn't say what the government said they did. Witnesses told the government that the Church does not physically discipline children, period. Children are never disciplined by Church babysitters—babysitters report to parents, who handle discipline themselves. *Id.* (15:17:40).

Fifteen (then fourteen)-year-old N.S., whose mother has been a live-in minister since 2021, described the ministry as essentially a Christian school with a spiritual mission: "the main goal is to do everything for God … you have to be serious about being a Christian. It's like a Christian school pretty much … you have to want to grow and participate. If you just come and don't want to participate, then you can't stay." CAFI Interview of N.S. (15:04:45). Adult congregants typically forgo outside employment because Pastor Taylor covers their expenses. *Id.* Their

responsibilities—connecting people to the ministry, praying with callers, and fundraising—are organized into shifts generally running from 9:00 a.m. to noon, though some extend later, even if the congregants were tired. *Id.* (14:34:04; 14:40:20; 14:53:42). But they receive breaks of 30 minutes to three hours and have Saturdays and Sundays off. *Id.* (14:41:15; 14:53:42).

Children do not work the prayer line. Participation requires being "at least 18," and when live-in members reach adulthood they may leave for college if they choose, or they can become ministers. *Id.* (14:59:50). Participation is voluntary:

> If you've been full time for a long time and get training and you still don't know how to close, then that's when it's a problem. Either you don't want to do it anymore or you gave up or don't really care for people. That's when Apostle comes in. They get fired like a job. When it comes to being full time you can still be connected. You can still be a part. But when it comes to being full time, if you're not doing your full part and you're not actually caring, then you can leave. And people are literally free to leave. Sometimes Apostle has to tell them to leave … but sometimes people just leave on their own. They're still capable of leaving … going back to their real life.

CAFI Interview of N.S. (14:46:47–14:47:59).

On discipline and safety, N.S. was unequivocal: nothing and no one in the ministry makes her feel uncomfortable or unsafe. *Id.* (15:18:00).

Ten (then nine)-year-old A.S., N.S.'s sister, described a daily routine of praise and worship, breakfast, and adult work shifts lasting, at most, "a few hours"—"4 hours" being "the longest." CAFI Interview of A.S. (13:33:05; 13:37:28). Meals were regular and varied; snacks were available on demand. *Id.* (13:33:50; 13:40:53).

The ministry's rules were unremarkable: "we can't curse or whatever." *Id.* (13:40:53). There were no prohibitions from discussing the ministry with outsiders. *Id.* (14:02:00). A.S. described Pastor Taylor as "very nice," someone who "loves us," "wants us to have fun," and "is not super strict." *Id.* (14:02:50; 14:03:15).

Sixteen (now Seventeen)-year-old D.D. offered a consistent account. Her mother has worked full time in the ministry for more than ten years. D.D. attends a structured school program, maintains friendships, and communicates with other children by phone. CAFI Interview of D.D. (13:13:00; 13:28:15; 14:09:10). She described the community in familial terms—"all the men are my uncles" and "the women are my aunties." *Id.* (13:37:05). Adults spend their days praying with callers—"almost like a therapy"—with breaks throughout, typically finishing by midnight. *Id.* (13:38:35–13:38:46; 13:45:35). "Kids never work at the call center." *Id.* (14:05:35). She reported that **Pastor Taylor provides groceries** and **covers members' basic needs**, and that aside from wanting more time with her father, "there's nothing I'd want to be different" about her life in the ministry. *Id.* (13:56:30; 14:06:00). When asked whether she is prohibited from discussing the ministry, she replied that there are no secrets: "we're very open." *Id.* (14:36:45–14:37:45).

Eighteen (now nineteen)-year-old B.W., V-7 and A.W.'s[17] daughter, has lived in the ministry for many years and attends a structured school program with six classes a day. CAFI Interview of B.W. (11:37:00; 11:40:55). She described the

[17] A.W. remains a full-time minister.

Houston building as "nice. It's like living in a house. **Everyone has a room**." *Id* at 11:47:20 (emphasis added). The ministry is "like my family." *Id.* (11:47:20–11:48:20). Electronic devices are widely available — "**everyone in the house has a phone**," and "everyone" **also** has **tablets** and **computers**. *Id.* (12:04:00). She has "never done any work in the call center" and will not be eligible until she turns 18 after this school year. *Id.* (11:42:30).

Fifteen (now sixteen)-year-old **C.W.'s account is the outlier.** It deviated substantially from every other minor's account and bore evident signs of unreliability and outside influence. Still, the government credited it as though it were the only story, suppressed the others, and falsely attributed his version to the group. The reason for the divergence is easy to find: at the time of his interview, C.W., B.W.'s brother, had been living with his father, complaining witness/alleged victim V-7, who left the ministry in 2018 and has publicly criticized it and its leadership. C.W. acknowledged his father told him negative things about the ministry. *See, e.g.,* CAFI Interview of C.W. (20:50; 33:45).[18]

C.W.'s account also includes inherent contradictions. He claimed he was "whooped" but admitted he never had marks or bruises. *Id.* (34:25; 36:30). He alleged food was withheld as punishment, yet acknowledged that "kids could go to the kitchen at any time" and there was "no food or water deprivation that I knew of."

[18] There is no evidence that the other minors—all of whom contradicted C.W.'s account—were similarly coached by their parents. To the contrary, each was interviewed without parental knowledge or consent.

*Id.* (41:55–42:30; 51:20). Notably, the latter statement was once again omitted from his 302. He described people being "put on the streets" while also conceding that those who didn't want to stay could "just leave." *Id.* (44:55; 47:10).

V-2 corroborates the other minors' accounts. In a recorded interview with FBI agents on October 26, 2022, she stated plainly that "the children are always taken care of." Recorded Interview of V-2 (1:27:10). She explained that Pastor Taylor is "very strict" about protecting children from any possibility of sexual abuse—prohibiting men from sleeping near or being alone with children. *Id.* at 1:13:28.[19]

The government's claims of rampant abuse fare no better under scrutiny. V-2 left the ministry in 2023—yet when agents explicitly asked her to describe the frequency and severity of violence she had witnessed, she could point to nothing more recent than a few incidents in "2016, maybe the very beginning of 2017"—none of them perpetrated by Pastor Taylor,[20] and none of them related, even remotely, to fundraising or other work:

> I haven't heard of anyone really being hit and like, recently, but like D.C. in 2016 for sleeping with [K.F.], and then I think [M.G.] was beaten, I think, for the same thing, like kind of just having sexual relationships with a

---

[19] Egregiously, this interview was conducted nearly three years before Pastor Taylor was indicted. Yet government counsel, in support of its plea for detention pending trial, asserted that "Taylor's depraved character is reflected in how he treated the children in the organization." ECF No. 62, PageID.461. Equally troubling, V-2's statements regarding Pastor Taylor and KOGGC's positive treatment and protection of children are omitted entirely from V-2's FD-302. This is not the first time a 302 has failed to reflect what a witness actually told agents. *See generally* Def. Mot. for Discovery, ECF No. 129.

[20] V-2's only account linking Pastor Taylor to any purported physical conduct was secondhand: she "heard" that in 2016 he yelled at and pushed "the guys," and that "someone said that he did hit them." *Id.* at 21:12.

> female. [S.K.] was hit with a baseball bat because he had sex with [K.K.]. That was all around the same time—as far as what year? Yeah, it was around 2016, maybe very beginning of 2017. But nothing that I know of recently.

*Id.* at 19:14.

V-2's interview also refutes the government's claims that Pastor Taylor would incite violence against law enforcement. *See* ECF No. No. 67, PageID.530 ("given Taylor's … evangelizing of violence and obstruction in defiance of law enforcement, Taylor would clearly be a danger to the community if released."). When agents asked whether he would instruct an armed security guard to "act with their weapon" if the FBI came, V-2 answered: "No[.]"[21] Audio Recording of V-2's Interview (1:29:46). When pressed further—"Do you think if law enforcement were to take some sort of physical action that there would be fighting? Do you think people would comply?"—she responded: "I don't think David or Michelle would actually specifically tell the staff [to fight]. I think that some people might take it upon themselves, but most people wouldn't want to cause trouble for David." *Id*. at 1:31:00.[22]

**b. The claims of threats, harassment, and stalking are old and vague.**

---

[21] That a KOGGC staff member has a weapon does not suggest dangerousness. Unfortunately, mass shooting are increasingly common. Churches are no exception. There was a shooting earlier this year at Pastor and televangelist Joel Osteen's Lakewood Church. Shooter at Houston Megachurch Had Lengthy Criminal History Including Weapons Charges, Police Say, CNN (Feb. 13, 2024), https://www.cnn.com/2024/02/12/us/joel-osteen-lakewood-church-shooting-monday.

[22] Once again, there is a discrepancy between what V-2 actually said to the agents and the 302 summarizing the interview. It reads: "If Taylor told KOGGC members to fight, she does believe some would." Ex. LL, FD-302 Interview of V-2 (Oct. 26, 2022). But V-2 never said Pastor Taylor would tell members to fight; she said they might take it upon themselves.

The government claims that Pastor Taylor "and others at his direction have threatened, harassed, and stalked members [who] indicated that they wanted to leave the organization or after they left." ECF No. 67, PageID.530; *see also* Hr'g Tr., ECF No. 62, PageID.415 ("part of the traumatization that occurred in this organization was the exceptional and extraordinary and repeated threats to what would happen to someone if they left the organization. And significantly, it wasn't just threats to the individual, but even worse in their minds, threats to their families.").

In reality, a handful of disaffected ex-ministers complained of harassment, all of them describing events from many years ago, all in conclusory terms, and nothing exceptional or extraordinary:

- **M.J.** (left 2017): Claims years ago she "told [ministers] she was thinking about leaving the ministry," two ministers "called [M.J.] and harassed her for thinking about leaving," and when she told Taylor she would no longer attend JMMI events, he "began to insult her." Ex. JJ, FD-302, Interview of M.J. (09/09/23). M.J. reports no harassment *after* departing *nine years ago*.
- **L.P.** (left 2018): Three years after leaving, she reported to the government that she had been "harassed/stalked after after [sic] leaving the ministry" and "felt she was being followed on multiple occasions"—yet she recognized none of the people she believed were following her. Ex. NN, FD-302, Interview of L.P. (03/09/21). Even if true, there is no apparent tie to the ministry.
- **B.H.** and **L.H.** (husband and wife; left late 2017 or early 2018): They claimed the harassment "became so severe" that they hired a lawyer to send a cease-and-desist letter. Ex. UU, FD-302, Interview of B.H./L.H. (06/18/19). But when they petitioned for personal protection orders (PPO) based on that purported harassment, the judge denied the petitions. *Id.* Notably, obtaining a PPO does not take much—only more than one separate, unwanted contact designed to harass. MCL 600.2950a; MCL 750.411h.
- **P.B.** (left 2016, after only a couple months): He reported that "JMMI members called [his] family frequently and harassed them for him leaving." Ex. OO, FD-302, Interview of P.B. (8/03/22). A decade has passed since then.
- **M.R.** (left 2018): She reported being "harassed via Facebook and her

cellphone" and *believes*—without more—that the ministry "took over her phone using her uncle's information" and that her Facebook account "was hacked and taken over by JMMI members." Ex. PP, FD-302, Interview of M.R. (07/13/23).

- **V-6** (left 2019): He reported that leadership "continued to look for [him]," called a friend and asked "multiple times to come over and look at her apartment," and knocked on doors at her apartment complex until police were called and asked them to leave. He reported no further harassment, and seven years have passed. Ex. QQ, FD-302, Interview of V-6. (03/27/24).

Ministers who left more recently reported nothing of the kind. In proffers with the government in late 2025 and early 2026, two former live-in ministers—S.J. and J.W.—reported that they were contacted after they left.[23] Neither reported threats, harassment, or stalking. Nor is there evidence Pastor Taylor directed the contact.[24]

V-2's account follows the same pattern. She told agents that ministers were harassed after leaving—but reported none herself.

## III. Discovery also disproves Pastor Taylor disseminated sexually explicit images.

The government repeatedly represented that multiple women feared Pastor Taylor or KOGGC members would distribute their sexually explicit images. *See* Gov't Mem., ECF No. 47, PageID.273, 277. At the hearing on Pastor Taylor's motion to revoke the detention order, for example, the government stated

[23] S.J. left in November 2024; J.W. left in September 2025. Ex. RR, FD-302, Interview of S.J. (Oct. 20, 2025); Ex. EE, FD-302, Interview of J.W. (Jan. 6, 2026).

[24] J.W.'s account changed materially over time. When agents interviewed her on August 27, 2025 (Ex. T)—immediately after the raids and before any opportunity to coordinate a narrative—she reported no mistreatment by the Church. By January 20, 2026, after leaving the ministry and after time to be influenced by others, her account shifted and closely tracked the allegations advanced by V-1 through V-8. *See* Ex. EE. But at the time of the bond proceedings, the government only had the first version.

> Women are fearful, Your Honor, that Taylor or someone at his direction will distribute this material. As one woman stated to the government very recently, and this was a woman who provided sexually explicit material to David Taylor, she said, "I would have to find an island that no one heard of and would go there," and she said because her whole family would be hurt if they knew. It terrified her.

Hr'g Tr., ECF No. 62, PageID.414.

This was deeply misleading. According to a summary of the interview—conducted on October 20, 2025, but not produced until late March 2026—the witness never expressed fear that Pastor Taylor or anyone else would distribute her images. The statement was in direct response *to a hypothetical* posed by the government: "how she would feel if the photos [she] sent to TAYLOR were made public." Ex. RR, FD-302 Interview of S.J., p. 9 (10/20/25).

More recently, S.J. told agents that "she was never explicitly told that [Pastor Taylor shares sexually explicit images] [n]or [has she] witnessed that herself." Ex. SS, FD-302 Interview of S.J., p. 3 (1/12/26). And, S.J. *has* publicly criticized Pastor Taylor and KOGGC since the indictment. Neither Pastor Taylor nor anyone else has released or threatened to release her sexually explicit images.

On this point, the discovery reflects that Pastor Taylor told one woman (V.Y.) he would release her sexually explicit images and the SSI alleges Pastor Taylor and Michelle Brannon discussed making threats to two women, F-3 and F-4.[25] The government insists the threats were sincere. The record refutes that. First, they are

---

[25] The dates associated with the messages suggests one of the woman is V.Y. Unfortunately, the government has refused to disclose their identities.

seven years old.[26] Second, context matters. Emails and text messages produced in discovery show that in 2019 Taylor and a woman he was involved with at the time warned V.Y. that they would release her images if she continued to defame him.[27] The messages included in the SSI suggest the same.

But V.Y. went on publicly criticizing Pastor Taylor and KOGGC—in 2019, 2020, 2021, 2022, 2023, 2024, 2025, and 2026. For seven years running, the very condition of the supposed threat was met. Yet neither Pastor Taylor nor any KOGGC member ever disseminated her images. Nor is there any evidence whatsoever that sexually explicit images of any other women were publicly disseminated either. If the government had that evidence, the Court would have heard it by now.

## CONCLUSION

During his earlier bond proceedings, without the benefit of the recently produced discovery, Pastor Taylor was effectively defenseless against the government's extreme and misleading claims. Recently produced discovery now raises serious doubts about those claims and whether Pastor Taylor's conduct can be prosecuted under the forced labor statute at all. This Court should, therefore, reopen the detention hearing or order a bond redetermination hearing and further order pretrial services to investigate the propriety of continued detention—though pretrial

---

[26] Although the government presented a couple messages to the Court during the detention proceedings, ECF No. 62, PageID.459, they all appear to be directed at V.Y.

[27] And, while not new information, Pastor Taylor additionally maintains that V.Y. posted and widely disseminated an image of him shirtless, which was the primary impetus for the threat.

services in both North Carolina and this district previously recommended release.[28]

Pastor Taylor additionally requests an expedited hearing on this Motion given detention was predicated on inaccurate information and the government did not produce the relevant discovery negating its claims until many months later.

Respectfully submitted,

**Allison L. Kriger**
LaRene & Kriger, P.L.C.
500 Griswold St., Suite 2400
Detroit, MI 48226
313-967-0100
akriger@larenekriger.com

**Todd Russell Perkins**
615 Griswold, Suite 400
Detroit, MI 48226
313-964-1702
tperkins@perkinslawgroup.net

**Laurence H. Margolis**
Margolis Law Firm
214 South Main Street, Suite 202
Ann Arbor, MI 48104
734-994-9590
larry@lawinannarbor.com

**Andrew T. George**
Bourelly, George, and Brodey PLLC
1050 30th St. NW
Washington, DC 20007
202-753-5012
andrew.george@bgblawyers.com

**J. Alex Little**
**Brent Adams Hannafan**
**Zachary C. Lawson**
Litson PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
615-985-8205
alex@litson.co
brent@litson.co
zack@litson.co

*Counsel for David Taylor*

DATED: August 25, 2026

[28] A reentry plan will be provided to pretrial services.