UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

DAVID TAYLOR, et al.,

Defendants.

Case No. 2:25-cr-20560

Honorable Susan K. DeClercq
United States District Judge

**OPINION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS (ECF Nos. 217; 226), GRANTING UNOPPOSED MOTION TO SEAL (ECF No. 275), AND DENYING DEFENDANTS' MOTIONS TO STRIKE (ECF Nos. 272; 273)**

Defendants David Taylor and Michelle Brannon have been charged with multiple counts of forced labor and one count of money laundering conspiracy. Together with Defendant Kathleen Klein, they have also been charged with one count of conspiracy to commit forced labor. Defendants now move to dismiss the Second Superseding Indictment, arguing that the First Amendment bars prosecution, the Indictment fails to state a claim, and the Religious Freedom Restoration Act ("RFRA") prevents prosecution. For the reasons stated below, this Court will deny all motions to dismiss.

Defendants also move to strike certain portions of the Second Superseding Indictment as surplusage. For the reasons stated below, this Court will deny the

motions to strike, but will grant the unopposed motion to seal exhibits attached to the motion to strike.

## I. BACKGROUND[1]

Defendant David Taylor is the leader of Kingdom of God Global Church ("KOGGC"). ECF No. 194 at PageID.2458. Defendant Michelle Brannon is the executive director of KOGGC. *Id.* Defendant Kathleen Klein is an executive of KOGGC, known internally as "Prophetess." *Id.* at PageID.2458–59. Together, the three Defendants managed KOGGC, with Brannon and Klein carrying out Taylor's orders. *Id.* at PageID.2459.

Taylor established call centers to raise money to support KOGGC's operations. ECF No. 194 at PageID.2459. He recruited individuals from across the country to work in these call centers, usually without pay. *Id.* Defendants "instructed the call center laborers to make a specific number of calls and raise a specific amount of money each day." *Id.* Taylor set impossibly high goals for soliciting donations. *Id.* at PageID.2466. KOGGC received approximately $50 million in donations over more than 10 years, and the funds were used in part to purchase residences and luxury vehicles for Taylor. *Id.* at PageID.2459–60.

[1] This Court recites the facts as presented in the operative Indictment. ECF No. 194. *See, e.g.*, *United States v. Ferguson*, 681 F.3d 826, 831 (6th Cir. 2012) ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment.") (quoting parenthetically *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006)).

Taylor also recruited personal servants. ECF No. 194 at PageID.2460. Those unpaid workers "carried out Taylor's demands, including providing food for him, transporting him, maintaining his houses and cars, bringing women from ministry houses, airports, and other locations to his location, and ensuring those women took Plan B emergency contraceptives." *Id.* (capitals omitted).

"To compel obedience," Defendants controlled nearly every aspect of workers' lives. ECF No. 194 at PageID.2462. Workers slept at call centers or homes owned by KOGGC. *Id.* They needed permission to leave those locations, including for medical care. *Id.* at PageID.2465. Taylor demanded that the workers give up any other employment they had. *Id.* at PageID.2462. He prohibited dating among his workers. *Id.* And Defendants demanded that the workers sever ties with any family or friends that questioned Taylor or KOGGC. *Id.* If workers attempted to leave KOGGC, Taylor told them they would suffer "consequences including sickness, accidents, death, and eternal damnation." *Id.* at PageID.2463.

Taylor used similar threats to coerce workers to produce and share sexually explicit photos and videos, and he threatened to disseminate the images if workers defied him. ECF No. 194 at PageID.2461–62. Brannon would pressure female laborers to comply with these demands. *Id.* at PageID.2462. And, at times, Taylor and Brannon agreed to disseminate these sexually explicit images as punishment and retaliation for speaking out about KOGGC. *Id.* at PageID.2464.

KOGGC workers lived in "a climate of fear that deterred [them] from leaving KOGGC." ECF No. 194 at PageID.2463. When workers "disobeyed an order or failed to follow a rule," Defendants imposed punishments, including "physical assault, additional work, sleep deprivation, food restrictions, loss of shelter, psychological abuse, and threats of spiritual damnation." *Id.* For example, when fundraising numbers were low, Defendants would restrict workers' diets to just peanut butter and jelly sandwiches, soup, salad, and water. *Id.* at PageID.2466–68. If insufficient funds were raised, workers would be forced to stay up until 4 A.M. or later. *Id.* at PageID.2467–68. Defendants also oversaw lengthy meetings where workers who had displeased them were humiliated and rebuked in front of other workers. *Id.* at PageID.2464.

As a result of this conduct, a grand jury indicted Taylor and Brannon on multiple counts of forced labor, in violation of 18 U.S.C. § 1589; all Defendants on one count of conspiracy to commit forced labor, in violation of 18 U.S.C. §§ 1594(b) and 1589; and Taylor and Brannon one count of money laundering conspiracy, in violation of 18 U.S.C. § 1956(h)). ECF No. 194. Taylor and Brannon now move to dismiss the Second Superseding Indictment. ECF Nos. 217; 226. All Defendants concur with both motions. *See* ECF Nos. 222; 226; 252; 253. The motions are fully

briefed, *see* ECF Nos. 245; 251; 257; 259, and this Court heard argument on the motions on September 24, 2026,[2] *see* ECF Nos. 215; 270.

Defendants also move—along with a separately filed set of exhibits—to strike certain portions of the Second Superseding Indictment as surplusage. *See* ECF Nos. 272; 273 (sealed). That motion is fully briefed. *See* ECF Nos. 276; 281. This Court finds a hearing on the Motion to Strike is unnecessary. *See* E.D. Mich. LR 7.1(f)(2).

Finally, Defendants move to seal the exhibits to their motion to strike. ECF No. 275. This Court will grant that unopposed motion.

## II. LEGAL STANDARD

An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged" to satisfy Criminal Rule 7. *See* FED. R. CRIM. P. 7(c)(1). A defendant may move to dismiss an indictment for failure to state an offense. FED. R. CRIM. P. 12(b)(3)(B)(v).

"In general, an indictment is constitutionally adequate if it contains the elements of the offense charged and fairly informs a defendant of the charge against

---

[2] This Court is cognizant of the fact that only 30 days after a motion hearing are excludable under the Speedy Trial Act. *See* ECF No. 18 U.S.C. § 3461(h)(1)(H); *United States v. Mentz*, 840 F.2d 315, 326 (6th Cir. 1988). However, Taylor's Motion to Strike Surplusage, filed on October 8, 2026, again paused the Speedy Trial Act clock. *See* ECF Nos. 272; 273; 18 U.S.C. § 3461(h)(1)(D). Moreover, the Parties have stipulated that all time between November 18, 2025, and April 20, 2027, is excluded from the Speedy Trial Act. *See* ECF Nos. 52; 111; 243.

which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Landham*, 251 F.3d 1072, 1079 (6th Cir. 2001) (internal quotation marks, footnote, and citations omitted). It is appropriate for the Government to use "the words of the statute itself, as long as those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be published." *Hamling v. United States*, 418 U.S. 87, 118 (1974) (internal quotation marks and citation omitted). Put simply, "[t]o be legally sufficient, the indictment must assert facts which in law constitute an offense; and which, if proved, would establish prima facie the defendant's commission of that crime." *United States v. Superior Growers Supply, Inc.*, 982 F.2d 173, 177 (6th Cir. 1992).

Importantly, however, "courts evaluating motions to dismiss do not evaluate the evidence upon which the indictment is based." *Landham*, 251 F.3d at 1080 (citing *Costello v. United States*, 350 U.S. 359, 362–63 (1956)). Rather, this Court considers only the face of the indictment, *Ferguson*, 681 F.3d at 831, and takes the indictment "read as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications," *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007).

## III. DISCUSSION

### A. First Amendment

Taylor[3] argues that his words and actions are protected First Amendment religious exercise, so imposing criminal liability on him for his actions and the use of spiritual coercion would violate the First Amendment. ECF No. 218 at PageID.3312–18. The Government responds that the First Amendment is no bar to prosecution because the charging statute is neutral toward religion and generally applicable. ECF No. 245 at PageID.4800–06. Further, the Government argues that Taylor's underlying religious beliefs are irrelevant, as only the charged *conduct* will be on trial. *Id.* As explained below, this Court finds that the First Amendment is not a bar to this prosecution.

At the outset, "neutral, generally applicable laws that incidentally burden the exercise of religion usually do not violate the Free Exercise Clause of the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 356–57 (2015). Taylor does not address this point directly, instead arguing that this prosecution improperly criminalizes his religious actions. Because Taylor does not argue that the anti-forced labor statute,

[3] Both Brannon and Klein adopt Taylor's arguments and ask this Court to dismiss the Indictment on the same grounds. *See* ECF Nos. 222, 226. This Court considers the arguments as to each Defendant, but because Taylor is the primary moving party, this Court generally refers to Taylor as the movant throughout. For arguments raised independently in Brannon's motion, Brannon is referred to as the movant.

18 U.S.C. § 1589, is not neutral or generally applicable, this Court will assume without deciding that it is neutral and generally applicable.[4]

Rather than challenging § 1589 broadly, Taylor argues that his free-exercise rights extend beyond beliefs and shield his religious conduct from prosecution. *See* ECF No. 218 at PageID.3312–18. He also argues that the Government's prosecution of him is premised on the view that he is a "false prophet." ECF No. 218 at PageID.3311, 3313. This, he argues, improperly turns theological disapproval into a crime, because a jury must conclude that his beliefs are false to find him guilty. *See id.* (citing *United States v. Ballard*, 322 U.S. 78, 86–87 (1944)).

As the Supreme Court long ago explained, actions and beliefs are two separate concepts: The freedom to believe "is absolute, but in the nature of things, the

---

[4] This Court notes that § 1589 has been used to bring both civil claims and criminal prosecutions against members of many religious groups. *See, e.g.*, *Bistline v. Parker*, 918 F.3d 849 (10th Cir. 2019) (finding allegations of civil § 1589 claims brought against the Fundamentalist Church of Jesus Christ of Latter-Day Saints sufficient to proceed past motion to dismiss); *Shukla v. Sharma*, No. 07 CV 2972, 2009 WL 10690810, at *7 (E.D.N.Y. 2009) (finding "subject matter jurisdiction to decide plaintiff's claims under [§ 1589]," despite the fact defendant was a Hindu priest). The same is true for related forced-labor statutes. *See, e.g.*, *United States v. King*, 840 F.2d 1276 (6th Cir. 1988) (affirming prosecution of "seven members of an unorthodox religious commune" under 18 U.S.C. § 1584, which prohibits the sale of another human into involuntary servitude); *Turner v. Unification Church*, 473 F. Supp. 367, 372 (D.R.I. 1978) (finding the First Amendment did not bar claims brought under 18 U.S.C. § 1853, which prohibits involuntary servitude, because "the Church cannot seek the protection of one constitutional amendment while it allegedly deprives citizens the protections of other constitutional guarantees."), *aff'd*, 602 F.2d 458 (1st Cir. 1979).

[freedom to act] cannot be." *Cantwell v. Conn.*, 310 U.S. 296, 303–04 (1940). The Sixth Circuit recognized in a recent appeal in this very case, "there is constitutional protection for freedom of religious belief," but "religious conduct remains subject to regulation for the protection of society." *United States v. Taylor*, 189 F.4th 521, 526 (6th Cir. 2026) (internal quotation marks, brackets, and citation omitted); *see also, e.g.*, ECF Nos. 62 at PageID.469 (distinguishing "conduct that's charged as criminal . . . from religion and faith. Criminal conduct is just that, it's conduct."); 113 at PageID.1097 ("This is a criminal case. This is not a religious case. The charge doesn't have anything to do with the faith of the defendant; it has to do with his conduct."). Indeed, the Supreme Court has repeatedly stated that actions and practices are not absolutely protected from governmental regulation simply because the actor classifies them as "religious." *See, e.g.*, *United States v. Lee*, 455 U.S. 252 (1982) (holding that social security taxes may be constitutionally imposed on persons who object on religious grounds to the payment of taxes to support public insurance funds); *Davis v. Beason*, 133 U.S. 333 (1890); *Reynolds v. United States*, 98 U.S. 145 (1878). So too has the Sixth Circuit. *See, e.g.*, *United States v. Greene*, 892 F.2d 453, 456 (6th Cir. 1989).

The Government may not only regulate; it may prosecute. It has long been true that the First Amendment is not a universal shield from prosecution. *See, e.g.*, *United States v. Ballard*, 322 U.S. 78, 86 (1944); *United States v. Rasheed*, 663 F.2d

843, 847 (9th Cir. 1981) ("The First Amendment does not protect fraudulent activity performed in the name of religion"); *Greene*, 892 F.3d at 456 (holding that the defendant's First Amendment rights did not bar prosecution for possession of marijuana). Of course, *Ballard* makes clear that the "truth or falsity" of Taylor's "religious concepts or beliefs" cannot be tried. 322 U.S. at 86–87. The jury must be instructed to set aside that judgment, and instead, evaluate Taylor's conduct. *See id.* But the fact that a defendant's allegedly illegal *actions* were religiously motivated does not prevent prosecution. *See id.* at 79 (allowing prosecution for fraud, perpetrated by claims that the defendant was a "divine messenger[]").

Critically, the Indictment primarily charges conduct, not Taylor's beliefs. For example, the Government alleges that Taylor ordered KOGGC workers to bring him food, transport him and others, and maintain his home and cars. ECF No. 194 at PageID.2460. It alleges that Taylor forced women to take sexually explicit photos and videos. *Id.* at PageID.2461–62. It alleges that Defendants punished workers, including by physically assaulting KOGGC workers. *Id.* at PageID.2463–64, 2466. It alleges that Defendants withheld food and sleep from workers. *Id.* Even if these actions were religiously motivated, they are all *actions*. In turn, this allegedly criminal conduct is subject to regulation for the protection of society, even if Taylor committed it under the guise of religion. *See, e.g.*, *Ballard*, 322 U.S. at 79; *Greene*, 892 F.3d at 456.

For this reason, Judge Kethledge's dissent in *Acosta* is distinguishable. *See Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 768 (6th Cir. 2018) (Kethledge, J., concurring). In *Acosta*, the Department of Labor sued Grace Cathedral church's restaurant—the Cathedral Buffet—alleging that Cathedral Buffet's use of unpaid church members as staff violated the Fair Labor Standards Act ("FLSA"). *Id.* at 763. After a bench trial, the district court found that Cathedral Buffet's use of unpaid labor violated the FLSA. *Id.* A majority of the Sixth Circuit held that the church volunteers were not employees within the meaning of the FLSA and reversed the district court. *Id.* Judge Kethledge authored a concurrence in which he noted that the Department of Labor's actions sought "to regulate spiritual conduct qua spiritual conduct," which would violate the First Amendment. *Id.* at 769 (Kethledge, J., concurring). Importantly, however, Judge Kethledge wrote as follows: "[T]his is not a case, like *Smith*, where illegal conduct (there, smoking peyote) remained illegal even though it was religiously motivated." *Id.* Rather, the Department's position in *Acosta* was that legal conduct—volunteering at a church restaurant—becomes illegal if motivated by spiritual coercion.[5] *Id.*

---

[5] Also important to Judge Kethledge was the fact that 134 members of the congregation "said under oath" that "they were not" coerced. 887 F.3d at 770 (Kethledge, J., concurring). Judge Kethledge highlighted that it would be inappropriate for the Department of Labor to ignore this evidence and instead insert its judgment regarding whether the congregants were coerced. *Id.* Here, Defendants may present evidence that members of KOGGC were not coerced at trial, *see infra* § III.B, but no such allegations are present on the face of the Indictment. At this

Here, the Indictment does not allege legal conduct transformed into illegal conduct via only spiritual coercion. Rather, it alleges that Defendants forced KOGGC workers to perform involuntary labor and physically punished them when they did not perform. The plainly illegal nature of that alleged conduct—spiritual coercion removed—distinguishes *Acosta*.

The more difficult question is whether Taylor's use of religious threats is actionable conduct. For example, the Indictment alleges that if KOGGC workers "disobeyed an order or failed to follow a rule," Defendants would "claim the laborer was defying God and would suffer in hell." ECF No. 194 at PageID.2463. Defendants would "threat[en] spiritual damnation." *Id.* These allegations arguably straddle the border between conduct—speaking threats—and simply stating beliefs allegedly shared by Taylor and KOGGC members. This Court finds that these threats are actionable conduct, rather than unprosecutable religious beliefs.

Begin with the statute itself, which prohibits forced labor obtained through "means of serious harm or threats of serious harm." 18 U.S.C. § 1589(a)(2). "Serious harm," in turn, includes "psychological . . . harm." *Id.* at § 1589(c)(2). This prohibits labor obtained by "improper threats or coercion." *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), *vacated on other grounds by Bradley v. U.S.*, 545 U.S. 1101

---

juncture, the Government is merely alleging—not determining—that KOGGC members were spiritually coerced. So the coercion problem present in *Acosta* is not present here.

(Mem.) (2005). In measuring what is an "improper" threat, this Court is cognizant that the truth or falsity of the beliefs themselves cannot be put to the jury. *See, e.g.*, *Ballard*, 322 U.S. at 86–87. However, the jury must be asked to determine whether the victims were subject to psychological harm, considering "all the surrounding circumstances."[6] 18 U.S.C. § 1589(c)(2).

Courts across the country agree that Defendants' spiritual threats may rise to the level of psychological harm, and, therefore, may be considered by the jury. *See, e.g.*, *United States v. Majeed*, No. 21-20060, 2024 WL 992884, at *9–10 (D. Kan. 2024) (finding in a § 1589 prosecution that evidence of spiritual threats is admissible under the First Amendment); *United States v. Murra*, No. 4:16-cr-00078, 2016 WL 10953909, at *6 (finding that "a threat of suffering harm in the after life constitutes 'serious harm' as defined by 18 U.S.C. § 1589 is a fact issue properly decided by the jury"), *aff'd*, 879 F.3d 669, 675 (5th Cir. 2018).

This Court also finds precedent addressing fraud and undue influence in the religious context persuasive on this point. For example, in *Roberts-Douglas v. Meares*, 624 A.2d 405 (D.C. Cir. 1992), nine plaintiffs—former parishioners of the Evangel Temple—accused the leaders of their church of fraudulent and coercive

[6] At the hearing, the Parties argued at length about how this Court could phrase jury instructions to effectuate this standard. *See, e.g.*, ECF No. 270 at PageID.5049–51, 5067–68. This Court appreciates that those instructions must be carefully worded, but the language of jury instructions does not bear on the question at hand of whether the Indictment fails to charge a crime. *Ferguson*, 681 F.3d 831.

conduct in fundraising. *Id.* at 408. The plaintiffs alleged that "[t]he defendants' coercive tactics allegedly included repeated threats of divine retribution against those who failed to pledge or contribute sufficient amounts, as well as various types of harassment." *Id.* The defendants argued that none of this conduct was actionable, because it "was dictated by their religious beliefs, and . . . they have a constitutional right to carry out their religious obligations without judicial interference or intrusion." *Id.* at 423.

The D.C. Circuit began its analysis by recognizing the same principle the Sixth Circuit recognized earlier this year: "The Free Exercise Clause embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Roberts-Douglas*, 624 A.2d at 423 (internal quotation marks and citations omitted). The D.C. Circuit went on to hold that if "defendants extracted contributions by overbearing the will of one or more of the plaintiffs, then their conduct is not insulated from judicial scrutiny by the defendants' status as clergymen." *Id.* In other words, if the defendants' conduct went beyond the bounds of ordinary solicitation and into undue influence or fraud, that allegedly criminal conduct was actionable. *See id.*

The D.C. Circuit went on to confirm that "the defendants' religious beliefs" could not be placed "on trial." *Roberts-Douglas*, 624 A.2d at 424. So, "[t]o the extent the claims are based merely on threats of divine retribution . . . , they cannot stand."

*Id.* (citation omitted). For example, a claim of undue influence likely would not survive were it based solely on "generalized invocation from the pulpit of the wrath of God." *Id.* But if certain other facts were present, the threat of divine intervention can cross the line from spiritual belief to coercion. *See id.* For example, "one-on-one or similar pressures focused on the complaining party rather than on the audience as a whole," tends to show undue influence. *Id.* So too does "[r]epeated reiteration, even from the pulpit, that God will curse or kill any parishioner who does not . . . meet the bishop's demands." *Id.* At bottom, the totality of the circumstances was relevant evidence, all of which the D.C. Circuit considered. *See id.*; *see also In re Love*, 182 B.R. 161 (Bankr. W.D. Ky. 1995) (setting out eight factors to consider when evaluating whether a donation from a client to their spiritual advisor was the product of undue influence).

This Court therefore finds that the spiritual threats may be considered "conduct" that violates § 1859 by their imposition of psychological harm. To avoid this conclusion, Taylor argues that this Court must "distinguish between improper threats or coercion and permissible warnings of adverse but legitimate consequences." *See Headley v. Church of Scientology Int'l*, 687 F.3d 1173, 1180 (9th Cir. 2012). This Court does not find *Headley* particularly persuasive, because this portion of *Headley* relies on *United States v. Bradley*, 390 F.3d 145, 151 (1st Cir. 2004), *judgment vacated on other grounds*, 545 U.S. 1101 (2005). Critically,

the First Circuit in *Bradley* explained that an employee's contract could impose certain consequences, like threatening to withhold future pay, if the employee stopped working. *Id.* at 151. Such a threat would be "legitimate," and would not rise to the level of "serious harm" as contemplated by § 1589. *Id.* Here, the Indictment does not provide some legitimate reason for Defendants to impose the allegedly coercive conduct. In turn, the logic underpinning *Bradley* (and in turn, *Headley*) is inapplicable here. The definition of serious harm will guide the jury in distinguishing reasonable consequences from coercion. This Court need not step in at this early juncture and do so itself.

Taylor also argues that all KOGGC's congregants' actions were voluntary, because all congregants believed his religious teachings. *See* ECF No. 218 at PageID.3313. But a motion to dismiss an Indictment considers the four corners of the Indictment, not a defendant's possible defenses or the evidence contradicting the Indictment. *See Landham*, 251 F.3d at 1080. Taylor's argument that the workers' conduct was voluntary is not a bar to prosecution because the Indictment makes no such allegation. Rather, when read "in a practical sense with all the necessary implications," *see McAuliffe*, 490 F.3d at 530, the Indictment alleges that Taylor's "laborers" were obedient for fear of punishment, *see* ECF No. 194.

At bottom, taking the Indictment on its face, Taylor's alleged actions constitute illegal conduct, which "remain[s] illegal, even though it was religiously

motivated." *See Acosta*, 887 F.3d at 769 (Kethledge, J., concurring); *see also, e.g.*, *United States v. Dickey*, 52 F.4th 680, 686 (7th Cir. 2022) (declining to use a proposed jury instruction that "would have excused [Dickey's] criminal conduct based on her religious assertions"). To be clear, the jury must be instructed that if it finds the Government's claims "based merely on threats of divine retribution . . . , they cannot stand." *Roberts-Douglas*, 624 A.2d at 424 (citation omitted). And Taylor will be free to present evidence at trial that he was not engaged in illegal conduct—as he argues volunteering, fasting, and sleep deprivation are. *See* ECF No. 218 at PageID.3315–16. If the jury finds his conduct legal, his religious motivations alone cannot make that legal conduct illegal. *See Acosta*, 887 F.3d at 769 (Kethledge, J., concurring). But spiritual threats may properly be considered in combination with the other alleged conduct, meaning the Indictment, on its face, does not violate the First Amendment.[7] This Court will therefore deny Defendants' motions to dismiss the Indictment on First Amendment grounds.

**B. Sufficiency of the Indictment**

Next, Defendants argue that the Indictment fails to allege any of the essential elements for a violation of 18 U.S.C. § 1589. ECF No. 218 at PageID.3318–3331. The Government contends that it has adequately done so. ECF No. 245 at

[7] Indeed, Brannon concedes as much: "If religion is background to an independently unlawful threat, the case may proceed." ECF No. 226 at PageID.3591.

PageID.4778–4800. This Court finds the Indictment is sufficiently pleaded.

Congress enacted the current version of § 1589 as part of the Trafficking Victims Protection Act ("TVPA") in 2000. *See* Pub. L. No. 106-386, § 112, 114 Stat. 1464. In enacting the TVPA, Congress specifically sought "to address the increasingly subtle methods" traffickers use to "place their victims in modern-day slavery." H.R. Conf. Rep. No. 939, at 101. A claim under § 1589 has three elements: a person that (1) obtains "labor or services" of another (2) "by means of" (3) "serious harm" violates the statute. 18 U.S.C. § 1589(a).

*1. "Serious Harm"*

First, Taylor argues that the Indictment does not allege "serious harm" as defined in § 1589. *See* ECF No. 218 at PageID.3318–22. He argues that the statute "sets a demanding threshold," requiring physical restraint, threats to third-parties, or other severe consequences to compel a person to remain in servitude. *Id.* at PageID.3319. The Government responds that physical restraint is not a necessary component of serious harm, ECF No. 245 at PageID.4782, and that Taylor's arguments present a question of fact, rather than a question of law, *id.* at PageID.4782–92. This Court finds the Indictment alleges serious harm as defined by § 1589.

As explained in part above, § 1589 defines "serious harm" as "any harm, whether physical or nonphysical, including psychological, financial, or reputational

harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or continue performing labor or services tin order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

Taylor argues that "early morning prayer calls, restricted diets during a voluntary boot camp, and communal sleeping arrangements" do not qualify as serious harm. ECF No. 218 at PageID.3319. As the Government argues, however, this summary minimizes the Indictment's allegations. *See* ECF No. 245 at PageID.4785. "Serious harm" is analyzed under a "reasonable person" standard. 18 U.S.C. § 1589(c)(2). The Indictment alleges psychological abuse, physical assaults, threats of physical violence, sleep deprivation, food deprivation, denial of medical attention, verbal abuse, humiliation, and isolation. *See generally* ECF No. 194. Taking these factual allegations as true, and construing them in a practical manner, *see McAuliffe*, 490 F.3d at 530, this Court finds that these circumstances constitute serious harm.

Rather than engage with the Indictment's allegations or the statutory text, Defendants point this Court to several cases in which courts found the evidence presented at summary judgment or trial did not establish "serious harm" within the meaning of § 1589. *See* ECF No. 218 at PageID.3119–20 (citing *Muchira v. Al-Rawaf*, 850 F.3d 605, 616 (4th Cir. 2017) and *United States v. Callahan*, 801 F.3d

606 (6th Cir. 2015)); *see also* ECF No. 226 at PageID.3539–40 (citing *United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) and *Bradley*, 390 F.3d 145). These cases are distinguishable procedurally and substantively.

Procedurally, this Court is mindful of the early posture here. An indictment may only be dismissed if "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60 (1969). Where there are questions of fact, those questions must be presented at trial. *See United States v. Knox*, 396 U.S. 77, 83 (1969). Nor can this Court "evaluate the evidence upon which the indictment is based." *Landham*, 251 F.3d at 1080.

Most of the cases on which Defendants rely were decided after full consideration of the evidence at trial. *See Callahan*, 801 F.3d 606 (presenting an appeal of conviction after a jury trial); *Dann*, 652 F.3d 1160 (same); *Bradley*, 390 F.3d 145 (same). Here, this Court cannot evaluate the evidence underlying the Indictment. *See Landham*, 251 F.3d at 1080. Rather, this Court evaluates only whether that Indictment alleges the elements of § 1589. *See United States v. Sampson*, 371 U.S. 75, 78–79 (1962) ("[A]t this stage of the proceedings, the indictment must be tested by its sufficiency to charge an offense.").

Critically, cases affirming a conviction under § 1589 do not set a *floor*. The statute itself does so. That *Bradley*, *Dann*, and *Callahan* found the evidence

presented satisfied § 1589's "serious harm" requirement does not raise that floor. In other words, the Government need not match or exceed the proofs in those cases, especially at this early stage. It need only allege the crimes charged. *See Landham*, 251 F.3d at 1079. This Court therefore declines Defendants' invitation to evaluate the evidence underlying the Indictment and compare that evidence to precedent. As noted above, the allegations rise to the level of serious harm.

Substantively, though, the only case finding no "serious harm"—*Muchira*—is distinguishable. In *Muchira*, the undisputed facts showed that the plaintiff was never physically abused; never threatened with harm; nor was she threatened with consequences if she left the defendants' employment. 850 F.3d at 622. Indeed, the evidence in *Muchira* failed to establish that the plaintiff was "ever prevented . . . from doing what she ultimately did do – terminate her employment." *Id.* at 622. Those facts are distinguishable from the Indictment here, which alleges that KOGGC workers were physically abused, threatened with physical abuse, threatened with consequences if they failed to meet Taylor's demanding goals, and threatened with consequences if they were to leave their position. *See generally* ECF No. 194.

Taylor goes on to argue that the "allegations here" show "competent adult members of a voluntary religious community with access to phones, identification documents, family, and the ability to leave," which does not establish "serious harm." ECF No. 218 at PageID.3320. But these are not the allegations in the

Indictment; presumably, they are emblematic of the evidence Taylor will present at trial. But this Court's review is limited to the four corners of the Indictment, *Ferguson*, 681 F.3d at 831, and here, Taylor asks this Court to evaluate the Government's evidence as compared to his evidence. This Court declines to do so.

Brannon, for her part, claims to accept the Indictment's allegations as true. ECF No. 226 at PageID.3540. She then goes on to explain that the Indictment pleads only "temporary, situational, and programmatic demands" to comply, rather than harm serious enough to be actionable under § 1589. *Id.* Again, Brannon is free to present evidence that the demands were temporary or situational, but no such representation appears on the face of the Indictment. Rather, when taken together, that Indictment describes an environment in which threats were constant and pervasive. *See generally* ECF No. 194.

This Court finds, upon a facial reading of the Indictment, that a reasonable person could feel he was compelled to continue performing labor for KOGGC to avoid the constantly threatened harm. Therefore, the Indictment, on its face, sufficiently alleges "serious harm" as defined in 18 U.S.C. § 1589.

*2. "By Means of" Prohibited Conduct*

Next, Taylor argues that the Second Superseding Indictment does not allege that the labor was obtained "by means of" the prohibited conduct, reiterating the allegation that all labor was voluntary. ECF No. 218 at PageID.3323. The

Government responds that the Indictment alleges that the victims worked involuntarily for fear of consequences. ECF No. 245 at PageID.4790. This Court finds the Indictment sufficiently alleges labor compelled "by means of" prohibited conduct.

The "by means of" language requires the Government to allege "that serious harm befall an employee if she did not continue to work or a threat that compels her to remain with the employer." *Headley*, 687 F.3d at 1180 (internal quotation marks, brackets, and citation omitted). Put differently, the Government must allege that the "victim of forced labor remains in servitude to avoid negative consequences." *Salem v. Mich. State Univ.*, No. 1:19-cv-220, 2021 WL 1381149, at *6 (W.D. Mich. Apr. 13, 2021).

The Indictment plainly meets this requirement. It alleges that Defendants imposed strict rules "[t]o compel obedience," ECF No. 194 at PageID.2462, and cultivated "a climate of fear," *Id.* at PageID.2463. Indeed, at least one victim texted Taylor that she "fear[ed] getting kicked out" and "sometimes I get into doing [what Taylor asked] because I feel I have to and not wanting to do it." ECF No. 194 at PageID.2480.[8] The Indictment fairly alleges that Defendants imposed forced labor "by means of" prohibited conduct.

[8] Taylor argues that the sexually explicit allegations—including those involving this victim and this text message exchange—are completely unrelated to the forced labor allegations. *See* ECF No. 218 at PageID.3329–30. In support, he relies on *United*

In arguing to the contrary, Defendants focus on whether the servitude was imposed "by means of" physical restraint. But physical restraint is not required. *See United States v. Djoumessi*, 538 F.3d 547, 553 (6th Cir. 2008) ("[O]pportunities for escape mean nothing if [the defendant] gave [the victim] reasons to fear leaving the house"). Both Taylor and Brannon ignore this binding precedent, and instead rely primarily on *Headley*, 687 F.3d at 1175, to argue that a religious organization can impose myriad security features and still not compel its members to remain on base. In *Headley*, the Sea Organization component of the Church of Scientology International imposed specific lifestyle constraints on its members, including censoring mail, monitoring phone calls, and not having children. 687 F.3d at 1175. Further, the Sea Organization imposed several restraints on physically leaving its base: "a perimeter fence, cameras, motion detectors, alarms, observation posts, and guards." *Id.* at 1177.

Defendants rely only on that general background from *Headley* without engaging with the actual facts of the plaintiffs' relationship with the church. The two

---

*States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010). There, the Second Circuit noted that "consensual [sexual] activities alone could not constitute the basis for a conviction under the sex trafficking charge," but the evidence showed that the victim was coerced into sex acts because she "feared that noncompliance would result in future physical and sexual abuse." *Id.* Here, the Indictment alleges the same, that Taylor told F-2 that noncompliance would "cost [her her] life." ECF No. 194 at PageID.2490. In any event, this Court finds that the sexual allegations independently allege "labor or services" within the meaning of § 1589.

plaintiffs in *Headley*, it turns out, "lived outside of the Base and had access to vehicles, phones, and the Internet. They traveled away from the Base often." 687 F.2d at 1180. Moreover, the evidence "overwhelmingly show[ed] that the Headleys joined and voluntarily worked for the Sea Org because they believed it was the right thing to do, [and] because they enjoyed it." *Id.* at 1179. Therefore, in *Headley*, the evidence demonstrated that the plaintiffs were not compelled into servitude because of the adverse consequences; rather, they believed the "servitude" was "the right thing to do." *Id.*

In contrast, the Indictment alleges nothing of the sort. Rather, it alleges that KOGGC members had to cut off contact with family and friends, ECF No. 194 at PageID.2462; give up outside employment, *id.*; sleep at the call center facility or other KOGGC-affiliated houses, *id.*; and were required to request permission before leaving the housing, *id.* at PageID.2465. Further, the Indictment alleges that Taylor and Brannon controlled the workers' access to medical care and transportation. *Id.* Of course, the evidence at trial may show that KOGGC members had more freedom, like the *Headley* plaintiffs. But that is not the question at this juncture. *See Landham*, 251 F.3d at 1080. On the face of the Indictment, Taylor and Brannon allegedly exercised huge amounts of control over the KOGGC members.

Moreover, interpreting "by means of" to *require* physical restraint would render § 1589(a)(2) superfluous. In subsection (a)(1), the forced labor statute

prohibits labor obtained "by means of . . . physical restraint." 18 U.S.C. § 1589(a)(1). Not only would Defendants' interpretation render that section redundant, it would render the other subsections of § 1859(a) unnecessary. Such a construction is improper. *See, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 29 (2001) (noting that courts should strive to avoid interpretations that "would in practical effect render [statutory language] entirely superfluous in all but the most unusual circumstances").

Next, Taylor relies on *Salem v. Michigan State University*, in which the Western District of Michigan confirmed that labor motivated by a *benefit*—such as obtaining an advanced academic degree—is not forced labor, because forced labor must be motivated by threatened *harm*. 2021 WL 1381149, at *2. Here, the Indictment alleges a multitude of harms that might befall KOGGC members if they did not comply with Taylor's rules and requirements, from psychological harm to threatened fasts to disclosure of intimate photos and videos. Again, at trial, the evidence may show motivation by spiritual benefits, but the Indictment does not.

Finally, Taylor argues that certain relationships, including the relationship between parent and child or pastor and congregant, prohibit forced labor charges. ECF No. 218 at PageID.3326–29. However, Taylor relies exclusively on parent-child cases. *Id.* This Court finds that the parent-child relationship is unique and inapplicable here. *See, e.g.*, *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) (recognizing "that the relationship between parent and child is constitutionally

protected"); *Chapman v. Brentlinger Ents.*, 124 F.4th 382, 391 (6th Cir. 2024) (recognizing the "uniqueness of the parent-child relationship" in the context of the Family Medical Leave Act). The case on which Taylor primary relies, *United States v. Toviave*, recognizes as much, noting that American parents have many "widely accepted parental rights." 761 F.3d 623, 625 (6th Cir. 2014).

To be sure, the relationship between a church and its pastor may be "intimate" and undoubtedly important. *See, e.g.*, *Hutchingson v. Thomas*, 789 F.2d 392 (6th Cir. 1986). But this Court is unaware of any precedent placing that relationship on equal footing with the parent-child relationship, and Taylor has failed to identify any such case. Therefore, this Court declines to apply parent-child relationship caselaw to the pastor-congregant relationship.

At bottom, the Indictment alleges that Defendants' victims were compelled into service "by means of" threats of and imposed negative consequences, satisfying this element.

*3. "Labor or Services"*

Taylor's third attack on the sufficiency of the Indictment is that the victims were not providing "labor or services"; rather, they were simply participating in voluntary religious exercise like any other widely accepted religion. ECF No. 218 at PageID.3330–31. The Government responds that "labor" and "services" must be read broadly, and encompasses even the sexual conduct alleged in the Indictment.

ECF No. 245 at PageID.4792–800. This Court finds the Indictment sufficiently alleges labor or services.

Many courts applying § 1589 have held that "labor" and "services" retain their ordinary meaning and are not limited to economic work. *See, e.g.*, *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017) ("Labor or services in § 1589 is not limited to work in an economic sense."); *Bistline v. Parker*, 918 F.3d 849, 872 (10th Cir. 2019) (citing *Ricchio* for the same proposition); *United States v. Kaufman*, 546 F.3d 1242, 1260–61 (10th Cir. 2008) (holding that "labor or services" may involve "physical or mental effort"); *United States v. Raniere*, 384 F. Supp. 3d 282, 312 (E.D.N.Y. 2019) (finding allegations of "personal favors and errands" satisfied the "labor or services" element of § 1589 on motion to dismiss indictment). This includes compelled sexual conduct. *See, e.g.*, *Ricchio*, 853 F.3d at 556 (holding that "sexual labor and services" pleaded a claim for violation of the forced labor statute); *Marcus*, 628 F.3d at 42–46 (holding that evidence of "physical and sexual abuse" was sufficient for a jury to convict under § 1589); *Kaufman*, 546 F.3d at 1262 (finding that sexual acts "could still be fairly described as . . . forced labor"). The Indictment, which alleges traditional economic labor in the sense of call center operations, in addition to compelled sexual activity, and what appears to be personal butler service, satisfies § 1589's "labor or services" element.

As before, Taylor argues that the KOGGC workers' actions were all voluntary. True, the Supreme Court has held that "[a]n individual who, 'without promise or expectation of compensation, but solely for his own personal purposes of pleasure, worked in activities carried on by persons either for their pleasure or profit," is not performing labor within the scope of the FLSA. *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985). The Department of Labor has similarly recognized that often in religious communities, community members will voluntarily participate in labor, but that voluntary labor is not subject to the rules and regulations of the FLSA. U.S. Dep't of Labor, Wage & Hour Div., Letter FLSA2018-29, at 2 (Dec. 21, 2018).

Here, however, the Indictment does not allege voluntary actions. As outlined above, KOGGC workers were cut off from family and friends; forced to give up outside employment; required to sleep in KOGGC facilities; and needed permission to leave KOGGC facilities. ECF No. 194 at PageID.2463–65. Even if KOGGC members began work willingly, the force with which Taylor allegedly retained them in the enterprise means the Government may still charge him with forced labor. *See, e.g.*, *Marcus*, 628 F.3d 36; *United States v. Mussry*, 726 F.2d 1448, 1454 n.6 (9th Cir. 1984); *United States v. Bibbs*, 564 F.2d 1165, 1165 (5th Cir. 1997).

Brannon cites *Robinson v. Baldwin*, 165 U.S. 275 (1897), to argue that if an agreement is voluntary at its inception, it can never become involuntary. *See*

ECF No. 270 at PageID.5025–26. True, in *Robinson*, the Supreme Court held that a seaman could not enter into a valid contract voluntarily and later claim the contract constituted involuntary servitude. 165 U.S. at 280–81. But the key distinction is the existence of a valid contract in *Robinson*. It is logical that an individual may relinquish some liberties in exchange "for a valuable consideration," and a later change of heart does not transform the initial contract into involuntary servitude. *Id.* at 280. But here, there are no allegations that Taylor entered into contracts with any KOGGC members, rendering *Robinson* distinguishable.

Of course, at trial, Taylor remains free to produce evidence that KOGGC members always participated voluntarily. But on the face of the Indictment, the Government has sufficiently alleged that KOGGC members were forced to provide "labor or services" as defined in § 1859. And because the Indictment alleges all three elements of the forced labor charge, Taylor's motion to dismiss will be denied.

*4. Motion to Strike*

While the motion to dismiss was pending, Defendants also moved to strike the allegations of sexually explicit communications from the Second Superseding Indictment, arguing they are surplusage that serves only to smear their character. ECF No. 272. Defendants separately filed exhibits in support of this motion. ECF No. 273. The Government responds that these allegations are properly considered part of the forced-labor conspiracy charges. ECF No. 276. This Court

finds that the sexual allegations are not surplusage, and will deny Defendants' motion to strike.

Criminal Rule 7(d) provides that "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." FED. R. CRIM. P. 7(d). This "Rule is properly invoked when an indictment contains nonessential allegations that could prejudicially impress the jurors." *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974). The Rule applies only where it is clear that the language is irrelevant and prejudicial. *See United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993). In other words, "if the language in the indictment is information which the [G]overnment hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *Id.* (citation omitted). Finally, the Rule is to be "strictly construed against striking surplusage." *Kemper*, 503 F.2d at 329.

Given this Court's finding that the allegedly coercive sexual messages constitute "labor or services" within the meaning of § 1589, this Court finds that the Indictment only includes information the Government "hopes to properly prove at trial." *See Moss*, 9 F.3d at 550. In turn, the sexual allegations are not surplusage, despite their prejudicial nature. *See id.* For the same reason, Defendants' argument that the challenged allegations are, in effect, inadmissible other-acts evidence, *see* ECF No. 272 at PageID.5092–95, is unavailing, *see Moss*, 9 F.3d at 550. Again, this

Court concludes that the sexual allegations are part and parcel of the forced labor conspiracy. *See, e.g.*, *Ricchio*, 853 F.3d at 556; *Marcus*, 628 F.3d at 42–46; *Kaufman*, 546 F.3d at 1262. Therefore, these allegations are not surplusage, and the motion to strike will be denied.

**C. Constitutionality of § 1589**

Brannon also argues that the Indictment must be dismissed because § 1589, as applied, is unconstitutional because it criminalizes conditions of "involuntary servitude" beyond those contemplated by the Thirteenth Amendment. *See* ECF No. 226 at PageID.3554. The Government responds that Congress's authority to enact legislation under the Thirteenth Amendment extends far more broadly. *See* ECF No. 245 at PageID.4828–29. This Court finds that § 1589 is constitutional as applied to the present matter.

Section 1589 was "passed to implement the Thirteenth Amendment against slavery or involuntary servitude." *Toviave*, 761 F.3d at 629. Brannon argues that the Thirteenth Amendment only prohibits "involuntary servitude" as the term was understood at the time of enactment. ECF No. 226 at PageID.3551. Then, Brannon cites *United States v. Kozminski*, 487 U.S. 931, 943 (1988), for the proposition that involuntary servitude (as the term is used in 18 U.S.C. § 1584) encompasses legal and physical coercion, but not psychological coercion. ECF No. 226 at PageID.3552.

Therefore, Brannon argues, § 1589 is overbroad as written because it purports to encompass psychological coercion. *Id.*

Brannon's argument misses several important points. First, in *Kozminski*, the Supreme Court addressed only the definition of "involuntary servitude" in § 1584; it explicitly declined to "draw conclusions about the potential scope of the Thirteenth Amendment." 487 U.S. at 944. In response to *Kozminski*'s holding, Congress amended § 1589 to *expand* the definition of involuntary servitude. *See United States v. Calimlim*, 538 F.3d 706, 714 (7th Cir. 2008). This amendment did not stray beyond Congress's Thirteenth Amendment authority because, as the Supreme Court held long ago, the Thirteenth Amendment "denounces a status or condition [of involuntary servitude], irrespective of the manner or authority by which it is created." *Clyatt v. United States*, 197 U.S. 207, 216 (1905). *Clyatt* is still good law, having been reinforced in 1971 by *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971). There, the Supreme Court held that Congress's authority to enact legislation under the Thirteenth Amendment includes the authority to regulate conduct "beyond the actual imposition of slavery or involuntary servitude." 403 U.S. at 105. *See also, e.g.*, *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 441 (1968) ("Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination

into effective legislation.”). The Supreme Court explicitly declined to revisit this issue in *Kozminski*, 487 U.S. at 944, meaning *Clyatt* and *Griffin* remain binding.

This Court finds that § 1589 is valid legislation enforcing the Thirteenth Amendment.[9] Brannon’s motion will therefore be denied.

**D. RFRA Defense**

*1. Legal Standard*

RFRA provides broader protections than the First Amendment. *See* 42 U.S.C. § 2000bb *et seq.*; *Holt*, 574 U.S. at 652. A defendant may raise a RFRA defense to a federal prosecution. *See* 42 U.S.C. § 2000bb-1. However, because this Court must view the Indictment’s factual allegations as true and only determine whether that Indictment is valid on its face, this Court must resolve any factual issues in favor of the Indictment. *United States v. Winddancer*, 435 F. Supp. 2d 687, 691 (M.D. Tenn. 2006) (citing *Costello*, 350 U.S. at 363).

A RFRA defense has two stages. First, the defendant bears the burden of demonstrating a prima facie case by showing that the government’s action (1) substantially burdens (2) a religious belief (3) that is sincerely held. *See Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 428

[9] In turn, this Court need not engage in Brannon’s framework of analyzing each tenant of KOGGC’s religion and comparing it to African slavery.

(2006). If the defendant establishes a prima face case, the burden then shifts to the government to prove that the burden (1) furthers a compelling governmental interest, and (2) is the least restrictive means of achieving that interest. 42 U.S.C. § 2000bb-1.

*2. Taylor's Prima Facie Case*

Taylor argues that the prosecution itself is a substantial burden, as is the Government's seizure of KOGGC's property. *See* ECF No. 218 at PageID.3341–45. The Government does not challenge that Taylor has presented evidence of a sincerely held religious belief. *See* ECF No. 245 at PageID.4811. Rather, it argues that Taylor has not established that this prosecution is a substantial burden. *Id.* at PageID.4811–17. This Court finds that the prosecution is a substantial burden, meaning Taylor has established a prima facie case.

A statute burdens the free exercise of religion if it "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.,* 450 U.S. 707, 718 (1981). An obvious example of such substantial pressure is when a statute, if enforced, "results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution." *Braunfeld v. Brown,* 366 U.S. 599, 605 (1961); *see also O Centro*, 546 U.S. at 425 (conceding prosecution would substantially burden sincere exercise of religion). Here, Taylor argues that he faces criminal prosecution for the way in which

he chooses to exercise his religious beliefs. This is sufficient to establish a prima facie case under RFRA.

*3. Strict Scrutiny*

Having found that Taylor has established a prima facie case that the prosecution itself substantially burdens his religious exercise, the burden shifts to the Government to prove a compelling interest in prosecuting him for these specific practices. *See* 42 U.S.C. § 2000bb-1. And the Government must show that the prosecution is the least restrictive means of advancing that interest. *See id.*

a. Compelling Interest

Taylor concedes that preventing forced labor is a compelling government interest in the abstract, but argues that here, the Government has no interest in prosecuting Taylor for these specific practices as applied to these specific congregants. ECF No. 218 at PageID.3345–49 (citing *O Centro*, 546 U.S. at 218). The Government responds that it has a compelling interest in protecting the victims of Taylor's crimes and in uniformly enforcing human trafficking laws to eradicate modern slavery. *See* ECF No. 245 at PageID.4818–20.

There exists a "legitimate and compelling state interest in protecting the community from crime [that] cannot be doubted." *Schall v. Martin*, 467 U.S. 253, 264 (1984). The Government also has a compelling interest in protecting the victims of crime. *See United States v. Epstein*, 91 F. Supp. 3d 573, 584 (D.N.J. 2015) ("[T]he

duty to prosecute persons who commit serious crimes is part and parcel of the government's paramount responsibility for the general safety and welfare of all its citizens" (citation omitted)). The Government's prosecution here is intimately tied to this compelling interest, and the Government has satisfied its burden here.

Taylor responds that this is too broad of a compelling interest. In essence, he argues, the Government's interest is in the application of § 1589 broadly, rather than against him individually. ECF No. 218 at PageID.3347. True enough, the Government cannot simply claim it needs to enforce the law broadly. *See O Centro*, 546 U.S. at 218. But here, where the Government has identified specific victims it seeks to protect and specific crimes it seeks to prevent, this Court finds the Government's interest is sufficiently narrow. *See Epstein*, 91 F. Supp. 3d at 584.

b. Least Restrictive Means

Finally, Taylor argues that the Government's prosecution of him is not the least restrictive means of enforcing any compelling interest. ECF No. 218 at PageID.3349–51. The Government responds that there is no other effective means to enforce its compelling interest in protecting victims. ECF No. 245 at PageID.4821–26.

The Sixth Circuit has described the least-restrictive-means test as considering "the extent to which accommodation of the [plaintiff] would impede the state's objectives," explaining further "that [w]hether the state has made this showing

depends on a comparison of the cost to the government of altering its activity to allow the religious practice to continue unimpeded versus the cost to the religious interest imposed by the government activity." *Legatus v. Sebelius*, 988 F. Supp. 2d 794, 810 (E.D. Mich. 2013) (quoting *S. Ridge Baptist Church v. Indus. Comm'n*, 911 F.2d 1203, 1206 (6th Cir. 1990)).

In this case, there is no way for the Government to enforce its interest in protecting KOGGC's victims without enforcing § 1589 via criminal prosecution. *See, e.g.*, *Epstein*, 91 F. Supp. 3d 586 (finding no other "effective means than prosecuting those who commit a crime of violence . . . to enforce the Government's compelling interest"). The Government has shown that there are no adequate, less restrictive options. For example, courts have rejected defendants' suggestions that a public warning is a more appropriate means to enforce the Government's compelling interest. *See id.* at 586. And there is no regulatory regime that can prevent this kind of behavior.[10] *See, e.g.*, *Holt*, 574 U.S. at 365–66 (considering various regulations that would serve the same purpose in the least-restrictive-means analysis). This is not a case where requiring KOGGC to obtain a permit, for example, satisfies the same interest as does the prosecution—there is no valid permitting process for

---

[10] Taylor argues that regulatory frameworks governing labor and nonprofit organizations could be applied, but in the same brief, Taylor notes that there is *no* regulatory framework for religious organizations. *Compare* ECF No. 218 at PageID.3349 *with id.* at PageID.3330–31. Therefore, this Court finds Taylor's proposed regulatory framework is not a valid less restrictive option.

obtaining forced labor. *See, e.g.*, *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 473 (5th Cir. 2014) (holding that imposing a permit process for obtaining a feather from an eagle is a possible less-restrictive means of protecting the compelling government interest in protecting eagles than imposing criminal penalties for obtaining feathers). Therefore, this Court finds that the Government has met its burden of showing that this prosecution is the least restrictive means of enforcing the Government's compelling state interest. In turn, Taylor's RFRA defense is no bar to prosecution.

In sum, this Court finds that neither the First Amendment nor RFRA is a bar to prosecution, and the Indictment is sufficiently pled.

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Taylor's Motion to Dismiss the Second Superseding Indictment, ECF No. 217, is **DENIED**.

It is further **ORDERED** that Brannon's Motion to Dismiss the Second Superseding Indictment, ECF No. 226, is **DENIED**.

It is further **ORDERED** that Defendants' Motion to Strike, ECF Nos. 272; 273 (sealed), is **DENIED**.

It is further **ORDERED** that Defendants' Motion to Seal, ECF No. 275, is **GRANTED**, hereby **SEALING** the Exhibits in ECF No. 273.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: November 9, 2026